**KOELLER, NEBEKER, CARLSON & HALUCK LLP**
David C. Bass (Cal. Bar No. 296380)
david.bass@knchlaw.com
Jerome Satran (Cal Bar. No. 188286)
jerry.satran@knchlaw.com
1478 Stone Point Drive, Suite 435
Roseville, CA 95661
(916) 724-5700
(916) 788-2850 (fax)

**INSTITUTE FOR JUSTICE**
Dan Alban (*pro hac vice* forthcoming)
dalban@ij.org
Kirby Thomas West (*pro hac vice* forthcoming)
kwest@ij.org
901 North Glebe Road, Suite 900
Arlington, VA 22203
(703) 682-9320
(703) 682-9321 (fax)

*Counsel for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
## EASTERN DIVISION

| | |
|---|---|
| EMPYREAL ENTERPRISES, LLC, d/b/a EMPYREAL LOGISTICS<br><br>Plaintiff,<br><br>v.<br><br>The United States of America; the U.S. Department of Justice; Attorney General MERRICK GARLAND, in his official capacity; the Federal Bureau of Investigation; CHRISTOPHER A. WRAY, Director of the Federal Bureau of Investigation, in his official capacity; KRISTI KOONS JOHNSON, Assistant Director of the Federal Bureau of | Case No.: 5:22-cv-94<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Investigation overseeing the FBI's Los Angeles Field Office, in her official capacity; the Drug Enforcement Administration; ANNE MILGRAM, Administrator of the Drug Enforcement Administration, in her official capacity; SHANNON D. DICUS, San Bernardino County Sheriff-Coroner, in his official capacity as the head of the San Bernardino County Sheriff's Office.

Defendants.

## INTRODUCTION

This is a civil rights lawsuit challenging the repeated and continuing highway robberies of armored cars by government agents. Specifically, Plaintiff Empyreal Logistics ("Empyreal"), a cash-in-transit company operating in 28 states, challenges the ongoing stops and searches of its vehicles, and the seizure of cash and other property lawfully transported therein. These unlawful and unconstitutional stops, searches, and seizures are orchestrated by the Department of Justice ("DOJ") and its subordinate law-enforcement agencies, including the Federal Bureau of Investigation ("FBI") and the Drug Enforcement Administration ("DEA"), in conjunction with local law-enforcement officials, including the San Bernardino County Sheriff (the "Sheriff"). Together, these law-enforcement agencies are targeting armored vehicles owned by Empyreal because those vehicles are transporting cash proceeds from state-legal medical and adult-use cannabis dispensaries to legitimate financial institutions such as banks and credit unions. Notably, Empyreal never transports any actual cannabis. Empyreal also provides cash transport services for traditional, non-cannabis businesses, such as restaurants and convenience stores. Empyreal and its clients operate in full compliance with applicable state cannabis laws and all applicable federal and state money laundering

compliance requirements, including the anti-money laundering requirements of the Banking Secrecy Act and applicable regulatory guidance issued by the Financial Crimes Enforcement Network ("FinCEN").

Despite this, sheriff's deputies are conducting pretextual stops of Empyreal's armored vehicles, searching them, and seizing the cash contents—covering up their surveillance cameras and sometimes damaging Empyreal's vehicles to access the cash in their secured vaults—and are then turning the seized cash over to federal law-enforcement for forfeiture proceedings under the federal equitable sharing program. Since mid-May 2021, Empyreal's vehicles have been stopped and searched by sheriff's deputies five times, including **three times in the past eight weeks** in San Bernardino County, California.  Three of those stops resulted in seizures of the cash contents of Empyreal's vehicles: once in May 2021 in Dickinson County, Kansas, and again in November 2021 and December 2021 in San Bernardino County, California.

These ongoing stops, searches, and seizures are beyond the statutory authority of the law-enforcement agencies involved and violate Empyreal's constitutional rights under the Fourth, Fifth, and Fourteenth Amendments to the U.S. Constitution. There is no legitimate reason that San Bernardino County Sheriff's deputies should be targeting a state-sanctioned business that is operating lawfully under California law. And there is no legitimate reason for federal agencies to be targeting a business that provides financial infrastructure support for the state-legal medical cannabis industry, particularly when DOJ is forbidden from spending federal funds to do so under the appropriations rider known as the Rohrabacher-Farr Amendment. Even if these agencies were genuinely concerned about whether Empyreal's clients are acting in full compliance with the law, it makes no sense to confiscate lawfully collected currency from Empyreal's vehicles as it is delivered safely to the financial system for greater transparency instead of investigating or enforcing against any

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

businesses suspected to be non-compliant. The real reason Empyreal is being targeted is because it is very profitable for these law-enforcement agencies to seize the cash proceeds that Empyreal is transporting and keep that money using civil forfeiture.

These repeated, ongoing stops, searches, and seizures are costly to Empyreal and extremely disruptive to its business. Empyreal has been forced to suspend business operations in the largest county in the United States, San Bernardino County, and has stopped driving through Kansas. Empyreal has lost customers because of these incidents, has been unable to roll out new services in multiple states because of informed concerns about similar seizures occurring in those states, and is constrained from growing its services in Southern California, a key market. If these incidents continue to occur—and there is every indication they will—it will threaten Empyreal's business model and its ability to continue providing financial infrastructure for the state-legal medical cannabis industry by safely moving cash from business premises into the legal banking system for greater transparency. Accordingly, Empyreal seeks not only permanent injunctive and declaratory relief, but also seeks immediate injunctive and declaratory relief in the form of a Temporary Restraining Order and a preliminary injunction so that it can resume business operations in San Bernardino County and is not forced to suspend further business operations in California or elsewhere during the pendency of this lawsuit.

### JURISDICTION AND VENUE

1.  Plaintiff seeks prospective declaratory and injunctive relief against the Defendants' coordination of, and participation in, the ongoing unlawful and unconstitutional stops, searches, and seizures of its property, detentions of its employees, and seizures of the property of Plaintiff's clients in Plaintiff's lawful possession at the time of the stops and searches.

2.   Plaintiff brings a statutory *ultra vires* claim, a Fourth Amendment claim, and a Fifth Amendment claim against the United States of America; DOJ; Attorney General Merrick Garland, in his official capacity; FBI; FBI Director Christopher Wray, in his official capacity; Assistant FBI Director Kristi Koons Johnson, in her official capacity; DEA; and DEA Administrator Anne Milgram, in her official capacity (collectively, the "Federal Defendants") under the Administrative Procedure Act, 5 U.S.C. § 702, and the Declaratory Judgments Act, 28 U.S.C. §§ 2201, 2202, as well as directly under the United States Constitution.

3.   Plaintiff brings its Fourth and Fourteenth Amendment claims against San Bernardino County Sheriff-Coroner Shannon D. Dicus ("Sheriff Dicus" or the "Sheriff") in his official capacity as the head of the San Bernardino County Sheriff's Department (the "Sheriff's Department") under 42 U.S.C. § 1983.

4.   Plaintiff brings its *ultra vires* claim against Sheriff Dicus pursuant to taxpayer standing under California common law. *See Cal. DUI Lawyers Ass'n v. Cal. Dep't of Motor Vehicles*, 20 Cal. App. 5th 1247, 1264, 229 Cal. Rptr. 3d 787, 800 (2018) ("[A] governmental agency that acts outside of the scope of its statutory authority acts *ultra vires* and the act is void.").

5.   This Court has subject-matter jurisdiction under 28 U.S.C. § 1331, as five of Plaintiff's six claims arise under federal law.

6.   This Court has supplemental jurisdiction over Plaintiff's state law claim against Sheriff Dicus under 28 U.S.C. § 1367(a).

7.   Venue is proper in the United States District Court for the Central District of California under 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1) because the two most recent seizures of Plaintiff's property occurred in San Bernardino County, California. San Bernardino County is in the Eastern Division of the Central District of California.

## PARTIES

### Plaintiff

8. Plaintiff Empyreal Enterprises, LLC, d/b/a Empyreal Logistics ("Empyreal") is a Pennsylvania limited liability company in good standing with the Pennsylvania Bureau of Corporations and Charitable Organizations.

9. Empyreal is headquartered in Bethel Park, Pennsylvania.

10. Empyreal has over 200 employees in 13 offices.

11. Empyreal operates a cash-in-transit (armored car) business in approximately 28 states, including California.

12. Unlike traditional armored-car companies, Empyreal operates discreetly, using state-of-the art technology and surveillance systems in its vehicle fleet.

13. Empyreal serves financial institutions that work with state-legal medical cannabis businesses in numerous states, including California, offering secure cash collection and transport, deposit validation at secure vault locations, as well as standard cash services to businesses and financial institutions.

14. Empyreal offers these same cash management services to financial institutions that service state-licensed adult-use cannabis businesses.

15. Empyreal's clients include both financial institutions and the state-legal cannabis businesses with which they do business.

16. Empyreal also provides its cash logistics services to clients in other businesses outside the cannabis industry.

### Defendants

17. Defendant DOJ is the federal executive department responsible for the enforcement of federal law in the United States.

18. Defendant Merrick Garland ("AG Garland") is sued in his official capacity as Attorney General of the United States.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

19. As Attorney General, AG Garland supervises, directs, and coordinates the operations of DOJ, and the agencies operating under its aegis.

20. These agencies include, among others, FBI, DEA, and the U.S. Marshals Service.

21. DOJ agencies such as FBI and DEA also participate in joint task forces and joint investigations with state or local law-enforcement agencies. These federal task forces include federal Task Force Officers, local or state law-enforcement officers who are cross-sworn as federal officers.

22. Federal task forces connected to DOJ agencies such as FBI and DEA operate in San Bernardino County, California, in Dickinson County, Kansas, and across the nation.

23. DOJ coordinates the activities of federal task forces and joint investigations in conjunction with DOJ agencies and state and local law enforcement, particularly when their operations involve multiple states, jurisdictions, or DOJ agencies.

24. DOJ also operates the federal equitable sharing program, which partners with state and local law-enforcement agencies to process the property seized by those agencies through the federal forfeiture process and then distributes up to 80% of the forfeiture proceeds back to those agencies.

25. Defendant FBI is a federal intelligence and law enforcement agency, responsible for investigating and enforcing various federal crimes.

26. In addition to FBI agents who are exclusively federal employees, FBI includes FBI Task Force Officers, who are state and local law enforcement officers cross-sworn as FBI agents.

27. Defendant Christopher A. Wray ("Director Wray") is sued in his official capacity as the Director of the FBI.

28. Director Wray is responsible for supervising and directing the agency's operations.

29. Defendant Kristi Koons Johnson ("Assistant Director Johnson") is sued in her official capacity as Assistant Director of the FBI overseeing the FBI's Los Angeles Field Office.

30. The Los Angeles Field Office of the FBI conducts investigations related to the enforcement of federal law throughout the Central District of California, including in San Bernardino County.

31. Consequently, Assistant Director Johnson is responsible for the oversight and direction of FBI operations in San Bernardino County.

32. One or more FBI task forces operates in San Bernardino County.

33. Defendant DEA is a federal agency responsible for enforcing federal drug crimes in the United States.

34. In addition to DEA agents who are exclusively federal employees, DEA includes DEA Task Force Officers, who are state and local law enforcement officers cross-sworn as DEA agents.

35. One or more DEA task forces operates in San Bernardino County, California, in Dickinson County, Kansas, and in many other jurisdictions across the nation.

36. Defendant Anne Milgram ("Administrator Milgram") is sued in her official capacity as Administrator of the DEA.

37. As DEA Administrator, Administrator Milgram is responsible for supervising and directing the agency's operations.

38. Defendant Sheriff Dicus is the acting Sheriff-Coroner of San Bernardino County.

39. Sheriff Dicus is sued in his official capacity as Sheriff-Coroner of San Bernardino County.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

40. Under the California Constitution, Sheriff Dicus holds his office as an officer of the local county government.

41. In his capacity as Sheriff of San Bernardino County, Sheriff Dicus is the chief law enforcement officer of San Bernardino County and the head of the Sheriff's Department.

42. In his capacity as Sheriff of San Bernardino County, Sheriff Dicus has final authority over the Sheriff's Department policies, practices, administration, and enforcement.

43. The Sheriff's Department participates in multiple federal task forces, including both FBI and DEA task forces.

44. The Sheriff's Department participates in DOJ's federal equitable sharing program, which distributes up to 80% of forfeiture proceeds from property seized by local law-enforcement agencies directly back to those agencies.

### FACTUAL ALLEGATIONS

#### *Empyreal's Business*

45. Empyreal operates a cash-in-transit (armored car) business in approximately 28 states, including California.

46. Empyreal offers a variety of cash management solutions including cash collection and transport, deposit validation at secure vault locations, and delivery of the cash into the national banking system for greater transparency and tracking.

47. Empyreal is run by CEO Deirdra O'Gorman, who has more than 26 years of experience as a financial services executive and also runs a compliance firm that works with financial institutions to build compliance programs, with adherence to the enhanced due diligence compliance standards required by FinCEN.

48. Although its services mirror those offered by traditional armored-car companies, Empyreal's business model is unique as it relies on a multi-faceted approach that utilizes technology-based security solutions along with traditional approaches to armored transport.

49. Most of Empyreal's cannabis-industry clients hold medical cannabis licenses.

50. A significant percentage of Empyreal's cash-in-transit business does not involve the cannabis industry. These clients include restaurants, convenience stores, and other cash-intensive businesses.

51. With respect to its cannabis-industry clients, Empyreal contracts only with state-legal cannabis businesses that have established banking relationships with financial institutions with anti-money laundering law programs implemented pursuant to the 2014 FinCEN Guidance Regarding Marijuana-related Business ("2014 FinCEN Guidance") and applicable state-issued guidance.

52. Empyreal's financial institution clients must also conduct extensive initial and on-going due diligence of cannabis industry customers to ensure compliance with their Bank Secrecy Act obligations and other regulatory requirements, including filing marijuana-related Suspicious Activity Reports (SARs) to comply with the 2014 FinCEN Guidance.

53. Approximately 20% of Empyreal's business is in California, including business that originates in California but is served by Empyreal branches operating from nearby states.

54. Many of Empyreal's existing clients in California have requested that Empyreal expand services in California in the near future.

55. Absent interference by Defendants, such as the events described in this lawsuit, Empyreal projects it will double its business in California next year.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

*Defendants Are Targeting Empyreal's Vehicles*

56. Empyreal's vehicles have been repeatedly targeted by Defendants for stops, searches, and seizures based on the fact that Defendants know that Empyreal vehicles are transporting the cash proceeds of state-legal cannabis businesses and want to seize that money and forfeit it using civil forfeiture.

57. Upon information and belief, DOJ is coordinating a federal effort across multiple states, jurisdictions, and DOJ agencies—in cooperation with multiple state and/or local law-enforcement agencies via joint task forces or joint investigations—to target Empyreal vehicles for stops and searches in order to seize and forfeit the cash proceeds of state-legal cannabis businesses that Empyreal is transporting and forfeit those cash proceeds using civil forfeiture.

58. The traffic stops of Empyreal's vehicles leading to the searches of those vehicles and the seizures of their contents are pretextual.

59. Not a single traffic citation was issued to an Empyreal driver during any of the traffic stops discussed in this complaint.

60. No criminal charges have been brought against Empyreal or any of its employees relating to any of the traffic stops, searches, or seizures discussed in this complaint.

61. No criminal charges have been brought against any of Empyreal's clients relating to any of the traffic stops, searches, or seizures discussed in this complaint.

62. Empyreal's vehicles have been stopped and searched by sheriff's deputies at least five times: on May 17, 2021 in Dickinson County, Kansas (the "May 17 stop"); on May 18, 2021 in Dickinson County, Kansas (the "May 18 seizure"); on November 16, 2021 in San Bernardino County, California (the "November 16 seizure"); on December 9, 2021 in San Bernardino County, California (the

"December 9 seizure"); and on January 6, 2022 (the "January 6 stop") in San Bernardino County, California.

63.   Upon information and belief, the Federal Defendants were involved in conducting the first two stops and/or seizures in Dickinson County, Kansas, while all of the Defendants were involved in conducting the latter three stops and/or seizures in San Bernardino County, California.

64.   On May 17, 2021, the Dickinson County Sheriff's Office in Dickinson County, Kansas stopped an Empyreal vehicle eastbound on I-70 based on an allegedly obscured license plate tag. Upon information and belief, this was a pretextual stop done in conjunction with a DEA task force.

65.   The Empyreal vehicle was not transporting any cash proceeds during the May 17 stop, so no seizure occurred, but the deputy questioned the Empyreal driver extensively about the purpose of the trip, asking many questions that were unrelated to the alleged license plate tag issue, demanded to see the driver's manifest without cause, and searched the vehicle.

66.   On May 18, 2021, the Dickinson County Sheriff's Office in Dickinson County, Kansas stopped, searched, and seized approximately $165,620 from an Empyreal vehicle westbound on I-70, working in conjunction with a DEA task force.

67.   The cash proceeds being transported by Empyreal's vehicle during the May 18 seizure were entirely from state-licensed medical cannabis dispensaries operating lawfully under Missouri law in Kansas City, Missouri.

68.   On September 3, 2021, the United States of America filed a civil forfeiture complaint in the United States District Court for the District of Kansas seeking civil forfeiture of the cash seized in the May 18 seizure. DEA special agent Bryson Wheeler was the affiant for the affidavit accompanying that forfeiture complaint. According to that complaint, the DEA conducted surveillance of the

Empyreal vehicle as it visited state-legal medical cannabis dispensaries in Kansas City, Missouri to pick up the currency prior to the May 18 seizure.

69. Three times in the past eight weeks, the San Bernardino County Sheriff's Department in California has stopped and searched Empyreal vehicles as their drivers lawfully conducted Empyreal business. Two of those stops resulted in seizures of the vehicles' contents.

70. Upon information and belief, the Sheriff's Department is working in coordination with one or more of the Federal Defendants to orchestrate these ongoing seizures.

71. On November 16, 2021, San Bernardino County Sheriff's Department deputies stopped and seized approximately $700,000 in legal currency from one of Empyreal's vehicles, seized the vehicle itself, and seized the driver's business and personal cellphones. In the process, the government caused significant, unnecessary damage to the vehicle and the technology therein.

72. The cash proceeds being transported by Empyreal's vehicle during the November 16 seizure were entirely from state-licensed cannabis businesses in good standing, operating lawfully under California law.

73. Three of the four cannabis businesses whose cash proceeds were seized during the November 16 seizure hold California medical cannabis licenses.

74. Upon information and belief, the San Bernardino County Sheriff's Department was working in conjunction with the FBI and/or one or more of the Federal Defendants during or shortly after the November 16 seizure.

75. On December 9, 2021, San Bernardino County Sheriff's Department deputies stopped and seized approximately $350,000 in legal currency from one of Empyreal's vehicles.

76. The cash proceeds being transported by Empyreal's vehicle during the December 9 seizure were entirely from state-licensed cannabis businesses operating lawfully under California law.

77. All four of the cannabis businesses whose cash proceeds were seized during the December 9 seizure hold California medical cannabis licenses.

78. Upon information and belief, the San Bernardino County Sheriff's Department was working in conjunction with a joint investigation or task force involving one or more of the Federal Defendants during or shortly after the December 9 seizure.

79. On January 6, 2022, one or more San Bernardino County Sheriff's Department deputies stopped and searched an Empyreal vehicle and interrogated the driver. The vehicle was not transporting any cannabis proceeds but was transporting coins from a non-cannabis business. Deputies declined to seize the coins once they realized they were from a non-cannabis business.

80. Upon information and belief, the approximately $1,050,000 in cash seized from Empyreal's vehicles in the two seizures by San Bernardino County Sheriff's Department has been transferred to one or more of the Federal Defendants and remains in the possession of one or more of the Federal Defendants.

81. Upon information and belief, one or more of the Federal Defendants will be pursuing civil forfeiture of the currency seized in the November 16 seizure and the December 9 seizure pursuant to the federal equitable sharing program.

82. No warrant was obtained for the search and seizure of Empyreal's vehicles or their contents for the May 18 seizure or the December 9 seizure.

83. Upon information and belief, Defendants are actively engaged in an ongoing effort to intercept or interdict Empyreal vehicles, stop them pretextually, search them, seize their monetary contents, and permanently keep the proceeds using civil forfeiture.

84. Upon information and belief, Defendants' ongoing effort targeting Empyreal vehicles does not take into account whether the cash proceeds being seized are from state-licensed medical cannabis dispensaries operating lawfully under the laws of the state in which they are located.

85. Upon information and belief, Defendants do not know whether the cash proceeds they are seizing from Empyreal vehicles are proceeds from medical cannabis, and Defendants take no measures to verify whether the proceeds are from medical cannabis or other state-legal, adult-use cannabis sales.

86. Upon information and belief, Defendants do not even necessarily know whether the cash proceeds they are seizing from Empyreal vehicles are from cannabis businesses or other types of businesses.

### *The May 17, 2021 Stop and Search*

87. On May 17, 2021, Dickinson County Sheriff's Deputy Kalen Robinson pulled over an Empyreal vehicle driven by an Empyreal employee eastbound on I-70 in Dickinson County, Kansas toward Kansas City, Missouri, allegedly because the Colorado license plate tag was slightly covered by the license plate holder.

88. Upon information and belief, the Empyreal vehicle's license plate tag was not actually covered and the May 17 stop was entirely pretextual and at least partly based on the vehicle having a Colorado license plate.

89. Upon information and belief, the May 17 stop was done in conjunction with one or more of the other Federal Defendants, including DEA and the local DEA task force.

90. No warrant was obtained to stop or search the vehicle.

91. Upon being questioned by Deputy Robinson about the purpose of the trip, the Empyreal driver answered all questions truthfully. The driver explained that the vehicle was going to pick up cash proceeds from state-licensed medical

cannabis dispensaries in Kansas City, Missouri the next day and then transport those cash proceeds back on I-70 westbound across Kansas.

92. Deputy Robinson demanded the route manifest and access to the vehicle without cause.

93. Deputy Robinson released the Empyreal driver without issuing a traffic citation, but the driver was then surveilled by DEA the next morning, May 18, 2021, as the Empyreal vehicle visited state-legal medical cannabis dispensaries in Kansas City, Missouri to pick up the cash proceeds for transportation to financial institutions.

*The May 18, 2021 Stop, Search, and Seizure*

94. On May 18, 2021, the same Empyreal driver and Empyreal vehicle were again pulled over in a traffic stop by Dickinson County Sheriff's Deputy Kalen Robinson while travelling westbound on I-70 in an Empyreal vehicle from Kanas City, Missouri to deliver approximately $165,620 in cash proceeds from state-legal medical cannabis dispensaries in Kansas City, Missouri to financial institutions in other states.

95. Upon information and belief, there was no legitimate reason for the traffic stop on May 18, which was entirely pretextual.

96. Upon information and belief, the traffic stop on May 18 was planned in advance by Dickinson County Sheriff's deputies and one or more of the Federal Defendants, including DEA and the local DEA task force.

97. Dickinson County Sheriff's deputies, working in conjunction with a DEA task force, interrogated the Empyreal driver, searched the vehicle, gained access to the secured vault, and seized the $165,620.

98. No warrant was obtained to search the vehicle or seize its contents.

99. To protect its business reputation, Empyreal reimbursed its clients the approximately $165,620 seized during the May 18 seizure, effectively indemnifying its clients, and thus has an interest in recovering the seized cash. If this cash is recovered, it will be used by Empyreal, since Empyreal has already reimbursed the other parties involved.

100. As a cash-in-transit business, Empyreal was acting as a bailee for its clients while transporting the $165,620 in cash seized during the May 18 seizure.

101. Empyreal has a possessory interest in the approximately $165,620 in cash seized during the May 18 seizure.

102. Empyreal owns the vehicle that was temporarily seized during the May 18 seizure.

103. Empyreal employs the driver, who was seized and detained during the May 18 seizure.

104. The Empyreal driver was not issued a traffic citation for either the May 17 traffic stop or the May 18 traffic stop.

105. The May 18 seizure was done without regard for whether the money was proceeds from state-legal medical cannabis dispensaries in Missouri.

106. The $165,620 was eventually transferred from the Dickinson County Sherriff's Department to DEA pursuant to federal equitable sharing.

107. Upon information and belief, the cash seized during the May 18 seizure remains in the possession of the DEA or one of the other Federal Defendants.

108. DEA sent a Notice of Seizure of Property and Initiation of Administrative Forfeiture Proceedings (a "CAFRA Notice") to Empyreal indicating that it was pursuing administrative forfeiture of the $165,620.

109. On September 3, 2021, the United States filed a civil forfeiture complaint seeking to forfeit the $165,620 in the United States District Court for the

District of Kansas. The affiant for the affidavit supporting the complaint was DEA Special Agent Bryson Wheeler.

### *The November 16, 2021 Stop, Search, and Seizure*

110. On November 16, 2021, San Bernardino County Sheriff's Deputy Jonathan Franco conducted a traffic stop of an Empyreal vehicle driven by an Empyreal employee in San Bernardino County, California, for allegedly driving too close to a semi-truck on the freeway.

111. Upon information and belief, there was no legitimate reason for the traffic stop on November 16, which was entirely pretextual.

112. At the time of the stop, the Empyreal vehicle was transporting approximately $700,000 in cash proceeds from state-licensed cannabis businesses operating lawfully under California law to legitimate financial institutions. Three of the four cannabis businesses hold California medical cannabis licenses.

113. Deputy Franco proceeded to ask the Empyreal driver to disclose information about what the Empyreal vehicle was transporting and after learning that the Empyreal vehicle was transporting cash, Deputy Franco asked many questions about the nature of Empyreal's business.

114. The Empyreal driver answered Deputy Franco's questions and offered to call his supervisors to provide any other requested information.

115. Deputy Franco then spoke with members of Empyreal's leadership team, including the current Senior Vice President of Operations at Empyreal, who is a former deputy sheriff.

116. Empyreal's leadership team explained to Deputy Franco the legitimacy of the business, where the cash was coming from and where it was going, the identity and licensure of the companies whose cash was being transported, and offered GPS data to confirm this information.

117. Despite these assurances and the offer of additional supporting information, Deputy Franco was joined by other law enforcement officers.

118. Upon arriving at the scene, law enforcement covered the vehicle's external cameras.

119. Law enforcement then seized the Empyreal driver's business and personal phones.

120. During the seizure, counsel for Empyreal was repeatedly denied any access to its driver.

121. The Sheriff's Department instead sought a search warrant to take the phones and seized cash on the grounds that they "were possessed by a person with the intent to use [them] as a means of committing a public offense or [are] possessed by another to whom he or she may have delivered [them] for the purpose of concealing [them] or preventing discovery" and that they "tend to show that a felony has been committed or that a particular person has committed a felony."

122. While they sought a search warrant, the Sheriff's Department continued to subject Empyreal's driver to extensive questioning about Empyreal's business operations, details of its cash logistics process, and other information considered by Empyreal to be trade secrets.

123. After securing the warrant, and without asking Empyreal for access to the money in the vehicle, law enforcement destroyed property in the armored vehicle in order to access the cash inside.

124. Law enforcement then seized approximately $700,000 from the vehicle and the vehicle itself.

125. While seizing the money, one of the deputies noted that each bag of cash had its own barcode from different companies and stated that they could not mix the money together because some companies might be able to "prove it's legit."

126. Upon information and belief, despite knowing the names of the companies whose proceeds they were seizing based on the labeling of the bags containing the cash, the deputies made no effort to inquire about whether any of those companies were state-licensed medical cannabis businesses, state-licensed adult use cannabis businesses, or otherwise "legit."

127. After they finished counting the money and announced the total amount seized, the deputies celebrated, exchanging the following statements with each other:

"Shut the front door!"

"No way, dude!"

"Nice."

"Way to go, buddy!"

"Wowee!"

"Good job, Will."

128. The November 16 seizure took more than four hours.

129. The Empyreal driver was not issued a traffic citation for the November 16 traffic stop.

130. To protect its business reputation, Empyreal reimbursed its clients the approximately $700,000 seized during the November 16 seizure, effectively indemnifying its clients, and thus has an interest in recovering the seized cash. If this cash is recovered, it will be used by Empyreal, since Empyreal has already reimbursed the other parties involved.

131. As a cash-in-transit business, Empyreal was acting as a bailee for its clients while transporting the $700,000 in cash seized during the November 16 seizure.

132. Empyreal has a possessory interest in the approximately $700,000 in cash seized during the November 16 seizure.

133. Empyreal owns the business phone seized from the Empyreal driver during the November 16 seizure.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

134. Empyreal owns the vehicle that was temporarily seized and seriously damaged during the November 16 seizure.

135. Empyreal employs the driver, who was detained for several hours during the November 16 seizure.

136. Based upon information provided to Empyreal's counsel by the San Bernardino County Sheriff's Department and the FBI, the property seized during the November 16 seizure was transferred to the FBI for civil forfeiture and has been issued an FBI tracking number.

137. Upon information and belief, the cash seized during the November 16 seizure remains in the possession of the FBI or one of the other Federal Defendants.

138. Upon information and belief, the FBI and/or DOJ will be pursuing civil forfeiture of the currency seized in the November 16 seizure pursuant to the federal equitable sharing program.

139. Empyreal has not yet received any notice of forfeiture related to the property seized during the November 16 seizure.

140. On November 30, 2021, counsel for Empyreal sent a mitigation packet to the Sheriff's Department in response to the November 16 seizure.

141. The mitigation packet contained a detailed nine-page letter further explaining Empyreal's operations and regulatory compliance, as well as other supporting documents. In the letter, counsel for Empyreal also requested the prompt return of the seized cash.

142. The Sheriff's Department has not responded to Empyreal's mitigation packet or request for communication and a prompt return of its seized funds, other than to confirm receipt of the mitigation packet.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

*The December 9, 2021 Stop, Search, and Seizure*

143. On December 9, 2021, in San Bernardino County, California, an Empyreal vehicle was again pulled over by San Bernardino County Sheriff's deputies while legally transporting cash from state-legal dispensaries to legitimate financial institutions.

144. The vehicle contained about $350,000 in cash proceeds from state-licensed cannabis businesses operating lawfully under California law to legitimate financial institutions. All four of the cannabis businesses hold California medical cannabis licenses.

145. Empyreal's vehicle was driven by the same Empyreal employee who drove the vehicle in the November 16 seizure.

146. Upon information and belief, deputies recognized the Empyreal vehicle or suspected that it was the same or similar Empyreal vehicle as the November 16 stop.

147. Deputies conducted a pretextual stop of the Empyreal vehicle, alleging that the driver had slightly exceeded the speed limit and prematurely activated his turn signal.

148. Upon information and belief, the driver's operation of the Empyreal vehicle was completely lawful.

149. In reality, the deputies had planned the stop in advance and would have pulled over the driver and the Empyreal vehicle regardless of how carefully or lawfully it was driven.

150. Upon information and belief, the same deputies conducted the December 9 stop and seizure that had conducted the November 16 stop and seizure, including Deputy Jonathan Franco.

151. One of the deputies said to the Empyreal driver: "You don't remember me do you? I remember you."

1   152. This time, the deputies had a drug-sniffing dog at the scene.

2   153. The deputies alleged that the dog alerted on the vehicle.

3   154. Upon information and belief, the dog did not alert on the vehicle. Video footage

4       from the vehicle does not show the dog alert on the vehicle. Instead, it shows

5       the dog is barely interested in the vehicle.

6   155. In reality, the basis for the search itself was pretextual and there was no probable

7       cause for the search.

8   156. Upon information and belief, the deputies had planned the search of the vehicle

9       and seizure of its cash contents in advance.

10  157. Deputies covered up or attempted to cover up the cameras on the exterior and

11      interior of the Empyreal vehicle but failed to disable audio recording

12      equipment.

13  158. One of the deputies told another deputy that he believed it was the same vehicle

14      as the November 16 seizure because they both had a crack in the windshield.

15  159. Deputies approached the driver and began asking questions.

16  160. Deputies asked the driver if there was anything illegal in the vehicle, and the

17      driver correctly answered that there was not.

18  161. Deputies ordered the driver to exit the vehicle.

19  162. Upon being questioned, the driver confirmed that the vehicle belonged to

20      Empyreal.

21  163. Deputies again questioned and interrogated the driver for several minutes about

22      the purpose of the trip and the nature of Empyreal's business.

23  164. One deputy told the driver: "If I stop you, I have the right to open the safe."

24  165. One deputy told the driver that "I do have the right to take the money" because

25      it was connected to "drugs," notwithstanding the fact that the money was

26      proceeds from medical and adult-use cannabis dispensaries operating legally

27      under California law.

28

166. The driver offered to call the CEO of Empyreal, who could explain the legality of Empyreal's business to the deputies, but they declined.

167. No warrant was obtained to search the vehicle or seize its contents.

168. Deputies searched the vehicle and found one or more manuals of Empyreal's procedures, which they began to read aloud and describe to each other. One deputy noted that one of the manuals specifically directs employees to not transport marijuana. Deputies seized the manual as evidence.

169. Deputies then gained access to the vehicle's secured vault using threat of force and seized the approximately $350,000 in cash in the vault.

170. The deputies counted the cash aloud in the vehicle. Before beginning the count, one of them apparently observed the physical amount of cash in the vehicle and said, "This is, uh, more small." Upon information and belief, he was comparing the December 9 seizure total to the November 16 seizure total.

171. After they finished counting the cash, one of the deputies said, "That's it?" and chuckled. He then said: "You set the bar too high." When another deputy remarked that he thought they'd get "a million or two," the deputy responded, "At least we got over a million."

172. Upon information and belief, the deputies were referring to the combined amounts of the November 16 and December 9 seizures, which total approximately $1,050,000.

173. After the cash was counted, one of the deputies remarked that there were "pretty small amounts [of cash] this time, huh?" Upon information and belief, he was comparing the December 9 seizure total to the November 16 seizure total.

174. Upon information and belief, despite knowing the names of the companies whose proceeds they were seizing based on the labeling of the bags containing the cash, the deputies made no effort to inquire about whether any of those

companies were state-licensed medical cannabis businesses or state-licensed adult use cannabis businesses.

175. After the stop, search, and seizure was completed, the deputies removed the covers that they had placed on the cameras in Empyreal's vehicle.

176. The December 9 seizure was much briefer than the November 16 seizure. Notably, the deputies appeared to already have a plan for the warrantless and pretextual stop, search, and seizure of the vehicle and its contents.

177. The Empyreal driver was not issued a traffic citation for the December 9 traffic stop.

178. To protect its business reputation, Empyreal reimbursed its clients the approximately $350,000 seized during the December 9 seizure, effectively indemnifying its clients, and thus has an interest in recovering the seized cash. If this cash is recovered, it will be used by Empyreal, since Empyreal has already reimbursed the other parties involved.

179. As a cash-in-transit business, Empyreal was acting as a bailee for its clients while transporting the $350,000 in cash seized during the December 9 seizure.

180. Empyreal has a possessory interest in the approximately $350,000 in cash seized during the December 9 seizure.

181. Empyreal owns the vehicle that was temporarily seized during the December 9 seizure.

182. Empyreal employs the driver who was again detained during the December 9 seizure.

183. Based upon information provided to Empyreal's counsel by the FBI on January 10, 2022, the property seized during the December 9 seizure was also transferred to the FBI for civil forfeiture.

184. Upon information and belief, the cash seized during the December 9 seizure remains in the possession of one of the Federal Defendants.

185. Upon information and belief, one or more of the Federal Defendants will be pursuing civil forfeiture of the currency seized in the December 9 seizure pursuant to the federal equitable sharing program.

186. Empyreal has not yet received any notice of forfeiture related to the December 9 seizure.

*January 6, 2022 Stop and Search*

187. On January 6, 2022, an Empyreal vehicle driven by an Empyreal driver was again stopped and searched by one or more San Bernardino County Sheriff's deputies in San Bernardino County, California.

188. Upon information and belief, the January 6 stop was a pretextual stop.

189. Upon information and belief, the January 6 stop was done in conjunction with one or more of the Federal Defendants.

190. No warrant was obtained to stop or search the vehicle.

191. Although Empyreal had suspended cash logistics operations in San Bernardino County after the December 9 seizure and instructed drivers on cash logistics trips not to enter San Bernardino County, this Empyreal driver was simply picking up an order of rolled coin boxes from Empyreal's vendor, which happens to be located in San Bernardino County, in order to replenish its rolled coin supply.

192. One or more deputies interrogated the Empyreal driver and searched the Empyreal vehicle.

193. The Empyreal vehicle was not transporting cannabis proceeds. It was transporting coins from a non-cannabis business (a rolled coin vendor).

194. Upon confirming that the coins were not related to cannabis, deputies did not seize the coins.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

195. Upon information and belief, had the coins been from a cannabis-related business, deputies would have seized the coins.

196. When the Empyreal driver asked a deputy why Empyreal vehicles were being stopped so frequently, the deputy told him it was "political" but declined to elaborate further.

197. Stopping vehicles based on "political" reasons is a pretextual and invalid reason for conducting a traffic stop.

198. Targeting Empyreal vehicles for stops, searches, and seizures for "political" reasons is an improper government motive for enforcement that exceeds the Sheriff's statutory authority and violates Empyreal's constitutional rights.

199. Deputies released the Empyreal driver and did not issue a traffic citation for the January 6 stop.

*California's Legal Cannabis Industry and Empyreal's Business Model*

200. Cannabis has been legal in California for medical use since 1996, when Californians voted to pass the Compassionate Use Act of 1996. Cal. Health & Safety Code § 11362.5.

201. Later, in November 2016, California voters also approved the Adult Use of Marijuana Act, which legalized the recreational use of cannabis.

202. In addition to protecting the use of cannabis, California law makes it legal for state-licensed dispensaries to sell cannabis for medical and recreational ("adult use") sales. Cal. Bus. & Prof. Code § 26000(b).

203. Under California law, local law enforcement is restricted from seizing and forfeiting the assets of state-legal cannabis operations. *See, e.g.*, *Granny Purps, Inc. v. County of Santa Cruz*, 53 Cal. App. 5th 1, 9, 266 Cal. Rptr. 3d 752, 758 (2020).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

204. As state-licensed dispensaries proliferated across the state, industry actors recognized a need for protection for financial transactions associated with cannabis businesses. *See* Assem. Com. on Banking and Finance, Analysis of Assem. Bill No. 1525 (2019–2020 Reg. Sess.).

205. Specifically, entities were reluctant to provide financial services to cannabis businesses because of the absence of a clear legal framework for providing those services. *See id.*

206. As a result, dispensaries and other state-legal cannabis businesses were often forced to keep large amounts of cash on hand, unable to deposit it with financial institutions. *See id.*

207. To address this problem, the California Legislature passed, and Governor Newsom signed, Assembly Bill 1525, which protects entities providing financial services to the legal cannabis industry. Cal. Bus. & Prof. Code § 26260(a).

208. Among other things, the new law made clear that "[a]n entity that . . . transports cash or financial instruments, or provides other financial services does not commit a crime under any California law . . . solely by virtue of the fact that the person receiving the benefit of any of those services engages in commercial cannabis activity as a licensee pursuant to this division." Cal. Bus. & Prof. Code § 26260(a).

209. Empyreal's business operations—transporting cash for financial institutions and state-legal dispensaries with which they contract—fall squarely within this statutory protection.

210. Financial service businesses like Empyreal are essential to the safety and efficient administration of California's state-legal cannabis industry.

211. The federal government still classifies cannabis as a Schedule 1 drug, but its enforcement powers are limited in states in which it is legal.

212. One such restriction is an appropriations rider known as the Rohrabacher-Farr Amendment. This Amendment prohibits the Department of Justice from spending funds "to prevent [states that have legalized marijuana] from implementing their own laws that authorize the use, distribution, possession, or cultivation of medical marijuana." Consolidated Appropriations Act 2021, Pub. L. No. 116-260, § 531, 134 Stat. 1283 (2020) (amended Dec. 3, 2021).

213. The Rohrabacher-Farr Amendment protects private entities operating cannabis dispensaries under state law and empowers them to enjoin prosecutions on this basis if they can show they were legally operating under state law. *United States v. McIntosh*, 833 F.3d 1163 (9th Cir. 2016); *Sierra Club v. Trump*, 929 F.3d 670, 695–96 (9th Cir. 2019).

*The "Equitable Sharing" Partnership Between*
*the Sheriff and the Federal Defendants*

214. Upon information and belief, the Sheriff is working with one or more of the Federal Defendants to seize and forfeit the proceeds of state-legal cannabis businesses.

215. Upon information and belief, the Sheriff is participating in DOJ's equitable sharing program with one or more of the Federal Defendants.

216. The Sheriff's decision to repeatedly seize money lawfully earned by Empyreal's clients and lawfully transported by Empyreal for its financial institution clients is motivated solely or primarily by the prospect of participating in DOJ's equitable sharing program and the subsequent receipt of direct payments to the Sheriff's Department of up to 80% of the forfeiture proceeds.

217. Under California law, the Sheriff would normally only be able to directly receive 65% of forfeiture proceeds from civil forfeitures done under state law.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

218. Under California law, the Sheriff cannot seize or otherwise participate in the civil forfeiture of the cash proceeds of cannabis businesses operating legally under California law.

219. Without participating in DOJ's equitable sharing program, the Sheriff would be unable to seize or keep any of the proceeds from forfeitures of cash proceeds seized from Empyreal vehicles under California law because they are cash proceeds from businesses operating legally under California law.

220. Unlike federal law, for a civil forfeiture of $40,000 or more in currency, California law requires proof by "clear and convincing evidence" that the property is subject to forfeiture. This is a more stringent standard than federal law.

221. Without participating in DOJ's equitable sharing program, any seizure by the Sheriff of $40,000 or more in U.S. currency—including all of the seizures of cash from Empyreal vehicles—would be subject to this higher burden of proof.

222. The DOJ's equitable sharing program permits local or state law-enforcement agencies to transfer seized property to a federal agency, which then processes the forfeiture under federal law and distributes the proceeds of forfeitures to cooperating state and local law enforcement agencies. Participating agencies are eligible for payments of up to 80% of the forfeiture proceeds.

223. There are two primary ways for local law enforcement to qualify for equitable sharing: by participating in a joint task force or investigation with federal law-enforcement, or through adoption, a process by which a federal agency takes control of property seized by state authorities, based on state law, and then investigates and prosecutes the case under federal law.

224. Upon information and belief, the Sheriff is participating in a joint task force or investigation with one or more of the Federal Defendants related to Empyreal, which is how it qualifies for equitable sharing. This enables the Sheriff's

Department to receive up to 80% of forfeiture proceeds related to the Empyreal seizures.

225. Upon information and belief, the joint task force involved in the November 16 seizure, the December 9 seizure, and the January 6 stop was the Inland Regional Narcotics Enforcement Team ("IRNET"), which is a joint task force lead by the San Bernadino County Sheriff's Department and composed of state and federal agencies, including DEA and FBI.

226. In the alternative, the Sheriff has referred or transferred the Empyreal seizures for adoption by one or more of the Federal Defendants. Although this would qualify the Sheriff's Department for equitable sharing under federal law, this would violate California law, which prohibits California law-enforcement agencies from participating in adoptive forfeitures. *See* Cal. Health & Safety Code § 11471.2(a) ("State or local law enforcement authorities shall not refer or otherwise transfer property seized under state law authorizing the seizure of property to a federal agency seeking the adoption of the seized property by the federal agency for proceeding with federal forfeiture under the federal Controlled Substances Act.").

227. In the alternative, by referring or transferring the Empyreal seizures for adoption by one or more of the Federal Defendants, the Sheriff is violating Cal. Health & Safety Code § 11471.2(a).

228. Every year, state and local law enforcement agencies collect hundreds of millions through equitable sharing. In 2019 alone, the federal government made $333.8 million in payments to state and local law enforcement through the program. From 2000 to 2019, that figure was $8.8 billion nationwide.

229. According to data made available online by DOJ, in the last five years, the San Bernardino County Sheriff's Department has directly received more than $4.2

1  million in equitable sharing proceeds, earned primarily through joint task
2  forces.

3  230. According to data made available online by DOJ, in the last five years, the
4  IRNET joint task force has received more than $15.8 million in equitable
5  sharing proceeds.

6  231. Upon information and belief, San Bernardino County Sheriff's deputies
7  contacted FBI and/or one or more of the other Federal Defendants during or
8  after seizing Empyreal's vehicle on November 16, 2021.

9  232. Upon information and belief, the Sheriff's Department again alerted one or
10 more of the Federal Defendants during or after stopping another Empyreal
11 vehicle on December 9, 2021.

12 233. Upon information and belief, the Sheriff's Department stopped the Empyreal
13 vehicle on December 9 because—after the November 16 seizure—they were
14 aware that the vehicle might contain a large amount of cash.

15 234. Upon information and belief, the Sheriff's Department stopped the Empyreal
16 vehicle on January 6, 2022 because—after the November 16 seizure and
17 December 9 seizure—they were aware that the vehicle might contain a large
18 amount of cash.

19 235. Upon information and belief, one or more of the Federal Defendants and the
20 Sheriff are actively engaged in an ongoing effort to intercept or interdict
21 Empyreal vehicles, stop them pretextually, search them, seize their monetary
22 contents, and permanently keep the proceeds using civil forfeiture.

23 236. Upon information and belief, the IRNET joint task force facilitates coordination
24 between the Sheriff and the Federal Defendants to intercept or interdict
25 Empyreal vehicles, stop them, search them, seize their monetary contents, and
26 permanently keep the proceeds using civil forfeiture.

27
28

237. Upon information and belief, the Sheriff has an ongoing policy, pattern, or practice of stopping Empyreal vehicles, searching them, seizing their cash contents, and turning the seized property over to one or more of the Federal Defendants for civil forfeiture, as described in the foregoing paragraphs of this complaint.

238. Upon information and belief, the IRNET joint task force, led by the San Bernardino Sheriff's Department, has an ongoing policy, pattern, or practice of stopping Empyreal vehicles, searching them, seizing their cash contents, and turning the seized property over to one or more of the Federal Defendants for civil forfeiture

239. Upon information and belief, the Federal Defendants, coordinated by DOJ, have an ongoing nationwide policy, pattern, or practice of coordinating with state and local law enforcement, including the San Bernardino County Sheriff's Department and the Dickinson County Sheriff's Department, through joint task forces such as IRNET, in an ongoing campaign to stop, search, and seize of Empyreal vehicles and their contents, and then pursue the civil forfeiture of their cash contents, as described in the foregoing paragraphs of this complaint.

## INJURY TO PLAINTIFF

240. Defendants' ongoing stops, searches, and seizures of Empyreal's vehicles and their contents—including the stop and search on May 17, 2021, the stops, searches, and seizures on May 18, 2021, November 16, 2021, and December 9, 2021, and the stop and search on January 6, 2022—have injured and continue to injure Empyreal, as described below.

241. Defendants' continued retention of the seized cash since the seizures constitute an ongoing injury to Empyreal, as described below.

242. Defendants' ongoing efforts to forfeit the seized cash constitutes an ongoing injury to Empyreal, as described below.

243. Defendants' ongoing policy, pattern, or practice of stopping and searching Empyreal vehicles, and then seizing their contents, constitutes an ongoing injury to Empyreal, as described below.

244. Defendants' ongoing campaign targeting Empyreal vehicles for interception or interdiction, followed by the seizure and attempted forfeiture of their contents, constitutes an ongoing injury to Empyreal, as described below.

245. Empyreal is being injured by being regularly subjected to pretextual stops, which unnecessarily delay and inconvenience its drivers and their vehicles, subject its drivers to additional legal hazards and dangers from unnecessary interaction with law enforcement, and violate the constitutional rights of both Empyreal and its drivers.

246. Empyreal is being injured by being regularly subjected to warrantless searches without reasonable suspicion or probable cause, which unnecessarily delay and inconvenience its drivers and their vehicles, subject its drivers to additional legal hazards and dangers from unnecessary interaction with law enforcement, and violate the constitutional rights of both Empyreal and its drivers.

247. Empyreal is being injured by being regularly subjected to stops, searches, and seizures for "political" reasons, which unnecessarily delay and inconvenience its drivers and their vehicles, subject its drivers to additional legal hazards and dangers from unnecessary interaction with law enforcement, and violate the constitutional rights of both Empyreal and its drivers.

248. Empyreal was injured by the seizure of approximately $165,620 in cash on May 18, 2021, which rendered it unable to perform a service—transportation of cash—for which it had been contracted by its clients.

249. Empyreal was injured by the necessity of reimbursing its clients for the approximately $165,620 in cash seized on May 18, 2021.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

250. Empyreal is injured by the continued inability to complete this contracted-for service as one or more of the Federal Defendants continue to retain the cash seized on May 18, 2021.

251. Empyreal is and will continue to be injured by the cost of contesting the forfeiture of the approximately $165,620 in cash seized on May 18, 2021, in order to secure its return.

252. Due to the May 18 seizure, Empyreal has re-routed its services for medical cannabis dispensaries in Kansas City, Missouri in order to avoid traveling through the State of Kansas, including Dickinson County, at substantial expense. This is particularly inconvenient because Kansas City, Missouri sits on the Kansas border, and is primarily served by I-70, which runs through Kansas, for westbound travel.

253. Empyreal was injured by the seizure of approximately $700,000 in cash on November 16, 2021, which rendered it unable to perform a service—transportation of cash—for which it had been contracted by its clients.

254. Empyreal was injured by the necessity of reimbursing its clients for the approximately $700,000 in cash seized on November 16, 2021.

255. Empyreal is injured by the continued inability to complete this contracted-for service as one or more of the Federal Defendants continue to retain the cash seized on November 16, 2021.

256. Empyreal was injured by the seizure and destruction of its property on November 16, 2021, requiring Empyreal to repair the vehicle's severely damaged security features.

257. Empyreal is and will continue to be injured by the cost of contesting the forfeiture of the approximately $700,000 in cash seized on November 16, 2021, in order to secure its return.

258. Empyreal was injured by the seizure of approximately $350,000 in cash on December 9, 2021, which rendered it unable to perform a service—transportation of cash—for which it had been contracted by its clients.

259. Empyreal was injured by the necessity of reimbursing its clients for the approximately $350,000 in cash seized on December 9, 2021.

260. Empyreal is injured by the continued inability to complete this contracted for service as one or more of the Defendants continues to retain the cash seized on December 9, 2021.

261. Empyreal is and will continue to be injured by the cost of contesting the forfeiture of the approximately $350,000 in cash seized on December 9, 2021, in order to secure its return.

262. Empyreal is injured by the Sheriff and one or more Federal Defendants seizing and covering the interior and exterior security cameras on its vehicles during the November 16 and December 9 seizures, which improperly interferes with Empyreal's property, impairs Empyreal's ability to protect and safeguard its property, and inhibits Empyreal's ability to gather facts about the incident to both defend against the forfeiture of the seized property and to pursue vindication of its statutory and constitutional rights, including through this lawsuit.

263. Because of these five stops of Empyreal vehicles, three of which occurred in the past eight weeks, Empyreal reasonably believes it is being targeted by the Federal Defendants.

264. Because of the two recent seizures in San Bernardino County, and three stops of Empyreal vehicles by Sheriff's deputies in the past eight weeks, and the comment by the Sheriff's deputy regarding the "political" motivation for the frequent stops, Empyreal reasonably believes it is being targeted by Sheriff Dicus and the San Bernardino County Sheriff's Department.

265. Being subject to repeated, ongoing stops, searches, and seizures by Defendants unjustifiably infringes on Empyreal's constitutionally protected rights and liberty interests, including its right to be free from unreasonable searches and seizures and its right to due process of law.

266. Being subject to repeated, ongoing stops, searches, and seizures by Defendants is extremely disruptive and costly to Empyreal and seriously jeopardizes Empyreal's ability to serve its clients, including medical cannabis businesses and non-cannabis clients.

267. For example, prior to the May 18 seizure, Empyreal had planned to start offering services for non-cannabis clients in three Midwestern states. But, upon information and belief, based on the May 18 seizure, law-enforcement agencies in those states have begun to keep a lookout for Empyreal vehicles to stop, search, and seize their contents. Because of this real risk of harassment and property loss, Empyreal has been unable to start offering services for non-cannabis customers in those three Midwestern states.

268. Being subject to repeated, ongoing stops, searches, and seizures by Defendants causes reputational harm and makes Empyreal's clients less likely to engage in business with Empyreal in the future.

269. Empyreal has lost business opportunities and potential clients because of the May 18 seizure in Kansas and reasonably expects the two California seizures to have a similarly negative effect on its business.

270. For example, Empyreal lost a potential client—the Colorado franchisee of a major fast-food chain—because of concerns the potential client had arising from the May 18 seizure.

271. Empyreal's competitors have used the May 18 seizure as a selling point for why Empyreal's clients and potential clients should do business with them instead, including in posts on social media websites such as LinkedIn.

272. As a result of the reputational harm Empyreal has suffered from the May 18 seizure, and that it reasonably anticipates suffering from the two California seizures, Empyreal is reasonably concerned that potential financial investors or business partners will be reluctant to invest in or enter into business relationships with Empyreal.

273. Being targeted for repeated, ongoing stops, searches, and seizures by Defendants threatens the viability of Empyreal's entire cash-in-transit business model.

274. Because of Defendants' actions against Empyreal vehicles in San Bernardino County, Empyreal has been forced to suspend its business operations in San Bernardino County and reroute other Southern California routes to avoid San Bernardino County, at serious and unquantifiable financial loss.

275. Suspending business operations in San Bernardino County has been particularly costly to Empyreal because Empyreal was building a vault and currency processing facility in San Bernardino County and has had to suspend further construction and planned operations from that facility. Empyreal had already spent approximately $100,000 on renovations to its planned location in San Bernardino County and is incurring expenses of approximately $21,000 per month in rent and utilities.

276. Losing the ability to open and operate the San Bernardino County currency processing facility has impacted Empyreal's operations outside San Bernardino County, because that location was to be Empyreal's currency processing facility serving all of Southern California, and Empyreal has had to reroute Southern California routes that would have delivered to that facility at considerable expense.

277. Empyreal's ability to meet the demands of its existing clients to expand its services in California is dependent on both being able to continue operations in

San Bernardino County and on being able to serve Southern California from its San Bernardino County currency processing facility.

278. Empyreal's projected future revenue growth in California is dependent on both being able to continue operations in San Bernardino County and on being able to serve Southern California from its San Bernardino County currency processing facility.

279. If Empyreal continues to have its vehicles stopped, searched, and seized by Defendants in California, Empyreal will have to suspend its business operations in California, at serious financial loss.

280. Suspending business operations in California will be particularly costly to Empyreal, because approximately 20% of Empyreal's business—over $3.5 million in 2021—originates in California, and Empyreal projects that revenue to more than double in 2022.

281. If Empyreal continues to have its vehicles stopped, searched, and seized nationwide by the Federal Defendants, and their task forces and partners in local or state law enforcement agencies, Empyreal will have to cease lawful business operations for financial institutions, and their customers, involved in state-legal medical cannabis and adult-use cannabis operations. Ending these services would severely impact Empyreal's business.

### CLAIMS

### Count I – *Ultra Vires* Actions by Sheriff Dicus

**Sheriff Dicus Has No Statutory Authority to Seize, Retain, or Forfeit Plaintiff's Property or the Property Plaintiff is Transporting**

282. Plaintiff hereby incorporates paragraphs 1-281 by reference.

283. Sheriff Dicus's repeated searches and seizures of lawfully obtained property are *ultra vires* because they not authorized by state law.

284. The authority vested in a sheriff in California is set out in Cal. Gov't Code §§ 26600–16.

285. Specifically, a sheriff is authorized to "preserve peace" and "to accomplish this object may sponsor, supervise, or participate in any project of crime prevention, rehabilitation of persons previously convicted of crime, or the suppression of delinquency." Cal. Gov't Code § 26600.

286. In pursuit of this goal, a sheriff is authorized to "arrest and take before the nearest magistrate for examination all persons who attempt to commit or who have committed a public offense." Cal. Gov. Code § 26601.

287. No provision of California law authorizes a sheriff to search and seize property where there is no evidence of criminal activity.

288. No provision of California law authorizes a sheriff to stop vehicles or search and seize property for "political" reasons.

289. "A governmental agency that acts outside of the scope of its statutory authority acts *ultra vires* and the act is void." *Cal. DUI Laws. Ass'n v. Cal. Dep't of Motor Vehicles*, 20 Cal. App. 5th 1247, 1264, 229 Cal. Rptr. 3d 787, 800 (2018).

290. Empyreal's business operations—transporting cash for state-legal dispensaries and financial institutions—are expressly protected by California law. *See* Cal. Bus. & Prof. Code § 26260(a) ("An entity that . . . **transports cash** or financial instruments, or provides other financial services **does not commit a crime** under any California law . . . solely by virtue of the fact that the person receiving the benefit of any of those services engages in commercial cannabis activity as a licensee pursuant to this division.") (emphasis added).

291. For both the November 16 seizure and the December 9 seizure, and the January 6 stop, Sheriff Dicus and his office had no reason to believe that Empyreal was engaged in activity that is criminal under California law.

292. In fact, Sheriff Dicus and his office were presented with ample information showing that Empyreal was engaged in lawful activity protected by California law.

293. Sheriff Dicus and his office, working in conjunction with one or more of the Federal Defendants, nevertheless seized and retained approximately $1,050,000 in cash over the course of the two seizures.

294. Whenever Sheriff Dicus and his department act as they did during the November 16 and December 9 seizures—seizing and retaining the proceeds of state-licensed cannabis industry businesses that are operating lawfully under California law—their conduct is *ultra vires* and unlawful.

295. Whenever Sheriff Dicus and his department act as they did during the November 16 and December 9 seizures—seizing and retaining property while it is being legally transported pursuant to Cal. Bus. & Prof. Code § 26260(a)—their conduct is *ultra vires* and unlawful.

296. Whenever Sheriff Dicus and his department act as they did during the November 16 and December 9 seizures and the January 6 stop—stopping, searching, and/or seizing vehicles that they believe are legally transporting cannabis proceeds pursuant to Cal. Bus. & Prof. Code § 26260(a)—their conduct is *ultra vires* and unlawful.

297. Any future stops, searches, or seizures of Empyreal vehicles or their contents by Sheriff Dicus and his department done on the same basis as the November 16 and December 9 seizures or the January 6 stop will also be *ultra vires* and unlawful.

298. Sheriff Dicus' stops, searches, and seizures of Empyreal vehicles for "political" reasons are invalid and *ultra vires* Sheriff Dicus' authority.

299. As a direct and proximate result of Sheriff Dicus' and his department's ongoing *ultra vires* acts, Empyreal's property and the property of its clients was unlawfully seized, causing Empyreal substantial injury.

300. As a direct and proximate result of Sheriff Dicus' and his department's ongoing *ultra vires* acts, Empyreal has had to suspend its operations in San Bernardino County.

301. Until Sheriff Dicus and his department cease acting in this *ultra vires* manner toward Empyreal, and Empyreal can be assured that these stops, searches, and seizures will no longer occur in San Bernardino County, Empyreal will be unable to resume operations in San Bernardino County.

302. But for the ongoing *ultra vires* acts of Sheriff Dicus and his department, Empyreal would resume its operations in San Bernardino County.

303. Plaintiff is entitled to protection from the ongoing *ultra vires* actions by the Sheriff directed at its vehicles and their contents.

## Count II – *Ultra Vires* Actions by the Federal Defendants

### The Federal Defendants Have No Statutory Authority to Seize, Retain. or Forfeit Plaintiff's Property or the Property Plaintiff is Transporting

304. Plaintiff hereby incorporates paragraphs 1-281 by reference.

305. The Federal Defendants' participation in any law enforcement activity that results in the seizure of cash in transit in Empyreal's possession that was collected from state authorized medical marijuana businesses is *ultra vires* and unlawful.

306. The Federal Defendants may not "draw[] [Money] from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7.

307. Congress has explicitly limited the Federal Defendants' authority to enforce the Controlled Substances Act as it applies to state authorized medical marijuana

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

use by exercising its appropriations power in the Consolidated Appropriations Act of 2021, via a rider known as the Rohrabacher-Farr Amendment.

308. Through its constitutional power, Congress has withheld all funding for any activities that interfere with a state's implementation of their medical marijuana laws. Consolidated Appropriations Act 2021, Pub. L. No. 116-260, § 531, 134 Stat. 1283 (2020) (amended Dec. 3, 2021) ("None of the funds made available under this Act to the Department of Justice may be used, with respect to any of the [listed states] to prevent any of them from implementing their own laws that authorize the use, distribution, possession, or cultivation of medical marijuana."); *United States v. McIntosh*, 833 F.3d 1163, 1172 (9th Cir. 2016) ("Congress has enacted an appropriations rider that specifically restricts DOJ from spending money to pursue certain activities.").

309. The Federal Defendants are prohibited from spending funds for law enforcement activities against those engaged in conduct permitted by state medical marijuana laws and who fully complied with such laws. *McIntosh*, 833 F.3d at 1177.

310. Moreover, prospective relief is available against DOJ and DOJ agencies for actions that violate the spending prohibition of the Rohrabacher-Farr Amendment. *See Sierra Club v. Trump*, 929 F.3d 670, 695–96 (9th Cir. 2019) ("'Appellants . . . can seek—and have sought—to enjoin [an agency] from spending funds' contrary to Congress's restrictions." (emphasis omitted) (quoting *McIntosh*, 833 F.3d at 1172)).

311. California and Missouri have both authorized the use of medical marijuana and the establishment of businesses to distribute and sell medical marijuana to customers.

312. Empyreal's cash-in-transit business provides a financial infrastructure for the depositing of cash proceeds that is essential to implementing the medical

marijuana laws in California and Missouri and has been expressly authorized by California law.

313. Missouri only licenses medical cannabis businesses, so all of the cash proceeds in the May 18 seizure were from state-legal medical cannabis businesses.

314. By participating in the May 18 seizure, and the subsequent forfeiture of the seized cash, the Federal Defendants have violated the spending prohibition of the Rohrabacher-Farr Amendment.

315. Seven of the eight cannabis businesses whose proceeds were seized in the November 16 and December 9 seizures in San Bernardino County hold medical cannabis licenses.

316. By participating in the November 16 and December 9 seizures, and any subsequent forfeiture of the seized cash, the Federal Defendants have violated the spending prohibition of the Rohrabacher-Farr Amendment.

317. Most of Empyreal's clients who operate in the cannabis industry hold medical cannabis licenses, so there is a high likelihood that any future seizure of cash proceeds being transported by Empyreal vehicles will involve funds from state-legal medical cannabis businesses.

318. The Federal Defendants' participation in the seizure and/or forfeiture of proceeds from state-legal medical marijuana businesses being transported by Empyreal causes federal funds to be spent without congressional appropriation.

319. Any time spent on any activity by the Federal Defendants incurs a cost to the United States, no matter how de minimis, and there is no good faith and mistake exception to the Appropriations Clause. *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012) ("The Appropriations Clause prevents Executive Branch officers from even inadvertently obligating the Government to pay money without statutory authority.").

320. For instance, any time spent conducting interdiction or traffic stops on vehicles suspected of containing cash proceeds from state-legal medical marijuana businesses by federal agents or task force officers, or any time spent processing the seizures or forfeitures of such funds, is an expenditure of federal funds.

321. Any direct costs spent by federal agencies or task forces—including the fuel cost of traveling to seizure locations, or the costs of transporting, counting, and storing any seized cash proceeds from state-legal medical marijuana businesses—is also the expenditure of federal funds.

322. Neither the Attorney General nor any other federal official can take an action that exceeds the scope of their constitutional and/or statutory authority.

323. Each time the Federal Defendants—including federal task force officers and any joint task forces or investigations—participate in activities that result in the seizure or forfeiture of proceeds that originated from state-legal medical marijuana transactions, this violates Congress' command in the Consolidated Appropriations Act 2021 and is thus *ultra vires* and unlawful.

324. Any future participation by the Federal Defendants—including federal task force officers and any joint task forces or investigations—in the seizure or forfeiture of proceeds that originated from state-legal medical marijuana transactions, this violates Congress' command in the Consolidated Appropriations Act 2021 and is thus *ultra vires* and unlawful.

325. Any future seizures of Empyreal vehicles or their contents involving the Federal Defendants on the same basis as the May 18, November 16, or December 9 seizures will also be *ultra vires* and unlawful.

326. As a direct and proximate result of the Federal Defendants' ongoing *ultra vires* acts, Empyreal's property and the property of its clients was unlawfully seized, causing Empyreal substantial injury.

327. As a direct and proximate result of the Federal Defendants' ongoing *ultra vires* acts, Empyreal has stopped operating in Kansas and has had to find other routes to transport proceeds from state-legal medical cannabis businesses in Missouri.

328. As a direct and proximate result of the Federal Defendants' ongoing *ultra vires* acts, Empyreal's ability to resume operating in San Bernardino County, and to continue operating in California, in Missouri, and nationwide, is seriously jeopardized.

329. If the Federal Defendants continue their ongoing *ultra vires* actions toward Empyreal, Empyreal will be forced to suspend operations not just in San Bernardino County, but in California, Missouri, and possibly nationwide.

330. Plaintiff is entitled to protection from the ongoing *ultra vires* actions by the Federal Defendants directed at its vehicles and their contents.


## **Count III – Fourth Amendment Violations by Sheriff Dicus**

### **42 U.S.C. § 1983; U.S. Const., Amends. IV, XIV**
### **Sheriff Dicus and the Sheriff's Department Are Violating the Fourth Amendment**

331. Plaintiff hereby incorporates paragraphs 1-281 by reference.

332. The Fourth Amendment generally requires a warrant to stop, search, or seize an individual or their property.

333. Even when a warrant is not required, the Fourth Amendment prohibits officers from conducting stops, searches, or seizures without articulable, individualized reasonable suspicion or probable cause of criminality.

334. Pretextual vehicle stops violate the Fourth Amendment.

335. The stops of Empyreal vehicles were pretextual and were really for the purpose of searching the vehicles and seizing their cash contents for forfeiture.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

336. The pretextual nature of the stops is demonstrated by the fact that not a single traffic citation was issued to an Empyreal driver for any of the traffic stops.

337. The pretextual nature of the stops is also demonstrated by the fact that a deputy told the Empyreal driver during the January 6 stop that the reason Empyreal's vehicles were being stopped so frequently was "political."

338. By definition, traffic stops made for "political" reasons are pretextual.

339. Sheriff Dicus' stops, searches, and seizures of Empyreal vehicles for "political" reasons are pretextual, invalid, and do not serve a legitimate government interest.

340. Even when an officer lawfully stops a vehicle for a valid traffic violation, the stop may not be prolonged beyond the time needed for that traffic-violation stop without at least reasonable suspicion.

341. Even when an officer lawfully stops a vehicle for a valid traffic violation, the officer may not search or seize any property in the vehicle without probable cause.

342. No warrant was obtained for the December 9 search and seizure of the Empyreal vehicle or its contents.

343. No warrant was obtained for the January 6 stop and search of the Empyreal vehicle.

344. The sale of cannabis and the transport of cannabis proceeds (including in localities where dispensaries are prohibited) are lawful under California law.

345. Empyreal lawfully transports the lawful proceeds of lawful product sales, and its business is expressly legal under California statute. *See* Cal. Bus. & Prof. Code § 26260(a).

346. The Fourth Amendment prohibits the Sheriff from stopping, searching, or seizing Empyreal's personnel or property without reasonable suspicion or

probable cause to believe that the property is associated with or is the proceeds of cannabis sales that violate state law.

347. The Fourth Amendment prohibits the Sheriff from stopping, searching, or seizing Empyreal's personnel or property for "political" reasons.

348. The Sheriff has no reasonable suspicion or probable cause that Empyreal's property is associated with or is the proceeds of cannabis sales that violate state law.

349. The Sheriff is engaged in ongoing violations of the Fourth Amendment by stopping, searching, and seizing Empyreal's personnel and property without reasonable suspicion or probable cause to believe that the property is associated with or is the proceeds of cannabis sales that violate state law.

350. Plaintiff is entitled to protection from any future stops, searches, and seizures by the Sheriff without reasonable suspicion or probable cause to believe that the property is associated with or is the proceeds of cannabis sales that violate state law.

## Count IV – Fourth Amendment Violations by the Federal Defendants

### U.S. Const., Amend. IV
### The Federal Defendants are Violating the Fourth Amendment

351. Plaintiff hereby incorporates paragraphs 1-281 by reference.

352. The Fourth Amendment generally requires a warrant to stop, search, or seize an individual or their property.

353. Even when a warrant is not required, the Fourth Amendment prohibits officers from conducting stops, searches, or seizures without articulable, individualized reasonable suspicion or probable cause of criminality.

354. The Fourth Amendment prohibits conducting stops, searches, or seizures for "political" reasons.

355. The Fourth Amendment's reasonableness requirement constrains officers' discretion, and their conduct is judged by balancing intrusions on individuals' security in their persons, property, and privacy against legitimate government interests.

356. The Fourth Amendment's reasonableness requirement imposes a minimum of reasonable suspicion or probable cause for officers' stops, searches, or seizures, and in some instances additional or other safeguards are also necessary to ensure that individuals' Fourth Amendment rights are not subject to officers' discretion.

357. The reasonableness of warrantless searches depends on the specific enforcement needs and privacy interests at issue.

358. Conducting stops, searches, or seizures for "political" reasons does not satisfy the Fourth Amendment's reasonableness requirement.

359. No warrant was obtained for the search and seizure of Empyreal's vehicles or their contents for the May 18 seizure or the December 9 seizure.

360. No warrant was obtained for the May 17 stop and search or the January 6 stop and search of Empyreal's vehicles.

361. Federal law prohibits Federal Defendants from spending funds "to prevent [all states that have legalized medical marijuana use] from implementing their own laws that authorize the use, distribution, possession, or cultivation of medical marijuana." Consolidated Appropriations Act 2021, Pub. L. No. 116-260, § 531, 134 Stat. 1283 (2020) (amended Dec. 3, 2021).

362. Federal law protects private entities operating medical cannabis businesses under state law and empowers them to enjoin prosecutions on this basis if they can show they were legally operating under state law.

363. The Federal Defendants' conduct invades Empyreal's security in its persons, property, and privacy and does not serve any legitimate government interest.

364. Stops, searches, and seizures of Empyreal vehicles for "political" reasons do not serve a legitimate government interest.

365. The Federal Defendants' conduct is unreasonable, and thus violates the Fourth Amendment, because even if the Federal Defendants did have probable cause to seize the cash contents of Empyreal's vehicles for violation of federal controlled substances laws, actually seizing or forfeiting that property would exceed Federal Defendants' authority because that conduct would improperly "prevent [states] from implementing their own laws that authorize the use, distribution, or cultivation of medical marijuana."

366. It is not reasonable for Federal Defendants to coordinate and/or participate in the stop, search, and seizure of vehicles transporting state-legal medical cannabis proceeds that Federal Defendants are forbidden from spending any federal funds to interfere with. Therefore, those stops, searches, and seizures violate the Fourth Amendment.

367. It is not reasonable for Federal Defendants to coordinate and/or participate in the stop, search, and seizure of vehicles when the motivation for that conduct is "political" in nature.

368. Upon information and belief, one or more of the Federal Defendants was aware of the Sheriff's "political" reasons for the stops, searches, and seizures of Empyreal's vehicles.

369. In the alternative, one or more of the Federal Defendants was the source of the "political" motivation for the stops, searches, and seizures of Empyreal's vehicles.

370. The Federal Defendants are engaged in ongoing violations of the Fourth Amendment by coordinating and/or participating in the unreasonable stops, searches, and seizures of Empyreal's personnel and property, and the seizure

and forfeiture of property entrusted to Empyreal for transport to financial institutions.

371. Plaintiff is entitled to protection from any future Fourth Amendment violations by the Federal Defendants arising from their coordination of, or participation in, unreasonable stops, searches, and seizures of Empyreal vehicles, and the seizure and forfeiture of their contents, as described above.

## Count V – Due Process Violations by Sheriff Dicus

**42 U.S.C. § 1983, U.S. Const., Amend. XIV**
**The Sheriff's Seizure of Plaintiff's Property was Motivated by an**
**Unconstitutional Profit Incentive in Violation of the Fourteenth Amendment**

372. Plaintiff hereby incorporates paragraphs 1-281 by reference.

373. The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution requires that government deprivations of property occur only through neutral and objective actors.

374. It is a violation of due process for enforcement processes to be infected with personal or institutional financial interests.

375. The Sheriff has a significant financial incentive in stopping, searching, and seizing Empyreal's vehicles and the money transported within them, creating actual bias, the potential for bias, and/or the appearance of bias.

376. The Sheriff receives up to 80% of the money forfeited through civil forfeiture following seizures processed through DOJ's equitable sharing program.

377. On information and belief, these profits are used to pay for Sheriff's Department salaries, equipment, facilities, and/or other benefits.

378. These financial interests distort the Sheriff's decision-making in investigating potential wrongdoing and enforcing the laws of the State of California.

379. The financial interests incentivize the Sheriff to stop, search, and seize Empyreal's vehicles and the money transported within them for reasons other

1   than enforcing the laws of the State of California and regardless of equities or
2   justice.

3   380. For instance, the financial interests incentivize the Sheriff to stop, search, and
4   seize Empyreal vehicles and the money transported within them even though
5   Empyreal's business is in full compliance with California's cannabis laws.

6   381. Because Empyreal's business is in full compliance with California laws, the
7   Sheriff does not have any law-enforcement purpose for stopping, searching, and
8   seizing Empyreal's vehicles or the money transported within them.

9   382. In fact, the Sheriff would be unable to seize and pursue civil forfeiture of the
10  cash proceeds transported by Empyreal's vehicles absent DOJ's equitable
11  sharing program because the cash proceeds come from businesses operating
12  lawfully under California law.

13  383. If the Sheriff's intent is to investigate and pursue cannabis-related operations
14  out of compliance with state law, then he would investigate accordingly, but
15  instead, the Sheriff's interest in these stops, searches, and seizures is the profits
16  his department receives after the funds are forfeited through civil forfeiture.

17  384. If the Sheriff were motivated by proper law-enforcement objections, instead of
18  profits, he would simply investigate the dispensaries themselves to ensure their
19  compliance with California's cannabis laws, instead of stopping, searching, and
20  seizing Empyreal's vehicles and the money transported within them.

21  385. Because of these financial incentives, the only "enforcement" effort the Sheriff
22  is taking against the state-legal cannabis businesses whose cash proceeds
23  Empyreal is transporting is seizing and forfeiting those proceeds.

24  386. Absent these financial incentives, the Sheriff would have no reason to behave
25  in this manner.

26  387. Absent DOJ's equitable sharing program, the Sheriff would be unable to behave
27  in this manner.

28

388. Absent these financial incentives, the Sheriff would not stop, search, and seize Empyreal's vehicles and the money transported within them.

389. In other words, these financial incentives are the sole motivation for the Sheriff's Department to conduct actual highway robberies—where Empyreal's armored vehicles are pulled over on threat of force, their vaults are forcibly opened, and the cash contents are forcibly taken—in cooperation with federal agencies and task forces.

390. Plaintiff is entitled to protection from highway robberies, regardless of whether they are conducted by criminals or by the Sheriff and federal law-enforcement agencies acting under color of law.

391. Plaintiff is entitled to protection from these profit-incentivized stops, searches, and seizures and to relief for the harms Plaintiff has already endured as a result of the profit-incentivized stops, searches, and seizures it has been subjected to until now.

## **Count VI – Due Process Violations by the Federal Defendants**

### **U.S. Const., Amend. V**
**Federal Defendants' Seizure of Plaintiff's Property was Motivated by an Unconstitutional Profit Incentive in Violation of the Fifth Amendment**

392. Plaintiff hereby incorporates paragraphs 1-281 by reference.

393. The Due Process Clause of the Fifth Amendment to the U.S. Constitution requires that government deprivations of property occur only through neutral and objective actors.

394. It is a violation of due process for enforcement processes to be infected with personal or institutional financial interests.

395. The Federal Defendants have a significant financial incentive in stopping, searching, and seizing Empyreal's vehicles and the money transported within them, creating actual bias, the potential for bias, and/or the appearance of bias.

396. The Federal Defendants retain at least 20% of the money forfeited through civil forfeiture following seizures made under DOJ's equitable sharing program.

397. On information and belief, these profits are used to pay for Federal Defendants' salaries, equipment, facilities, and/or other benefits.

398. These financial interests distort the Federal Defendants' decision-making in investigating potential wrongdoing and enforcing the laws of the United States.

399. The financial interests incentivize the Federal Defendants to coordinate the stop, search, and seizure of Empyreal's vehicles and the money transported within them for reasons other than enforcing the laws of the United States and regardless of equities or justice.

400. For instance, the financial interests incentivize the Federal Defendants to coordinate the stop, search, and seizure of Empyreal vehicles and the money transported within them instead of simply investigating or taking enforcement action against businesses that might be operating unlawfully, if they genuinely believe them to be operating in violation of federal law.

401. Because of these financial incentives, the only "enforcement" effort the Federal Defendants are taking against the state-legal cannabis businesses whose cash proceeds Empyreal is transporting is seizing and forfeiting those proceeds.

402. Absent these financial incentives, the Federal Defendants would have no reason to behave in this manner.

403. Absent these financial incentives, the Federal Defendants would not coordinate the stop, search, and seizure of Empyreal's vehicles and the money transported within them.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

404. These financial interests incentivize the Federal Defendants to interfere with state-legal medical cannabis industries, even though they have been forbidden by Congress from spending any federal funds on such activities.

405. These financial interests incentivize the Federal Defendants to focus only on seizing and forfeiting the legitimate cash proceeds of state-legal cannabis proceeds generated by sales at legitimate, state-licensed dispensaries and transported by a legitimate cash-in-transit service in a means expressly legalized by state statute rather than pursuing genuine criminal activity that actually poses a danger to public safety.

406. In other words, these financial incentives are the sole motivation for Federal Defendants to coordinate actual highway robberies—where Empyreal's armored vehicles are pulled over on threat of force, their vaults are forcibly opened, and the cash contents are forcibly taken—in conjunction with state and local law-enforcement agencies and task forces.

407. Plaintiff is entitled to protection from highway robberies, regardless of whether they are conducted by criminals or by Federal Defendants and other law-enforcement agencies acting under color of law.

408. Plaintiff is entitled to protection from any future profit-incentivized stops, searches, and seizures coordinated by the Federal Defendants.

### REQUEST FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that this Court:

A. Issue declaratory relief against Defendant Sheriff Dicus in his official capacity declaring void as *ultra vires* his detention, search, and seizure of vehicles believed to be involved in the lawful transportation of proceeds from state-legal cannabis businesses, and his seizure of those proceeds, in contravention of California statutes permitting the licensed medical and adult-use sale of cannabis, and California's express statutory protection of Plaintiff's business operations.

B. Issue injunctive relief against Defendant Sheriff Dicus in his official capacity enjoining him stopping, searching, and seizing vehicles believed to be involved in the lawful transportation of proceeds from state-legal cannabis businesses, and his seizure of those proceeds, in contravention of California statutes permitting the licensed medical and adult-use sale of cannabis and California's express statutory protection of Plaintiff's business operations.

C. Issue declaratory relief against Federal Defendants declaring void as *ultra vires* their participation in the detention, search, and seizure of vehicles believed to be involved in the transportation of proceeds from state-legal medical cannabis businesses, and the seizure and attempted forfeiture of those proceeds, for violating Congress' command against spending funds on such activities contained in the appropriations rider known as the Rohrabacher-Farr Amendment.

D. Issue injunctive relief against Federal Defendants enjoining them from participating in the detention, search, and seizure of vehicles believed to be involved in the transportation of proceeds from state-legal medical cannabis businesses, and the seizure and attempted forfeiture of those proceeds, for violating Congress' command against spending funds on such activities contained in the appropriations rider known as the Rohrabacher-Farr Amendment.

E. Issue declaratory relief against Defendant Sheriff Dicus in his official capacity, declaring unconstitutional under the Fourth Amendment, as incorporated by the Fourteenth Amendment, his policy, pattern, or practice of unreasonably stopping and searching Plaintiff's vehicles and seizing or retaining the contents of those vehicles, based solely on the actual or suspected presence of cash earned by state-legal cannabis dispensaries.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

F. Issue injunctive relief against Defendant Sheriff Dicus in his official capacity enjoining him from unreasonably stopping, searching, seizing, retaining, or forfeiting Plaintiff's vehicles or their contents based solely on the actual or suspected presence of cash earned by state-legal cannabis dispensaries without reasonable suspicion or probable cause.

G. Issue declaratory relief against the Federal Defendants declaring unconstitutional under the Fourth Amendment their policies, patterns, or practices of unreasonably stopping and searching Plaintiff's vehicles, and seizing, retaining, or forfeiting the contents of those vehicles, based on the actual or suspected presence of cash earned by state-legal cannabis dispensaries.

H. Issue injunctive relief against Federal Defendants enjoining Defendants from stopping, searching, seizing, retaining, or forfeiting Plaintiff's vehicles or their contents based on the actual or suspected presence of cash earned by state-legal cannabis dispensaries without reasonable suspicion or probable cause.

I. Issue declaratory relief against Defendant Sheriff Dicus in his official capacity declaring unconstitutional under the Fourteenth Amendment of the United States Constitution his seizure of Plaintiff's property—including property being transported by Plaintiff in which it has a possessory interest as a bailee or in which it has a property interest through indemnification of its clients—for the purpose of participation in the DOJ's equitable sharing program because the Sheriff is motivated by an improper financial incentive, and thus deprives Plaintiff of due process of law.

J. Issue injunctive relief against Defendant Sheriff Dicus in his official capacity enjoining him from seizing Plaintiff's property—including property being transported by Plaintiff in which it has a possessory interest as a bailee or in which it has a property interest through indemnification of its clients—for the purpose of participation in the DOJ's equitable sharing program because the Sheriff is

motivated by an improper financial incentive, and thus deprives Plaintiff of due process of law.

K. Issue declaratory relief against the Federal Defendants declaring unconstitutional under the Fifth Amendment of the United States Constitution their seizure and forfeiture of Plaintiff's property—including property being transported by Plaintiff in which it has a possessory interest as a bailee or in which it has a property interest through indemnification of its clients—because their actions are motivated by an improper financial incentive, and thus deprives Plaintiff of due process of law.

L. Issue injunctive relief against Federal Defendants enjoining their seizure and forfeiture of Plaintiff's property—including property being transported by Plaintiff in which it has a possessory interest as a bailee or in which it has a property interest through indemnification of its clients—because their actions are motivated by an improper financial incentive, and thus deprives Plaintiff of due process of law.

M. Enter an award against all Defendants allowing Plaintiff to recover its attorney fees, costs, and expenses in this action under 28 U.S.C. § 2412 and any other applicable provisions of law or equity.

N. Award any further equitable or legal relief the Court may deem just and proper.

1

2    Dated: January 14, 2022                    Respectfully submitted,

3                                               /s/    David C. Bass

4    **INSTITUTE FOR JUSTICE**                  **KOELLER, NEBEKER, CARLSON &**
                                                **HALUCK LLP**
5    Dan Alban (*pro hac vice* forthcoming)     David C. Bass (Cal. Bar No. 296380)
     dalban@ij.org                              david.bass@knchlaw.com
6    Kirby Thomas West (*pro hac vice*          Jerome Satran (Cal Bar. No. 188286)
     forthcoming)
7    kwest@ij.org                               jerry.satran@knchlaw.com
     901 North Glebe Road, Suite 900            1478 Stone Point Drive, Suite 435
8    Arlington, VA 22203                        Roseville, CA 95661
9    (703) 682-9320                             (916) 724-5700
     (703) 682-9321 (fax)                       (916) 788-2850 (fax)
10

11                          *Counsel for Plaintiff*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF