**KOELLER, NEBEKER, CARLSON & HALUCK LLP**
David C. Bass (Cal. Bar No. 296380)
david.bass@knchlaw.com
Jerome Satran (Cal Bar. No. 188286)
jerry.satran@knchlaw.com
1478 Stone Point Drive, Suite 435
Roseville, CA 95661
(916) 724-5700
(916) 788-2850 (fax)

**INSTITUTE FOR JUSTICE**
Dan Alban (*pro hac vice* forthcoming)
dalban@ij.org
Kirby Thomas West (*pro hac vice* forthcoming)
kwest@ij.org
901 North Glebe Road, Suite 900
Arlington, VA 22203
(703) 682-9320
(703) 682-9321 (fax)

*Counsel for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA
# EASTERN DIVISION

| | |
|---|---|
| EMPYREAL ENTERPRISES, LLC, d/b/a EMPYREAL LOGISTICS,<br><br>Plaintiff,<br><br>vs.<br><br>The United States of America; the U.S. Department of Justice; Attorney General MERRICK GARLAND, in his official capacity; the Federal Bureau of Investigation; CHRISTOPHER A. WRAY, Director of the Federal Bureau of Investigation, in his official capacity; KRISTI KOONS JOHNSON, Assistant Director of the Federal Bureau of | Case No.: 5-22-cv-94<br><br>**DECLARATION OF DEIRDRA O'GORMAN IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION**<br><br>Judge:<br>Complaint Filed: 1/14/22 |

1
DECLARATION OF DEIRDRA O'GORMAN

| | |
|---|---|
| 1 | Investigation overseeing the FBI's Los Angeles Field Office, in her official capacity; the Drug Enforcement Administration; ANNE MILGRAM, Administrator of the Drug Enforcement Administration, in her official capacity; SHANNON D. DICUS, San Bernardino County Sheriff-Coroner, in his official capacity as the head of the San Bernardino County Sheriff's Office, |
| | Defendants. |

I, Deirdra O'Gorman, submit the following declaration in support of Plaintiff's Ex Parte Application for Temporary Restraining Order and Order to Show Cause.

1. I am a citizen of the United States of America and a resident of the state of Colorado. I am over eighteen years of age and fully competent to make this declaration.

2. I am the President and CEO of Empyreal Enterprises, LLC d/b/a Empyreal Logistics.

3. I have personal knowledge of the following facts and would competently testify to them if called upon to do so.

4. Empyreal Enterprises, LLC, d/b/a Empyreal Logistics ("Empyreal") is a Pennsylvania limited liability company in good standing with the Pennsylvania Bureau of Corporations and Charitable Organizations.

5. Empyreal has over 200 employees in 13 offices.

6. I am Empyreal's CEO. I have more than 26 years of experience as a financial services executive and I also run a compliance firm that works with financial institutions to build compliance programs, with adherence to the enhanced due diligence compliance standards required by FinCEN.

7. Empyreal operates a cash-in-transit (armored vehicle) business in approximately 28 states, including California.

8. Unlike traditional armored-vehicle companies, Empyreal operates discreetly, using state-of-the-art technology and surveillance systems in its vehicle fleet.

9. Empyreal's business model is unique as it relies on a multi-faceted approach that utilizes technology-based security solutions along with traditional approaches to armored transport.

10. Empyreal's clients include both financial institutions and the state-legal cannabis businesses with which those institutions do business.

11. Empyreal serves financial institutions that work with state-legal medical cannabis businesses in numerous states, including California, offering secure cash collection and transport, deposit validation at secure vault locations, and standard cash services to businesses and financial institutions.

12. Empyreal offers these same cash management services to financial institutions that service state-licensed adult-use cannabis businesses.

13. Most of Empyreal's cannabis-industry clients hold medical cannabis licenses.

14. Empyreal also provides its cash logistics services to clients in other businesses outside of the cannabis industry.

15. A significant percentage of Empyreal's cash-in-transit business does not involve the cannabis industry. These clients include restaurants, convenience stores, and other cash-intensive businesses.

16. With respect to its cannabis-industry clients, Empyreal contracts only with state-legal cannabis businesses that have established banking relationships with financial institutions with anti-money laundering law programs implemented pursuant to the 2014 FinCEN Guidance Regarding Marijuana-related Business ("2014 FinCEN Guidance") and applicable state-issued guidance.

17. Empyreal's financial institution clients must also conduct extensive initial and on-going due diligence of cannabis industry customers to ensure compliance with their Bank Secrecy Act obligations and other regulatory requirements, including filing marijuana-related Suspicious Activity Reports (SARs) to comply with the 2014 FinCEN Guidance.

18. Approximately 20% of Empyreal's business is in California, including business that originates in California but is served by Empyreal branches operating from nearby states.

19. Many of Empyreal's existing clients in California have requested that Empyreal expand services in California in the near future.

20. Absent interference by Defendants, such as the events described in this lawsuit, Empyreal projects it will double its business in California next year.

21. Empyreal's vehicles have been repeatedly targeted by Defendants for stops, searches, and seizures based on the fact that Defendants know that Empyreal vehicles are transporting the cash proceeds of state-legal cannabis businesses.

22. In the several stops, searches, and seizures described below, not a single traffic citation was issued to an Empyreal driver, and no criminal charges have been brought against Empyreal or any of its employees relating to any of the stops, searches, and seizures.

23. On May 17, 2021, a deputy from the Dickinson County Sheriff's Office stopped and searched an Empyreal vehicle driven by an Empyreal driver, demanding (and receiving) access to the vehicle without any basis as well as Empyreal's route manifest for the next day's pickup of cash proceeds from state-licensed medical cannabis dispensaries in Kansas City, Missouri.

24. The next day, on May 18, 2021, deputies from the Dickinson County Sheriff's Office in Dickinson County, Kansas stopped, searched, and seized approximately $165,620 from an Empyreal vehicle ("the May 18 seizure") on I-70 without a warrant, working in conjunction with a DEA task force.

25. The cash proceeds being transported by Empyreal's vehicle during the May 18 seizure were entirely from state-licensed medical cannabis dispensaries operating lawfully under Missouri law in Kansas City, Missouri, and the proceeds were being transported to legitimate financial institutions.

26. On September 3, 2021, the United States of America filed a civil forfeiture complaint in the United States District Court for the District of Kansas seeking civil forfeiture of the cash seized in the May 18 seizure. DEA Special Agent Bryson Wheeler was the affiant for the affidavit accompanying that forfeiture complaint. According to that complaint, the DEA conducted surveillance of the Empyreal vehicle as it visited state-legal medical cannabis dispensaries in Kansas City, Missouri to pick up the currency prior to the May 18 seizure.

27. Three times in the past eight weeks, the San Bernardino County Sheriff's Department in California has stopped, searched, and seized the contents of Empyreal vehicles as their drivers lawfully conducted Empyreal business.

28. Based on information provided to me, I understand that the San Bernardino County Sheriff's Department is working in coordination with one or more of the Federal Defendants to orchestrate these ongoing stops, searches, and seizures.

29. On November 16, 2021, San Bernardino County Sheriff's Department deputies stopped and seized approximately $750,000 in legal currency from one of Empyreal's vehicles, seized the vehicle itself, and seized the driver's business and

personal cellphones (the "November 16 seizure"). In the process, Defendants caused significant, unnecessary damage to the vehicle and the technology therein. The stop, search, and seizure took more than four hours.

30. The cash proceeds being transported by Empyreal's vehicle during the November 16 seizure were entirely from state-licensed cannabis businesses in good standing, operating lawfully under California law, and the proceeds were being transported to legitimate financial institutions.

31. Three of the four cannabis businesses whose cash proceeds were seized during the November 16 seizure hold California medical cannabis licenses.

32. On December 9, 2021, San Bernardino County Sheriff's Department deputies stopped and seized approximately $350,000 in legal currency from one of Empyreal's vehicles (the "December 9 seizure").

33. The cash proceeds being transported by Empyreal's vehicle during the December 9 seizure were entirely from state-licensed cannabis businesses operating lawfully under California law, and the proceeds were being transported to legitimate financial institutions.

34. All four of the cannabis businesses whose cash proceeds were seized during the December 9 seizure hold California medical cannabis licenses.

35. In the course of the December 9 seizure, the San Bernardino Sheriff's deputies covered up or attempted to cover up the cameras on the exterior and interior

of the Empyreal vehicle but failed to disable the vehicle's audio recording equipment.

36. In the video and audio recording of the December 9 seizure, the Sheriff's deputies can be heard to make several statements indicating that any purported traffic violation bases for the stop (for which no citations were issued) were pretextual, and that the Sheriff's deputies had planned the stop, search, and seizure of the vehicle and its cash contents in advance (as also indicated by the fact that they already had a drug-sniffing dog with them at the time of the stop). Those statements include:

    i. Alleging that the dog alerted on the vehicle, even though video footage from the vehicle shows that the dog did not alert on the vehicle and was barely interested in the vehicle.

    ii. Stating that "If I stop you, I have the right to open the safe" in the vehicle.

    iii. Stating that "I do have the right to take the money" because it was connected to "drugs," without indicating any basis to believe that the money was connected to anything other than state-legal cannabis sales.

37. In the video and audio recording of the December 9 seizure, the Sheriff's deputies can be heard to make several statements indicating that they were motivated by revenue generation, including:

i. Upon seeing the physical amount of cash in the vehicle, observing that "this is, uh, more small"—presumably in relation to the amount they seized in the November 16 seizure.

ii. After they finished counting the cash, one of the deputies said "That's it?" and chuckled. He then said: "You set the bar too high." When another deputy remarked that he thought they would get "a million or two," the first deputy responded "At least we got over a million"—presumably referring to the combined total of the November 16 and December 9 seizures, which totaled approximately $1.1 million.

iii. After they finished counting the cash, one of the deputies remarked that there were "pretty small amounts [of cash] this time, huh?"—presumably in relation to the amount they seized in the November 16 seizure.

38. Based on information provided to me by the Empyreal driver, whom I employ and supervise, I understand that some of the same Sheriff's deputies conducted the December 9 stop, search, and seizure and the November 16 stop, search, and seizure.

39. Based on information provided to me, I understand that the approximately $1,050,000 in cash seized from Empyreal's vehicles in the two seizures by San Bernardino County Sheriff's Department has been transferred to one

or more of the Federal Defendants and remains in the possession of one or more of the Federal Defendants.

40. Based on information provided to me, I understand that one or more of the Federal Defendants will be pursuing civil forfeiture of the currency seized in the November 16 seizure and the December 9 seizure.

41. Based on information provided to me and based on what I have observed in the video and audio of the seizures, the Defendants do not appear to take account of whether the cash proceeds they seized were from state-licensed medical cannabis dispensaries operating lawfully under the laws of the state in which they are located.

42. Based on information provided to me and based on what I have observed in the video and audio of the seizures, the Defendants do not appear to take account of whether the cash proceeds they seized were from medical cannabis, and Defendants took no measures to verify whether the proceeds were from medical cannabis or other state-legal, adult-use cannabis sales.

43. Based on information provided to me and based on what I have observed in the video and audio of the seizures, the Defendants often do not take account of whether the cash proceeds they seized were from cannabis businesses or other types of businesses.

44. On January 6, 2022, one or more San Bernardino County Sheriff's Department deputies stopped and searched an Empyreal vehicle and interrogated the driver.

45. Although Empyreal had suspended cash logistics operations in San Bernardino County after the December 9 seizure and instructed drivers on cash logistics trips to not to enter San Bernardino County, this Empyreal driver was simply picking up an order of rolled coin boxes from Empyreal's vendor, which happens to be located in San Bernardino County, in order to replenish its rolled coin supply.

46. The Empyreal vehicle was not transporting any cannabis proceeds on January 6 but was transporting rolled coins from a non-cannabis business.

47. Based on information provided to me by the Empyreal driver, whom I employ and supervise, Sheriff's deputies declined to seize the coins once they realized they were from a non-cannabis business.

48. Based on information provided to me by the Empyreal driver, whom I employ and supervise, when the Empyreal driver asked the Sheriff's deputy on January 6 why Empyreal vehicles were being stopped so frequently, the deputy told him it was "political" but declined to elaborate further.

49. As a result of Defendants ongoing conduct, including the stops, searches, and seizures of Empyreal's personnel, vehicles, safes, cellphones, and

money, Empyreal is suffering substantial and ongoing harms to its business and its business reputation. Those harms include:

    i.   Each seizure of Empyreal's cash renders it unable to perform a service for which it was contracted, damaging Empyreal's business reputation, client retention, and client recruitment.

    ii.   Being subject to repeated stops, searches, and seizures by Defendants causes reputational harm and makes Empyreal's clients less likely to engage in business with Empyreal in the future.

    iii.   Empyreal has lost business opportunities and potential clients because of the May 18 seizure in Kansas. Further, based on my extensive experience in the financial industry and as the CEO of Empyreal and my communications with clients, potential clients, and business partners, we at Empyreal reasonably expect the two California seizures to have a similarly negative effect on its business.

    iv.   Empyreal lost a potential client—the Colorado franchisee of a major fast-food chain—because of concerns the potential client had arising from the May 18 seizure.

    v.   Due to the May 18 seizure, Empyreal has re-routed its services for medical cannabis dispensaries in Kansas City, Missouri in order to avoid traveling through the State of Kansas, including Dickinson

County, at substantial expense. This is particularly inconvenient because Kansas City, Missouri sits on the Kansas border, and is primarily served by I-70, which runs through Kansas, for westbound travel.

vi. Prior to the May 18 seizure, Empyreal had planned to start offering services for non-cannabis clients in three Midwestern states. But I have been provided reliable information that, based on the May 18 seizure, law-enforcement agencies in those states have begun to keep a lookout for Empyreal vehicles to stop, search, and seize their contents. Because of this real risk of harassment and property loss, Empyreal has been unable to start offering services for non-cannabis customers in those three Midwestern states.

vii. Empyreal's competitors have used the May 18 seizure as a selling point for why Empyreal's clients and potential clients should do business with them instead, including in posts on social media websites such as LinkedIn. Attached to this declaration as **Exhibit A** is a true and correct copy of one such LinkedIn post.

viii. Based on my extensive experience in the financial industry and as the CEO of Empyreal, as well as my communications with potential investors and business partners, we at Empyreal are reasonably concerned that potential financial investors or business partners will

        be reluctant to invest in or enter into business relationships with Empyreal as a result of the reputational harm Empyreal has suffered from the May 18 seizure, and that we anticipate suffering from the two California seizures.

  ix.    Being targeted for repeated stops, searches, and seizures by Defendants threatens the viability of Empyreal's entire cash-in-transit business model.

  x.    Because of Defendants' actions against Empyreal vehicles in San Bernardino County, Empyreal has been forced to suspend its business operations in San Bernardino County and reroute other Southern California routes to avoid San Bernardino County, at serious and unquantifiable financial loss.

  xi.    Suspending business operations in San Bernardino County has been particularly costly to Empyreal because Empyreal was building a vault and currency processing facility in San Bernardino County and has had to suspend further construction and planned operations from that facility. Empyreal had already spent approximately $100,000 on renovations to its planned location in San Bernardino County and is incurring expenses of approximately $21,000 per month in rent and utilities.

xii. Losing the ability to open and operate the San Bernardino County currency processing facility has impacted Empyreal's operations outside San Bernardino County, because that location was to be Empyreal's currency processing facility serving all of Southern California, a key market for our business, and Empyreal has had to reroute Southern California routes that would have delivered to that facility at considerable expense.

xiii. Empyreal's ability to meet the demands of its existing clients to expand its services in California is dependent on both being able to continue operations in San Bernardino County and on being able to serve Southern California from its San Bernardino County currency processing facility.

xiv. Empyreal's projected future revenue growth in California is dependent on both being able to continue operations in San Bernardino County and on being able to serve Southern California from its San Bernardino County currency processing facility.

xv. If Empyreal continues to have its vehicles stopped, searched, and seized by Defendants in California, Empyreal will have to suspend its business operations in California, at serious and unquantifiable financial loss.

xvi. Suspending business operations in California will be particularly costly to Empyreal, because approximately 20% of Empyreal's business—over $3.5 million in 2021—originates in California, and Empyreal projects that revenue to more than double in 2022.

xvii. If Empyreal continues to have its vehicles stopped, searched, and seized nationwide by the Federal Defendants, and their task forces and partners in local or state law enforcement agencies, Empyreal will have to cease lawful business operations for financial institutions, and their customers, involved in state-legal medical cannabis and adult-use cannabis operations. Ending these services would severely impact Empyreal's business.

xviii. To protect its business reputation, Empyreal reimbursed its clients the approximately $165,620 seized during the May 18 seizure, effectively indemnifying its clients out of its own revenue.

xix. To protect its business reputation, Empyreal reimbursed its clients the approximately $700,000 seized during the November 16 seizure, and the approximately $350,000 seized during the December 9 seizure, effectively indemnifying its clients out of its own revenue.

xx. Defendants continue to retain all of the money they seized from Empyreal, without any measures to verify the sources of the money.

xxi. Empyreal is forced to expend revenue and resources contesting the attempted civil forfeitures of its seized money.

xxii. Empyreal is forced to expend revenue and resources repairing the damage that Defendants did to its vehicle and security features during the November 16 seizure.

xxiii. Defendants' practice of disabling the cameras on Empyreal's vehicles during these stops, searches, and seizures interferes with Empyreal's property and inhibits Empyreal's ability to gather facts about the incidents to both defend against the forfeiture of the seized property and to pursue vindication of its statutory and constitutional rights.

50. Due to the ongoing nature of Defendants' conduct and the ongoing harm Empyreal is suffering to avoid being further victimized by Defendants' conduct, every day Defendants' conduct continues, Empyreal will continue to suffer immediate and irreparable injury including the injuries I've mentioned above.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this <u>13th</u> day of January, 2022, in Englewood, Colorado.

/s/ *Deirdra A. O'Gorman*
Deirdra O'Gorman