**KOELLER, NEBEKER, CARLSON & HALUCK LLP**
David C. Bass (Cal. Bar No. 296380)
david.bass@knchlaw.com
Jerome Satran (Cal Bar. No. 188286)
jerry.satran@knchlaw.com
1478 Stone Point Drive, Suite 435
Roseville, CA 95661
(916) 724-5700
(916) 788-2850 (fax)

**INSTITUTE FOR JUSTICE**
Dan Alban (*pro hac vice* forthcoming)
dalban@ij.org
Kirby Thomas West (*pro hac vice* forthcoming)
kwest@ij.org
901 North Glebe Road, Suite 900
Arlington, VA 22203
(703) 682-9320
(703) 682-9321 (fax)

*Counsel for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
## EASTERN DIVISION

| | |
|---|---|
| EMPYREAL ENTERPRISES, LLC,<br><br>                         Plaintiff,<br><br>    v.<br><br>The United States of America, et al.,<br><br>                         Defendants. | Case No. 5:22-cv-00094-JWH-SHK<br><br>**PLAINTIFF'S RENEWED *EX PARTE* APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE: PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS & AUTHORITIES**<br><br>Honorable John W. Holcomb<br><br>Complaint Filed: 1/14/22 |

**PLEASE TAKE NOTICE** that Plaintiff Empyreal Enterprises, LLC, d/b/a Empyreal Logistics ("Empyreal") hereby renews its application, *ex parte*, for a temporary restraining order ("TRO") and an order to show cause regarding the issuance of a preliminary injunction against Defendants The United States; the U.S. Department of Justice; Attorney General Merrick Garland, in his official capacity; the Federal Bureau of Investigation; Christopher A. Wray, Director of the Federal Bureau of Investigation, in his official capacity; Kristi Koons Johnson, Assistant Director of the Federal Bureau of Investigation overseeing the FBI's Los Angeles Field Office, in her official capacity; the Drug Enforcement Administration; Anne Milgram, Administrator of the Drug Enforcement Administration, in her official capacity (together, "Federal Defendants"); Shannon D. Dicus, San Bernardino County Sheriff-Coroner, in his official capacity as the head of the San Bernardino County Sheriff's Office ("Sheriff Dicus" or the "Sheriff") (collectively, "Defendants").

Following the denial of Plaintiff's original application for TRO without prejudice (ECF No. 32), Plaintiff's counsel spoke telephonically with counsel for all of the Defendants on January 18, 2022, and provided notice of Plaintiff's plans to renew this application today in conjunction with a stipulated briefing schedule and proposed order that accompanies this filing. Jan. 19, 2022 Decl. David C. Bass, ("Bass Decl.") ¶¶ 14, 17. On January 15, 2022, counsel for the Federal Defendants filed a brief in opposition (ECF No. 31) to Plaintiff's original January 14, 2022 TRO application (ECF No. 17). Plaintiff plans to respond to the arguments raised therein, and in all of the Defendants' oppositions to this application, in Plaintiff's reply brief pursuant to the stipulated briefing schedule.

Empyreal seeks to prevent Defendants' continued unlawful and unconstitutional stops, searches, and seizures of its property, including Defendants' pretextual stops of Empyreal's vehicles and baseless seizures of hundreds of

thousands of dollars of currency that Empyreal lawfully transports for other lawful businesses to deposit into legitimate banking institutions.

Empyreal is a cash-in-transit (armored car) business. Among its clients are financial institutions and the state-legal and licensed medical cannabis dispensaries that have banking services with those institutions, as well as traditional, non-cannabis businesses such as restaurants and convenience stores. To help prevent cannabis dispensaries from storing so much cash on hand that they become the targets of robberies, Empyreal transports their cash proceeds to legitimate banking institutions.

On five occasions, including **three times in eight weeks** in San Bernardino County, sheriff's deputies have stopped and searched Empyreal's vehicles. During three of these five incidents, one or more Defendants seized the cash Empyreal was transporting. (Empyreal was not transporting any cash proceeds related to cannabis during the other two incidents.) The traffic stops themselves were pretextual; no citations were ever issued. And no one has been charged with any crime related to any of these incidents, but the seized cash has not been returned and has been turned over to the FBI for federal civil forfeiture proceedings so that the Defendants may ultimately keep the proceeds. The stops, searches, and seizures of Empyreal vehicles in San Bernardino County are being done through the Inland Regional Narcotics Enforcement Team ("IRNET"), a joint task force led by the Sheriff in conjunction with FBI and DEA. These stops and seizures were *ultra vires* the statutory authority of the agencies involved; were suspicionless, lacked probable cause, and were unreasonable in violation of the Fourth Amendment; and were motivated by Sheriff Dicus's ability to receive the proceeds of the civil forfeiture of the seized assets for his department's financial gain, in violation of the Due Process Clause of the Fourteenth Amendment.

Empyreal has already been forced to suspend its operations in San Bernardino County due to the ongoing nature of these stops, searches, and seizures, and it has

had to suspend the use and renovation of a vault and currency processing facility in San Bernardino County that is critical to its business in Southern California. It has also had to reroute its vehicles to avoid traveling through Kansas while traveling to and from state-licensed medical cannabis dispensaries in Kansas City, Missouri—after an Empyreal vehicle was stopped, searched, and had its cash contents seized on I-70 in Dickinson County, Kansas—at great inconvenience and additional cost. Empyreal has also had to forgo its plans to roll out services for non-cannabis customers in three Midwestern states due to informed concerns that Empyreal's vehicles may be targeted by law enforcement in those states in the aftermath of the Kansas seizure. Empyreal has lost potential customers and new business from existing customers due to concerns about the Kansas seizure, and it expects that the California seizures will have a similar effect.

For Empyreal to continue operating its lawful business, these unlawful and unconstitutional stops, searches, and seizures must be enjoined going forward. Without this Court's immediate intervention, Empyreal cannot continue to operate in San Bernardino County, or in Kansas, or anywhere else the Federal Defendants partner with state or local law-enforcement agencies to target Empyreal's vehicles for stops, searches, and the seizure of their contents. These ongoing abuses pose a critical threat to Empyreal's business operations and its ability to retain clients and acquire new clients, particularly in Southern California.

For the reasons explained in the accompanying memorandum of points and authorities, (1) Empyreal is likely to succeed on its claims that Defendants are acting *ultra vires* their statutory authority and that Sheriff Dicus is violating the Fourth and Fourteenth Amendments to the U.S. Constitution; (2) Empyreal is suffering and will continue to suffer irreparable harm in the absence of immediate injunctive relief; and (3) the balance of equities and the public interest compel immediate injunctive relief. Accordingly, the Court should issue a temporary restraining order and an order to show cause why a preliminary injunction should not issue.

The Court should also "dispense with" the requirement that Empyreal file a bond under Rule 65(c) because "there is no realistic likelihood of harm to [Defendants] from enjoining [their] conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003). This is a civil rights case, and Defendants are government entities—not for-profit businesses—so there is no risk to Defendants of business disruption or other economic injury in the absence of a bond. And "Defendants are not likely to suffer harm as a result of being enjoined from engaging in illegal [namely, ultra vires and unconstitutional] conduct." *BYD Co. Ltd v. Khazai*, 2020 WL 3893310, at *6 (C.D. Cal. July 10, 2020).

This *ex parte* application for a temporary restraining order is based on Empyreal's Complaint, this application, the attached memorandum of points and authorities, the attached declaration of Empyreal CEO Deirdra O'Gorman ("O'Gorman Decl.") and exhibits thereto, the attached affidavit of counsel, and exhibits thereto, and any further briefing and arguments of counsel.

Dated: January 19, 2022

Respectfully submitted,

/s/   David C. Bass

INSTITUTE FOR JUSTICE
Dan Alban (*pro hac vice* forthcoming)
dalban@ij.org
Kirby Thomas West (*pro hac vice* forthcoming)
kwest@ij.org
901 North Glebe Road, Suite 900
Arlington, VA 22203
(703) 682-9320
(703) 682-9321 (fax)

KOELLER, NEBEKER, CARLSON & HALUCK LLP
David C. Bass (Cal. Bar No. 296380)
david.bass@knchlaw.com
Jerome Satran (Cal Bar. No. 188286)
jerry.satran@knchlaw.com
1478 Stone Point Drive, Suite 435
Roseville, CA 95661
(916) 724-5700
(916) 788-2850 (fax)

*Counsel for Plaintiff*

# TABLE OF CONTENTS

Page

Table of Authorities .................................................................................. iii

Memorandum of Points & Authorities .......................................................1

I.    Introduction ....................................................................................1

II.   Background .....................................................................................2

      A.    Empyreal is a law-abiding, national cash-in-transit business ..............2

      B.    Defendants are engaged in an ongoing effort targeting Empyreal's
            vehicles for stops, searches, and seizures ................................................3

      C.    Because of Defendants' ongoing conduct, Empyreal has had to
            suspend operations and forgo offering new services in several states,
            and it is suffering reputational damage that is causing it significant
            harm, including losing potential clients .................................................6

      D.    California law authorizes the business activities for which Defendants
            are targeting Empyreal for unlawful stops, searches, and seizures .......9

      E.    The appropriations rider known as the Rohrabacher-Farr Amendment
            prohibits the Federal Defendants from interfering with state-legal
            medical cannabis industries ................................................................10

      F.    Defendants have a financial incentive to stop, search, and seize
            Empyreal's vehicles and their contents, which violates Empyreal's
            Due Process rights ..............................................................................11

III.  Legal Standard .............................................................................13

IV.   Argument .....................................................................................14

      A.    Empyreal is likely to succeed on its *ultra vires*, Fourth Amendment,
            and due process claims .......................................................................14

            1.    The ongoing conduct of Sheriff Dicus and his department
                  exceeds his statutory authority .................................................14

            2.    The Federal Defendants' ongoing conduct exceeds their
                  statutory authority to spend federal funds ................................16

3.    The Sheriff is violating the Fourth Amendment......................19

4.    The Sheriff is violating due process because his conduct is driven by improper financial motives.......................................21

B.    Empyreal is suffering and will continue to suffer substantial irreparable harm without relief from this Court...................................23

C.    The equities and public interest strongly favor an injunction.............25

V.    Conclusion.....................................................................................25

# TABLE OF AUTHORITIES

Page

**Cases**

*Adidas America, Inc. v. Skechers USA, Inc.*, 890 F.3d 747 (9th Cir. 2018)............23

*Allergan, Inc. v. Merz Pharmaceuticals, LLC*,
    2012 WL 781705 (C.D. Cal. Mar. 9, 2012) .......................................25

*Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ..............13

*American Trucking Associations, Inc. v. City of Los Angeles*,
    559 F.3d 1046 (9th Cir. 2009)......................................................23

*California DUI Lawyers Association v. California Department of Motor Vehicles*,
    20 Cal. App. 5th 1247 (2018).......................................................14

*East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640 (9th Cir. 2021) ..................13

*Granny Purps, Inc. v. County of Santa Cruz*,
    266 Cal. Rptr. 3d 752 (Cal. Ct. App. 2020) ......................................9

*Harjo v. City of Albuquerque*, 326 F. Supp. 3d 1145 (D.N.M. 2018)............. 22, 23

*Jones v. Las Vegas Metropolitan Police Department*,
    873 F.3d 1123 (9th Cir. 2017).......................................................19

*Kildare v. Saenz*, 325 F.3d 1078 (9th Cir. 2003) .........................................23

*Marshall v. Jerrico, Inc.*, 446 U.S. 238 (1980)...................................... 21, 23

*Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) .....................................25

*Office of Personnel Management v. Richmond*, 496 U.S. 414 (1990) ...................16

*Reeside v. Walker*, 52 U.S. 272, 13 L. Ed. 693 (1850)...................................17

*Republic of Philippines v. Marcos*, 862 F.2d 1355 (9th Cir. 1988).......................14

*Rodriguez v. United States*, 575 U.S. 348 (2015) .......................................21

*Shipp v. Schaaf*, 2019 WL 1472303 (N.D. Cal. Apr. 2, 2019) ...........................25

*Sierra Club v. Trump*, 929 F.3d 670 (9th Cir. 2019)........................... 11, 17

*Stuhlbarg International Sales Co. v. John D. Brush & Co.*,
    240 F.3d 832 (9th Cir. 2001).......................................................23

*U.S. Department of Navy v. Federal Labor Relations Authority*,
    665 F.3d 1339 (D.C. Cir. 2012).....................................................17

*United States v. Jackson*, 388 F. Supp. 3d 505 (E.D. Pa. 2019) ............................18

*United States v. McIntosh*, 833 F.3d 1163 (9th Cir. 2016) ............................ passim

*United States v. Place*, 462 U.S. 696 (1983) ............................20

*United States v. Raines*, 362 U.S. 17 (1960) ............................25

*United States v. Rojas-Millan*, 234 F.3d 464 (9th Cir. 2000) ............................19

*United States v. Ross*, 456 U.S. 798 (1982) ............................21

*United States v. Twilley*, 222 F.3d 1092 (9th Cir. 2000) ............................20

*Ward v. Village of Monroeville*, 409 U.S. 57 (1972) ............................22

*Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982) ............................25

*Whren v. United States*, 517 U.S. 806 (1996) ............................21

*Winter v. NRDC, Inc.*, 555 U.S. 7 (2008) ............................13

**Constitutional Provisions**

Mo. Const. art. XIV, § 1. ............................11

U.S. Const. art. I, § 9, cl. 7 ............................ 10, 16

**Statutes**

Cal. Bus. & Prof. Code § 26000 et seq. ............................11

Cal. Bus. & Prof. Code § 26000(b) ............................9

Cal. Bus. & Prof. Code § 26260(a) ............................ passim

Cal. Gov't Code § 26600 ............................14

Cal. Gov't Code § 26601 ............................15

Cal. Health & Safety Code § 11362.5 ............................9

Cal. Health & Safety Code § 11471.2(a) ............................12

Consolidated Appropriations Act 2021, Pub. L. No. 116-260, § 531, 134 Stat. 1283 (2020) (amended Dec. 3, 2021) ............................ 10, 17

**Other Authorities**

Assembly Committee on Banking and Finance, Analysis of Assembly Bill No. 1525 (2019–2020 Reg. Sess.) ............................ 9, 15

DOJ, Consolidated Asset Tracking System, ............................13

DOJ, *Guide to Equitable Sharing for State and Local Law Enforcement Agencies*, (July 2018)................................................................................................12

Institute for Justice, *Policing for Profit*, (Dec. 2020)...............................................12

PLAINTIFF'S RENEWED *EX PARTE* APPLICATION FOR TRO AND ORDER TO SHOW CAUSE

## MEMORANDUM OF POINTS & AUTHORITIES

### I.    Introduction

Defendants are actively engaged in an ongoing effort—including as recently as January 6, 2022—to intercept armored cars transporting lawfully earned cash, stop them pretextually, search them, seize their contents, and permanently keep the proceeds using civil forfeiture. These unlawful and unconstitutional stops, searches, and seizures are being orchestrated by the Department of Justice ("DOJ") and its subordinate law-enforcement agencies, including the Federal Bureau of Investigation ("FBI") and the Drug Enforcement Administration ("DEA") (collectively, with the United States, the "Federal Defendants"), in conjunction with local law-enforcement officials, including the San Bernardino County Sheriff ("Sheriff Dicus" or the "Sheriff"). Together, these law-enforcement agencies are targeting armored vehicles owned by Empyreal Logistics ("Empyreal") because those vehicles are transporting cash proceeds from state-licensed medical and adult-use cannabis businesses. This continuing, ongoing pattern of behavior exceeds Defendants' authority to act under state and federal law and violates Empyreal's Fourth Amendment and due process rights.

These stops, searches, and seizures are costly to Empyreal and extremely disruptive to its business: Empyreal has been unable to complete contracted services with clients, has been forced to suspend business operations in the largest county in the United States, San Bernardino County, and has stopped driving through Kansas entirely. Because of these incidents, Empyreal has lost customers, has been unable to roll out new services in multiple states because of informed concerns about similar seizures occurring in those states, and is constrained from growing its services in Southern California, a key market. If these incidents continue to occur—and there is every indication they will given the five previous stops and seizures—they will threaten Empyreal's business model and its ability to continue providing financial

infrastructure for the state-legal medical cannabis industry by safely moving cash from business premises into the legal banking system for greater transparency. Accordingly, Empyreal seeks immediate injunctive and declaratory relief in the form of a temporary restraining order followed by a preliminary injunction so that it can resume business operations in San Bernardino County and is not forced to suspend or forgo business operations elsewhere in California and nationwide.

## II.   Background

### A.   Empyreal is a law-abiding, national cash-in-transit business.

Empyreal is a law-abiding, cash-in-transit (armored car) business operating in 28 states, including California. Unlike traditional armored-car companies, Empyreal operates discreetly, using state-of-the art technology and surveillance systems in its vehicle fleet. Empyreal serves financial institutions that work with state-licensed medical and adult-use cannabis businesses in numerous states, including California, offering secure cash collection and transport, deposit validation at secure vault locations, and standard cash services. Empyreal thus provides critical financial infrastructure for the state-legal medical (and adult-use) cannabis industry by safely moving cash from business premises into the legal banking system for greater transparency and improved public safety. Notably, Empyreal never transports cannabis. A significant percentage of Empyreal's cash-in-transit business does not involve the cannabis industry; these clients include restaurants, convenience stores, and other cash-intensive businesses. O'Gorman Decl. ¶¶ 7–15.

Most of Empyreal's cannabis-industry clients hold medical cannabis licenses. Empyreal and its clients operate in full compliance with applicable state cannabis laws and all applicable federal and state money laundering laws, including the anti-money laundering requirements of the Banking Secrecy Act. With respect to its cannabis-industry clients, Empyreal contracts only with state-legal cannabis businesses that have established banking relationships with financial institutions that have anti-money laundering programs implemented pursuant to the 2014 FinCEN

Guidance Regarding Marijuana-related Business and applicable state-issued guidance. O'Gorman Decl. ¶¶ 16–17.

Approximately 20% of Empyreal's business is in California, including business that originates in California but is served by Empyreal branches in nearby states. Many of Empyreal's existing clients in California have requested that Empyreal expand services in California in the near future. To serve client demand, Empyreal was building a vault and currency processing facility in San Bernardino County, which was intended to serve all of Southern California. However, it recently suspended this project in response to Defendants' unlawful actions at the heart of this motion. Absent interference by Defendants, Empyreal projects it would double its business in California next year. O'Gorman Decl. ¶¶ 18–19, 49.

### B. Defendants are engaged in an ongoing effort targeting Empyreal's vehicles for stops, searches, and seizures.

Defendants are targeting Empyreal's vehicles for pretextual stops and searches, and they are seizing cash and other property lawfully transported therein for civil forfeiture. Empyreal's vehicles are being targeted by Defendants because Defendants know Empyreal vehicles are transporting the cash proceeds of state-legal cannabis businesses and want to seize that money and forfeit it using civil forfeiture.

Upon information and belief, DOJ is coordinating a federal effort across multiple states, jurisdictions, and DOJ agencies—in cooperation with multiple state and/or local law-enforcement agencies via joint task forces or joint investigations—to target Empyreal vehicles for these stops, searches, seizures, and forfeitures. The San Bernardino County Sheriff's Department is working with FBI and one or more of the other Federal Defendants via the Inland Regional Narcotics Enforcement Team ("IRNET"), a joint task force lead by the San Bernadino County Sheriff's Department, along with DEA and FBI, and/or other task forces or joint investigations, to orchestrate these ongoing stops, searches, seizures, and forfeitures. O'Gorman Decl. ¶¶ 21, 28; Bass Decl. ¶¶ 4–7, Ex. A; Compl. ¶¶ 56–63, 235–39.

Since mid-May 2021, Empyreal's vehicles have been stopped and searched by sheriff's deputies five times, including **three times in eight weeks**: on May 17, 2021 in Dickinson County, Kansas (the "May 17 stop"); on May 18, 2021 in Dickinson County, Kansas (the "May 18 seizure"); on November 16, 2021 in San Bernardino County (the "November 16 seizure"); on December 9, 2021 in San Bernardino County (the "December 9 seizure"); and on January 6, 2022 (the "January 6 stop") in San Bernardino County. No warrant was obtained for the stop and search of Empyreal's vehicles on May 17 or January 6, nor for the stop, search, and seizure of Empyreal's vehicles and their contents on May 18 or December 9.

On May 17, 2021, the Sheriff's Office in Dickinson County, Kansas stopped an Empyreal vehicle eastbound on I-70 based on an allegedly obscured license plate tag. Upon information and belief, this was a pretextual stop done in conjunction with a DEA task force. The Empyreal vehicle was not transporting any cash proceeds during the May 17 stop, so no seizure occurred, but the deputy questioned the Empyreal driver extensively about the purpose of the trip, asking many questions unrelated to the alleged license plate tag, demanded to see the driver's manifest without cause, and searched the vehicle. O'Gorman Decl. ¶ 23; Compl. ¶¶ 87–93.

On May 18, 2021, the Sheriff's Office in Dickinson County, Kansas stopped, searched, and seized approximately $165,620 from an Empyreal vehicle traveling westbound on I-70, working in conjunction with a DEA task force. The cash proceeds being transported by Empyreal's vehicle during the May 18 seizure were entirely from state-licensed medical cannabis dispensaries operating lawfully under Missouri law in Kansas City, Missouri. On September 3, 2021, the United States of America filed a civil forfeiture complaint in the United States District Court for the District of Kansas seeking civil forfeiture of the cash seized in the May 18 seizure. The accompanying affidavit by DEA Special Agent Bryson Wheeler stated that DEA conducted surveillance of Empyreal's vehicle visiting state-legal medical

cannabis dispensaries in Kansas City, Missouri to pick up the currency prior to the May 18 seizure. O'Gorman Decl. ¶¶ 24–26; Compl. ¶¶ 94–109.

On November 16, 2021, San Bernardino County Sheriff's Department deputies stopped and seized approximately $700,000 in lawfully obtained currency from one of Empyreal's vehicles, seized the vehicle itself, and seized the driver's business and personal cellphones. In the process, the government caused significant, unnecessary damage to the vehicle and the technology therein. The cash proceeds being transported by Empyreal's vehicle during the November 16 seizure were entirely from state-licensed cannabis businesses in good standing, operating lawfully under California law. Three of the four cannabis businesses whose cash proceeds were seized during the November 16 seizure hold California medical cannabis licenses. The Sheriff was working with FBI and/or one or more of the other Federal Defendants during or shortly after this seizure. FBI sent Empyreal a notice dated January 11, 2022, stating that the cash was "seized...by the FBI" and FBI intends to forfeit it. O'Gorman Decl. ¶¶ 28–31; Bass Decl. ¶¶ 4–6, Ex. A; Compl. ¶¶ 110–42.

On December 9, 2021, San Bernardino County Sheriff's Department deputies again stopped an Empyreal vehicle and this time seized approximately $350,000 in lawfully obtained currency from one of Empyreal's vehicles. The cash proceeds being transported by Empyreal's vehicle during the December 9 seizure were entirely from state-licensed cannabis businesses operating lawfully under California law. All four of the cannabis businesses whose cash proceeds were seized during the December 9 seizure hold California medical cannabis licenses. The Sheriff was working with FBI and/or one or more of the other Federal Defendants during or shortly after the December 9 seizure. The seized cash has been transferred to FBI for forfeiture. O'Gorman Decl. ¶¶ 28, 32–34; Bass Decl. ¶ 7; Compl. ¶¶ 143–86.

On January 6, 2022, one or more San Bernardino County Sheriff's deputies stopped and searched an Empyreal vehicle and interrogated the driver. The driver was not on a cash logistics trip and was merely picking up Empyreal's order of rolled

coin boxes from Empyreal's vendor, which happens to be located in San Bernardino County. The vehicle was not transporting any cannabis proceeds. It was transporting coins from a non-cannabis business (a rolled coin vendor). Deputies declined to seize the coins once they realized they were from a non-cannabis business. When the Empyreal driver asked a deputy why Empyreal's vehicles were being stopped so frequently, the deputy told him it was "political" but declined to elaborate. O'Gorman Decl. ¶¶ 44–48; Compl. ¶¶ 187–99. This statement confirms that Empyreal's vehicles are being targeted by Defendants for improper reasons.

Upon information and belief, the approximately $1,050,000 cash seized by Sheriff Dicus has been transferred under DOJ's equitable sharing program to FBI and/or the other the Federal Defendants, who are or will be pursuing civil forfeiture of that cash. Bass Decl. ¶¶ 4–7, Ex. A; O'Gorman Decl. ¶¶ 39–40.

Because of these five stops and searches—including three in eight weeks in San Bernardino County—which resulted in three seizures of the cash Empyreal vehicles were transporting, as well as the comments made by San Bernardino Sheriff's deputies during the stops, including that they were being done for "political" reasons, Empyreal reasonably believes it is being targeted by the Sheriff and the Federal Defendants for continued stops, searches, and seizures. O'Gorman Decl. ¶¶ 21, 36–37, 48, 49.

Upon information and belief, Defendants' ongoing targeting of Empyreal vehicles does not take into account whether the proceeds being seized are from state-licensed medical cannabis businesses operating lawfully under state law, Defendants take no measures to verify whether the proceeds are from medical or adult-use cannabis sales, and Defendants often do not even know whether the proceeds being seized are from cannabis or non-cannabis businesses. O'Gorman Decl. ¶¶ 41–43.

**C.**  **Because of Defendants' ongoing conduct, Empyreal has had to suspend operations and forgo offering new services in several states, and it is suffering reputational damage that is causing it significant harm, including losing potential clients.**

Defendants' conduct is causing irreparable harm to Empyreal, forcing it to suspend business operations in San Bernardino County and Kansas and to forgo offering new services in several states. The May 18 seizure already caused Empyreal to suffer reputational damage causing economic hardship to it business, including losing potential clients and business opportunities. Empyreal reasonably anticipates the two California seizures will cause it similar serious harm. O'Gorman Decl. ¶ 49.

Being subject to repeated stops, searches, and seizures by Defendants is extremely disruptive and costly to Empyreal and threatens the viability of Empyreal's entire cash-in-transit business model. Because of Defendants' actions against Empyreal vehicles in San Bernardino County, Empyreal has been forced to suspend its business operations in San Bernardino County, at substantial financial loss. This was particularly costly because Empyreal was building a vault and currency processing facility in San Bernardino County to serve all of Southern California and has had to suspend further construction and planned operations from that facility. Empyreal had already spent approximately $100,000 on renovations to its planned location in San Bernardino County and is incurring expenses of approximately $21,000 per month in rent and utilities. Losing the ability to open and operate the San Bernardino County currency processing facility has impacted Empyreal's operations outside San Bernardino County, because that location was to be Empyreal's currency processing facility serving all of Southern California. *Id.*

Empyreal's ability to meet the demands of its existing clients, expand its services, and meet revenue projections in California is dependent on both being able to continue operations in San Bernardino County and on being able to serve Southern California from its San Bernardino County currency processing facility. *Id.*

If Empyreal continues to have its vehicles stopped and searched and their contents seized by Defendants in California, Empyreal will have to suspend its business operations in California, at substantial financial loss. Suspending business operations in California will be particularly costly to Empyreal, because

approximately 20% of Empyreal's business—over $3.5 million in 2021—originates in California, and Empyreal projects that revenue to more than double in 2022 (absent Defendants' interference). *Id.*

If Empyreal continues to have its vehicles stopped, searched, and seized nationwide by the Federal Defendants, their task forces, and local or state law enforcement partners, Empyreal will have to cease lawful business operations for financial institutions, and their customers, involved in state-legal medical cannabis and adult-use cannabis operations. Ending these services would severely impact Empyreal's business. *Id.*

Defendants' conduct seriously jeopardizes Empyreal's ability to serve even its non-cannabis clients. For example, prior to the May 18 seizure, Empyreal had planned to start offering services for non-cannabis clients in three Midwestern states. Because of the events described in this lawsuit, and reasonable, informed fears that its vehicles would be targeted for stops, searches, and seizures in those expansion states, Empyreal has been unable to start offering those new services. *Id.*

Being subject to repeated stops, searches, and seizures by Defendants also causes Empyreal reputational harm and makes Empyreal's clients less likely to engage in business with Empyreal in the future. Empyreal has lost business opportunities and potential clients because of the May 18 seizure in Kansas and reasonably expects the two California seizures to have a similarly negative effect on its business. For example, Empyreal lost a potential client—the Colorado franchisee of a major fast-food chain—because of concerns the potential client had arising from the May 18 seizure. Empyreal's competitors have also used the May 18 seizure as a selling point for why Empyreal's clients and potential clients should do business with them instead, including in posts on social media websites such as LinkedIn. *Id.*

Because of the reputational harm Empyreal has suffered from the May 18 seizure, and that it anticipates suffering from the two California seizures, Empyreal

1    is reasonably concerned that potential financial investors or business partners will

2    be reluctant to invest in Empyreal or enter into business relationships with it. *Id.*

>       **D.    California law authorizes the business activities for which Defendants are targeting Empyreal for unlawful stops, searches, and seizures.**

Cannabis has been legal in California for medical use since 1996, when Californians voted to pass the Compassionate Use Act of 1996. Cal. Health & Safety Code § 11362.5. Later, in November 2016, California voters also approved the Adult Use of Marijuana Act, which legalized the recreational use of cannabis. In addition to protecting the use of cannabis, California law makes it legal for state-licensed dispensaries to sell cannabis for medical and recreational ("adult use") sales. Cal. Bus. & Prof. Code § 26000(b). Under California law, local law enforcement may not seize or forfeit the assets of state-legal cannabis operations. *See, e.g.*, *Granny Purps, Inc. v. County of Santa Cruz*, 266 Cal. Rptr. 3d 752, 758 (Cal. Ct. App. 2020).

As state-licensed dispensaries proliferated across the state, industry actors recognized a need for protection for financial transactions associated with cannabis businesses. *See* Assem. Com. on Banking and Finance, Analysis of Assem. Bill No. 1525 (2019–2020 Reg. Sess.). Specifically, entities were reluctant to provide financial services to cannabis businesses because of the absence of a clear legal framework for providing those services. *See id.* As a result, dispensaries and other state-legal cannabis businesses were often forced to keep large amounts of cash on hand, unable to deposit it with financial institutions. *See id.* To address this problem, the California Legislature passed, and Governor Newsom signed, Assembly Bill 1525, which protects entities providing financial services to the legal cannabis industry. Cal. Bus. & Prof. Code § 26260(a). Among other things, the new law makes clear that "[a]n entity that . . . **transports cash** or financial instruments, or provides other financial services **does not commit a crime under any California law** . . . solely by virtue of the fact that the person receiving the benefit of any of those services engages in commercial cannabis activity as a licensee pursuant to this

division." Cal. Bus. & Prof. Code § 26260(a) (emphasis added). Empyreal's business operations—transporting cash for state-legal dispensaries and the financial institutions with which they contract—fall squarely within this statutory protection.

### E.   The appropriations rider known as the Rohrabacher-Farr Amendment prohibits the Federal Defendants from interfering with state-legal medical cannabis industries.

Congress has explicitly limited the Federal Defendants' authority to enforce federal drug laws against state-authorized medical cannabis use by exercising its appropriations power in the Consolidated Appropriations Act of 2021, via a rider known as the Rohrabacher-Farr Amendment. This rider constrains the Federal Defendants because they may not "draw[] [Money] from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7.

Through this constitutional power, Congress has withheld all funding for any activities that interfere with a state's implementation of its medical marijuana laws. Consolidated Appropriations Act 2021, Pub. L. No. 116-260, § 531, 134 Stat. 1283 (2020) (amended Dec. 3, 2021) ("None of the funds made available under this Act to the Department of Justice may be used, with respect to any of the [listed states] to prevent any of them from implementing their own laws that authorize the use, distribution, possession, or cultivation of medical marijuana."); *United States v. McIntosh*, 833 F.3d 1163, 1172 (9th Cir. 2016) (interpreting the Rohrabacher-Farr Amendment to conclude that "Congress has enacted an appropriations rider that specifically restricts DOJ from spending money to pursue certain activities").

The Federal Defendants are thus prohibited from spending funds for law enforcement activities against those engaged in conduct permitted by state medical marijuana laws so long as they are in full compliance with such laws. *Id.* at 1177. And the Federal Defendants cannot interfere with the state-sanctioned operations of a state's medical cannabis industry, including the financial infrastructure necessary for that industry to operate, because this prohibition includes *any* use of funds that "prevent[s a] state from giving practical effect to its [medical cannabis] law[s]." *Id.*

10

Moreover, prospective relief is available against the Federal Defendants for actions that violate the spending prohibition of the Rohrabacher-Farr Amendment. *Sierra Club v. Trump*, 929 F.3d 670, 695–96 (9th Cir. 2019) ("'Appellants . . . can seek—and have sought—to enjoin [an agency] from spending funds' contrary to Congress's restrictions." (quoting *McIntosh*, 833 F.3d at 1172)).

California and Missouri, among other states, have both authorized the use of medical marijuana and the establishment of businesses to distribute and sell medical marijuana to customers. Cal. Bus. & Prof. Code, § 26000 *et seq.*; Mo. Const. art. XIV, § 1. Empyreal's cash-in-transit business provides financial infrastructure for the depositing of cash proceeds that is essential to implementing the medical marijuana laws in California and Missouri, among other states, and that has been expressly authorized by California statute. Cal. Bus. & Prof. Code § 26260(a).

### F.     Defendants have a financial incentive to stop, search, and seize Empyreal's vehicles and their contents, which violates Empyreal's Due Process rights.

Defendants' true motivation for stopping, searching, and seizing Empyreal's vehicles and the money they transport is not law enforcement, but revenue generation. Sheriff Dicus has no legitimate reason to interdict Empyreal vehicles for engaging in a business that is expressly authorized by California law, and the Federal Defendants are transparently focused only on seizing the cash proceeds that Empyreal is transporting while taking no other steps to enforce federal laws against state-licensed cannabis businesses that operate openly and publicly.

The San Bernardino Sheriff's Department participates in DOJ's equitable sharing program and is working with FBI and/or one or more of the other Federal Defendants to seize and forfeit the proceeds of state-legal cannabis businesses that Empyreal transports. DOJ's equitable sharing program permits local or state law-enforcement agencies to transfer seized property to a federal agency, which then processes the forfeiture under federal law and distributes the proceeds to cooperating state and local law enforcement agencies. *See* DOJ, *Guide to Equitable Sharing for*

*State and Local Law Enforcement Agencies* (July 2018), https://www.justice.gov/criminal/afmls/pubs/pdf/04-2009guide-equit.pdf. The minimum share of the proceeds that goes to federal agencies is 20%. *Id.* at 9–10. Participating local or state agencies are eligible for payments of up to 80% of the forfeiture proceeds. Institute for Justice, *Policing for Profit*, "Equitable Sharing Creates a Giant Loophole" (Dec. 2020), https://ij.org/report/policing-for-profit-3/pfp3content/equitable-sharing-creates-a-giant-loophole/.

There are two primary ways for local law enforcement to qualify for DOJ equitable sharing: by participating in a joint task force or investigation with federal law-enforcement, or through adoption, a process by which a federal agency takes control of property seized by state authorities, based on state law, and then investigates and prosecutes the case under federal law. *Id.*, "Didn't DOJ Fix the Problem," https://ij.org/report/policing-for-profit-3/pfp3content/equitable-sharing-creates-a-giant-loophole/didnt-doj-fix-the-problem/. Because adoptive forfeitures are prohibited by California law, *see* Cal. Health & Safety Code § 11471.2(a), the Sheriff may only *legally* qualify for equitable sharing—and up to 80% of federal equitable sharing proceeds from Empyreal seizures—through the former option: a joint task force or investigation with one or more of the Federal Defendants.

Every year, state and local law enforcement agencies collect hundreds of millions through DOJ equitable sharing. In 2019 alone, the federal government made $333.8 million in payments to state and local law enforcement through the program. Institute for Justice, *Policing For Profit*, "Trends in Equitable Sharing Revenues and Payments," https://ij.org/report/policing-for-profit-3/pfp3content/equitable-sharing-creates-a-giant-loophole/trends-in-equitable-sharing-revenues-and-payments/. Sheriff Dicus also relies on equitable sharing as a significant revenue stream. In the last five years alone, the San Bernardino County Sheriff's Department has received more than $4.2 million in equitable sharing proceeds, earned primarily through joint task forces. *See* DOJ, Consolidated Asset Tracking System,

https://web.archive.org/web/20210418164910/https://www.justice.gov/afp/freedo
m-information-act (data obtained through analysis of CATS Zip File, current
through Jan. 9, 2021). Also in the last five years, IRNET—the task force involved
in the Empyreal seizures—has received more than $15.8 million in equitable sharing
proceeds. *Id*; Bass Decl. ¶¶ 4, 7. Since there is no legal basis for the Sheriff to seize
the cash proceeds Empyreal is transporting for state-legal cannabis business, and
since the Sheriff is not pursuing forfeiture in California courts for any violations of
state law, the only plausible explanation for the Sheriff's conduct in seizing the cash
and transferring it to the Federal Defendants is revenue generation.

The January 6 stop demonstrates the Sheriff is *only* interested in seizing
cannabis proceeds, not cash from other businesses. That is because, unlike other
business revenue that is legal in California, state-licensed cannabis proceeds—illegal
under federal law—can be forfeited through DOJ's equitable sharing program.[1]

## III.   Legal Standard

To obtain a TRO or preliminary injunction, Empyreal must demonstrate that
(1) it is likely to succeed on the merits of at least one of its claims, (2) it is likely to
suffer irreparable harm in the absence of preliminary relief, (3) the balance of
equities tips in its favor, and (4) an injunction is in the public interest. *Winter v.
NRDC, Inc.*, 555 U.S. 7, 20 (2008). "When the government is a party, the last two
factors (equities and public interest) merge." *E. Bay Sanctuary Covenant v. Biden*,
993 F.3d 640, 668 (9th Cir. 2021). Under the Ninth Circuit's sliding scale approach,
"[s]erious questions going to the merits and a balance of hardships that tips sharply
towards the plaintiff can support issuance of a preliminary injunction, so long as"
the irreparable injury and public interest elements are satisfied. *Alliance for the Wild
Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). So "[i]f the balance of harm
tips decidedly toward [Empyreal], then [it] need not show as robust a likelihood of

---

[1] However, as noted *supra*, DOJ is prohibited from spending any funds to forfeit
state-legal medical cannabis proceeds.

success on the merits as when the balance tips less decidedly." *Republic of Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988).

### IV.    Argument

A TRO should issue and a preliminary injunction is appropriate here because (A) Empyreal is likely to succeed on the legal claims it brings here challenging Defendants' conduct as *ultra vires* and violative of Empyreal's constitutional rights, (B) Empyreal is currently suffering and will continue to suffer substantial irreparable harm due to Defendants' ongoing conduct without relief from this Court, and (C) the balance of the equities and public interest strongly favor an injunction.

#### A.    Empyreal is likely to succeed on its *ultra vires*, Fourth Amendment, and due process claims.

##### 1.    The ongoing conduct of Sheriff Dicus and his department exceeds his statutory authority.

Under California law, "[a] governmental agency that acts outside of the scope of its statutory authority acts *ultra vires* and the act is void." *Cal. DUI Laws. Ass'n v. Cal. Dep't of Motor Vehicles*, 20 Cal. App. 5th 1247, 1264 (2018). California law provides specific protections for the business activities Empyreal was engaged in at the time of the searches and seizures. And Sheriff Dicus has no statutory authority to search and seize property without evidence of criminal activity. Because Sheriff Dicus had no statutory authority for his illegal searches and seizures of Plaintiff's property, those acts, including any future such acts, are void as *ultra vires*.

Sheriff Dicus is the chief law enforcement officer of San Bernardino County. He acts under the authority vested in California sheriffs set out in Cal. Gov't Code §§ 26600–16. Specifically, those provisions authorize a sheriff to "preserve peace" and, in furtherance of that objective, to "sponsor, supervise, or participate in any project of crime prevention, rehabilitation of persons previously convicted of crime, or the suppression of delinquency." Cal. Gov't Code § 26600. Sheriffs are also authorized to "arrest and take before the nearest magistrate for examination all persons who attempt to commit or who have committed a public offense." Cal. Gov't

Code § 26601. No California law, however, empowers Sheriff Dicus to search or seize property where there is no probable cause of criminal activity. Nor is Sheriff Dicus authorized to conduct stops, searches, or seizures for "political" reasons.

Sheriff's deputies had no reason to believe that Plaintiff was engaged in criminal activity during the course of any of the three stops, searches, and seizures of Empyreal. Any alleged initial doubt over the origin of the cash carried in Empyreal's vehicles was immediately resolved by information readily provided by Empyreal documenting the operation of its legal cash-in-transit business. O'Gorman Decl. ¶¶ 29–48. These business activities are expressly protected by California law, which states that "**[a]n entity that** . . . **transports cash** or financial instruments, or provides other financial services **does not commit a crime under any California law** . . . solely by virtue of the fact that the person receiving the benefit of any of those services engages in commercial cannabis activity as a licensee pursuant to this division." Cal. Bus. & Prof. Code § 26260(a) (emphasis added). Through this law, the California Legislature recognized the importance of businesses like Empyreal's in making California's legal cannabis industry safe. *See* Assem. Com. on Banking and Finance, Analysis of Assem. Bill No. 1525 (2019–2020 Reg. Sess.). Sheriff Dicus's ongoing disruptions of Empyreal's business operations are not only unauthorized by California law, they undermine the law's express protections and the important public safety objectives it advances.

Sheriff Dicus is exceeding his statutory authority by instructing or permitting his office to repeatedly stop, search, and seize Empyreal's property without any indication of criminal activity (let alone probable cause). Targeting Empyreal's vehicles for any sort of criminal enforcement measures based on "political" reasons is also deeply improper and unauthorized by any statute. Because the activities for which Sheriff Dicus is targeting Empyreal for stops, searches, and seizures are expressly protected by California law, Empyreal is likely to succeed on its claim that Sheriff Dicus's practice of illegal searches and seizures is void as *ultra vires*.

### 2. The Federal Defendants' ongoing conduct exceeds their statutory authority to spend federal funds.

Any activity by the Federal Defendants to seize cash proceeds from medical cannabis businesses that Empyreal is transporting is *ultra vires* their authority and should be enjoined. The ability for California cannabis distributors to sell medical cannabis and deposit the cash proceeds in financial institutions is not only essential to conducting business, it is also explicitly authorized under California law. *See* Cal. Bus. & Prof. Code § 26260(a). Congress has spoken clearly and prohibits DOJ from spending any funds interfering with state-legal medical cannabis, including the seizure of any cash proceeds from medical cannabis. The Federal Defendants' ongoing seizures are *ultra vires* because they violate Congress's prohibition.

The Constitution exclusively vests the power of the purse with Congress. U.S. Const. art I., § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law.") ("Appropriations Clause"). The Appropriation Clause is simple and explicit: "It means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990) (citations omitted). The Constitution delegates to Congress "exclusive" power "not only to formulate legislative policies and mandate programs and projects, but also to establish their relative priority for the Nation." *McIntosh*, 833 F.3d at 1172.

Unlike other constitutional provisions, there is no *de minimis* allowance, no reasonableness test, no forgiveness for mistake, no good faith exception, and no balancing against compelling government interests that allows the Executive Branch to act in violation of the plain language of the Appropriations Clause. *See Off. of Pers. Mgmt.*, 496 U.S. at 425 (holding that a mistake by an official is not grounds for obliging the government to pay where no appropriation has been made because under the Appropriations Clause "if individual hardships are to be remedied by payment of Government funds, it must be at the instance of Congress"); *Reeside v.*

*Walker*, 52 U.S. 272, 291 (1850) ("However much money may be in the Treasury at any one time, not a dollar of it can be used in the payment of any thing not thus previously sanctioned."); *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1342 (D.C. Cir. 2012) (holding that the Navy may not even buy bottled water absent a congressional appropriation). The command is clear—without an appropriation, no money may be spent by the Executive Branch.

Pursuant to its exclusive power of appropriation, Congress imposed through an appropriations rider a duty on DOJ, including its subsidiary agencies FBI and DEA, to not spend *any* money that prevents a state from implementing its own laws that authorize the use, distribution, possession, or cultivation of medical cannabis. Consolidated Appropriations Act 2021, Pub. L. No. 116-260, § 531, 134 Stat. 1283 (2020) (amended Dec. 3, 2021). In *McIntosh*, the Ninth Circuit recognized the absolute effect of this appropriation rider's command and the ability for courts to grant injunctive relief. *McIntosh*, 833 F.3d at 1175. There, the Court held that "Appellants . . . can seek—and have sought—to enjoin DOJ from *spending funds*" contrary to Congress's restrictions." *McIntosh*, 833 F.3d at 1172 (enjoining prosecution of charged conduct that is in compliance with state medical marijuana laws); *see also Sierra Club v. Trump*, 929 F.3d at 695 (rejecting an interpretation of *McIntosh* that only provides "a defense for criminal defendants"). By seizing the proceeds of medical cannabis businesses that Empyreal is transporting and by forcing Empyreal to stop operating where those seizures occur, the Federal Defendants are "spending money on actions that prevent the Medical Marijuana States' giving practical effect to their state laws that authorize the use, distribution, possession, or cultivation of medical marijuana." *McIntosh*, 833 F.3d at 1176. Empyreal thus seeks to enjoin the Federal Defendants from seizing the medical cannabis funds it is transporting because those acts are unfunded and thus *ultra vires*.

Empyreal's lawful business of transporting cash from state-licensed medical cannabis businesses to financial institutions has been targeted several times by the

Federal Defendants, including as recently as January 6, 2022. Transporting cash from a state-licensed medical cannabis business is expressly protected by California law. Cal. Bus. & Prof. Code § 26260(a). The threat of future seizures of cash proceeds like those that have already occurred has forced Empyreal to suspend its service to state-licensed medical cannabis businesses in San Bernardino County and threatens to force Empyreal to suspend service to state-licensed medical cannabis businesses elsewhere in California and across the nation. This threat of seizure interferes with a vital business operation for medical cannabis businesses, frustrating their ability to safely store cash proceeds off-premises, which in turn interferes with their ability to provide medical cannabis to those seeking treatment. O'Gorman Decl. ¶ 49. The Federal Defendants' actions violate the clear prohibition against DOJ spending money that prevents states from implementing their own laws that authorize the use, distribution, possession, or cultivation of medical cannabis.[2]

The Federal Defendants' participation in these seizures and forfeitures also cannot be justified by reliance on probable cause, even if some of the seized cash might originate from adult-use cannabis businesses not covered by the appropriations rider. As noted above, the necessity of strict adherence to the limitations of the Appropriation Clause, coupled with the prohibitions of the rider, means the Federal Defendants must take care to not engage in activities, whether they have probable cause or some other justification, to spend *any* money that prevents states from implementing their medical cannabis laws. As such, the Federal Defendants should be enjoined from participating in the stops and searches of

---

[2] Any activity by Federal Defendants to seize proceeds from medical cannabis necessarily costs money and violates the rider—government employees do not work pro bono. *See United States v. Jackson*, 388 F. Supp. 3d 505, 514 (E.D. Pa. 2019) ("That U.S. Attorneys and U.S. Marshals are paid a fixed salary is immaterial; the fact that these employees would be devoting time to this case over another case is sufficient to constitute use of funds. Moreover, however minor the expense, the rider provides that '*[n]one* of the funds' appropriated to DOJ may be used to prevent a state from implementing its medical marijuana laws. Thus, DOJ participation in such proceedings would constitute a use of its funds under the rider.").

Empyreal's vehicles or in the seizures or forfeitures of proceeds Empyreal is transporting unless they can establish that those funds originated *entirely* from adult-use cannabis (or from medical cannabis not in compliance with California law).[3]

The practical effect may be that the Federal Defendants are limited in the types of law enforcement tactics they can engage in or require them to be more careful in identifying the sources of funds before seizing them, but that result was Congress's policy decision to make, not the Federal Defendants'. *McIntosh*, 833 F.3d at 1172 ("Once Congress, exercising its delegated powers, has decided the order of priorities in a given area, it is for the courts to enforce them when enforcement is sought.") (cleaned up). The burden is rightly on the Federal Defendants because it is their burden to not violate the Appropriations Clause by acting *ultra vires* their authority. A contrary holding would allow for the inadvertent (or advertent) spending of funds without an appropriation, which is antithetical to long-standing constitutional law. Therefore, Empyreal is likely to succeed on this claim.

### 3. The Sheriff is violating the Fourth Amendment.

The sine qua non of the Fourth Amendment is that, even where a warrant may not be required, officers are prohibited from conducting stops, searches, or seizures without reasonable suspicion or probable cause of criminality. *Jones v. Las Vegas Metro. Police Dep't*, 873 F.3d 1123, 1132 n.7 (9th Cir. 2017) ("Officers are required to have at least reasonable suspicion to stop a vehicle for investigatory purposes.") (citations omitted); *United States v. Rojas-Millan*, 234 F.3d 464, 468 (9th Cir. 2000) (Officers "must have at least a reasonable suspicion of criminal misconduct before detaining a driver."); *United States v. Place*, 462 U.S. 696, 709–10 (1983) (brief

---

[3] However, if such seizures were to prevent Empyreal from operating the financial infrastructure necessary to support state-sanctioned medical cannabis businesses, they would still violate the Rohrabacher-Farr appropriations rider by interfering with states' implementation of their medical cannabis laws. DOJ may not spend money on actions that prevent states from "giving practical effect to their state laws that authorize" medical cannabis. *McIntosh*, 833 F.3d at 1176.

investigatory seizure of property requires reasonable suspicion, and anything longer requires probable cause). The Sheriff is violating that elementary principle.

Because the sale of cannabis and the transport of cannabis proceeds (including in localities where dispensaries are prohibited) are lawful under California law, the Fourth Amendment prohibits the Sheriff from stopping, searching, or seizing Empyreal's personnel or property (namely, vehicles, safes, and cash) without reasonable suspicion or probable cause to believe that the property is associated with or is the proceeds of cannabis sales that violate state law. The Sheriff has no such basis for conducting the ongoing stops, searches, and seizures of Empyreal's vehicles, as revealed by his deputy's January 6, 2022 statement that Empyreal's vehicles are being targeted for "political" reasons. O'Gorman Decl. ¶ 48.

Instead, the ongoing stops, searches, and seizures are improperly based on the Sheriff's insistence that because the cash Empyreal lawfully transports on behalf of its clients is connected to "drugs" the Sheriff has "the right to take the money." *Id.* ¶ 36. That is wrong. Empyreal is lawfully transporting the lawful proceeds of product sales that are completely lawful under California law, the state that employs the Sheriff and the state whose laws he is bound to enforce. The Sheriff has no "right to take the money" because the Sheriff has no "specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity." *United States v. Twilley*, 222 F.3d 1092, 1096 (9th Cir. 2000) (citation omitted). And the Sheriff's apparent "mistaken view of the law" does not absolve the Sheriff's repeated, ongoing Fourth Amendment violations. *Id.*

Also wrong is the Sheriff's mistaken belief that "if I stop you I have the right to open the safe" in the vehicle. O'Gorman Decl. ¶ 36. No such rule exists. Clearly, the Sheriff is using pretextual traffic stops to search and seize Empyreal's property without probable cause. Indeed, the Sheriff is not even issuing traffic citations during these stops—just taking Empyreal's cash. *Id.* ¶ 22. Even when the Sheriff has

"probable cause to believe that a traffic violation has occurred" and may therefore conduct a vehicle stop, *Whren v. United States*, 517 U.S. 806, 810 (1996), that traffic-violation stop does not give officers the right to search the vehicle. To the contrary: Any warrantless search pursuant to the automobile exception requires probable cause to believe that the place searched contains contraband. *United States v. Ross*, 456 U.S. 798, 825 (1982). Contra the Sheriff's wishes, a traffic-violation stop is not carte blanche to search a vehicle, let alone a locked safe inside it.

At this stage, the Court need not opine on the pretextual nature of these ongoing stops. All the Court need hold is: Even assuming the Sheriff's stops are lawful if based on actual traffic violations, any searches or seizures of personnel or property conducted after those stops must be based on probable cause, *Ross*, 456 U.S. at 825, and the stops may not be prolonged beyond their traffic-violation "mission" without at least articulable, individualized reasonable suspicion of criminality, *Rodriguez v. United States*, 575 U.S. 348, 354–55 (2015). The Court should preliminarily enjoin any stops, searches, or seizures of Empyreal vehicles made without probable cause under California law—which the Sheriff does not and cannot have, as evidenced by the fact that after multiple searches and seizures, the Sheriff has not issued any traffic citations, arrested anyone, filed criminal charges, or otherwise articulated or shown any evidence that Empyreal is doing anything other than lawfully transporting the lawful proceeds of state-licensed businesses.

### 4. The Sheriff is violating due process because his conduct is driven by improper financial motives.

The Fourteenth Amendment's Due Process Clause "entitles a person to an impartial and disinterested tribunal in both civil and criminal cases." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980). For this reason, a "scheme injecting a personal interest, financial or otherwise, into the enforcement process may . . . raise serious constitutional questions." *Id.* at 249–50; *see also, e.g.*, *Ward v. Village of Monroeville*, 409 U.S. 57, 60–62 (1972) (holding that petitioner's due process rights

were violated when he was required to appear in traffic court before a mayor who was also responsible for village finances); *Harjo v. City of Albuquerque*, 326 F. Supp. 3d 1145, 1193 (D.N.M. 2018) (holding that institutional incentive to prosecute constituted a due process violation). Defendants run afoul of this constitutional guarantee by stopping, searching, and seizing Empyreal's vehicles and the money transported in them for no reason other than supplementing their agencies' budgets.

As detailed above, the Sheriff is participating in equitable sharing with one or more of the Federal Defendants, through which he receives up to 80% of the proceeds from assets forfeited through civil forfeiture. Notably, because medical and adult-use cannabis is entirely legal under California law, and Empyreal's business has been expressly authorized by California law, the Sheriff has no legitimate law-enforcement purpose to search Empyreal's property or seize the money Empyreal transports. And even if the Sheriff believed that Empyreal's *clients* were not fully compliant with California law, it would only make sense for the Sheriff to search and investigate those businesses, not Empyreal's vehicles.

While this alone demonstrates the Sheriff's true motivation for seizing the money in Empyreal's vehicles, his deputies' comments during the December 9 seizure leave no room for doubt. After seizing the cash in the vehicle, the deputies counted the money. Before beginning the count, one of them apparently observed the physical amount of cash in the vehicle and said, "this is, uh, more small," presumably comparing the December 9 seizure total to the November 16 seizure total. Then, after they finished counting the cash, one of the deputies remarked that there were "pretty small amounts [of cash] this time, huh?" Another deputy said, "That's it?" and chuckled. He then said "You set the bar too high." When another deputy remarked that he thought they would get "a million or two," the first deputy responded, "At least we got over a million." Again, the deputies appear to be comparing the November 16 and December 9 seizures, which together totaled approximately $1.1 million. O'Gorman Decl. ¶ 37. As these discussions reveal, the

deputies' focus was on the quantity of cash, not its source. Because they cannot actually be interested in curtailing the cannabis industry—which is legal under California law—they must be interested in DOJ equitable sharing revenues.

The Sheriff's financial motivation is further supported by the January 6 stop, when deputies declined to seize boxed coins Empyreal was transporting because they were from a non-cannabis business. *Id.* ¶ 47. That is because, unlike cannabis proceeds, lawful revenue from other businesses cannot be forfeited through DOJ's equitable sharing program (nor can it be forfeited under California law).

This type of financial incentive is precisely the type that the U.S. Supreme Court has warned violates due process. *See Marshall*, 446 U.S. at 249–50; *see also Harjo*, 326 F. Supp. 3d at 1193. Empyreal is thus likely to succeed on this claim.

## B. Empyreal is suffering and will continue to suffer substantial irreparable harm without relief from this Court.

"[E]conomic hardship constitutes irreparable harm." *Kildare v. Saenz*, 325 F.3d 1078, 1083 (9th Cir. 2003). More specifically, evidence supporting irreparable harm can be: "threatened loss of prospective customers or goodwill," *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001); "loss of control over business reputation," *Adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 756 (9th Cir. 2018); or a "constitutional violation alone, coupled with the damages incurred," *Am. Trucking Assocs., Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058 (9th Cir. 2009). Having to cease lawful business operations suffices. *Id.*

Here, because of Defendants' ongoing conduct, Empyreal is suffering the following immediate and irreparable injuries. It is: (1) being deprived of its ability to complete contracted services with its clients, damaging its business reputation, client retention, and client recruitment; (2) forced to suspend its operations in San Bernardino County and reroute other Southern California routes to avoid San Bernardino County; (3) forced to suspend its operations through Kansas and reroute its operations to serve Kansas City, Missouri, at considerable expense; (4) forced to

forgo offering new services in three Midwestern states; (5) unable to expand its services to meet client demands in Southern California due to its inability to make use of its currency processing facility in San Bernardino County and to otherwise operate there, including rerouting Southern California routes that would have delivered to that facility; (6) losing potential clients; (7) suffering significant reputational harm and economic hardship based on the May 18 seizure, including having its competitors use the May 18 seizure to publicly attack and degrade Empyreal to potential and current clients; (8) reasonably anticipating additional reputational harm and economic hardship due to the California seizures, which will affect its ability to attract investors and business partners; (9) being deprived of hundreds of thousands of dollars seized from its vehicles; (10) being forced to expend funds to defend against civil forfeiture proceedings initiated without cause; and (11) suffering violations of its constitutional rights. O'Gorman Decl. ¶ 49.

All of the above immediate and irreparable injuries will continue unabated if Defendants are not enjoined from this ongoing conduct, as shown by the January 6 stop. Each day Defendants' unlawful conduct continues, Empyreal will continue to suffer injury, further compounding its economic hardship and reputational damage.

Finally, if Defendants' conduct continues, it poses an existential threat to Empyreal. If Defendants' conduct continues in California, Empyreal will have to suspend its business operations in the state, at a significant financial loss, since California represents about 20% of Empyreal's business and Empyreal reasonably anticipated its business would otherwise double in California in 2022. Even worse, if the Federal Defendants' conduct continues in other jurisdictions, Empyreal may be forced to cease lawful business operations for financial institutions, and their customers, involved in state-legal medical cannabis and adult-use cannabis operations. Ending these services would severely impact Empyreal's business. *Id.*

**C.     The equities and public interest strongly favor an injunction.**

"[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quotation marks and citations omitted). It is, in fact, "the highest public interest." *United States v. Raines*, 362 U.S. 17, 27 (1960). For that reason alone, Empyreal satisfies the equities and public-interest requirements for immediate relief, given that Defendants' conduct violates Empyreal's Fourth and Fourteenth Amendment rights. But even if the Court grants relief only on statutory grounds, the policies expressed in those statutes, both state and federal, make clear that there is no public interest in disrupting Empyreal's lawful business specifically and the operations of the lawful cannabis industry generally—which depends on services like Empyreal's to operate safely and in compliance with federal and state financial regulations. *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982) (exercise of equity in the public interest should be in accordance with what legislature sought to protect); *Allergan, Inc. v. Merz Pharms., LLC*, 2012 WL 781705, at *13 (C.D. Cal. Mar. 9, 2012) (giving effect to a law's "broadly stated policies" "would serve the public interest"); *Shipp v. Schaaf*, 2019 WL 1472303, at *2 (N.D. Cal. Apr. 2, 2019) (finding it in the public interest to enjoin conduct that "does not follow . . . stated policy"). On the other side of the ledger, Defendants have no reason to disrupt these lawful businesses. Their only interest, as demonstrated by their own words and conduct, is financial gain. That, of course, is never a legitimate government interest—especially when it contravenes explicit statutory commands, policies, and goals, in a manner that violates the Fourth Amendment to boot.

## V.     Conclusion

The Court should issue a temporary restraining order enjoining Defendants' unlawful and unconstitutional stops, searches, and seizures of Empyreal's vehicles, cash, and other property, and an order for Defendants to show cause why a preliminary injunction should not issue.

Dated: January 19, 2022

**INSTITUTE FOR JUSTICE**
Dan Alban (*pro hac vice* forthcoming)
dalban@ij.org
Kirby Thomas West (*pro hac vice*
forthcoming)
kwest@ij.org
901 North Glebe Road, Suite 900
Arlington, VA 22203
(703) 682-9320
(703) 682-9321 (fax)

Respectfully submitted,

/s/   David C. Bass

**KOELLER, NEBEKER, CARLSON &
HALUCK LLP**
David C. Bass (Cal. Bar No. 296380)
david.bass@knchlaw.com
Jerome Satran (Cal Bar. No. 188286)
jerry.satran@knchlaw.com
1478 Stone Point Drive, Suite 435
Roseville, CA 95661
(916) 724-5700
(916) 788-2850 (fax)

*Counsel for Plaintiff*