**INSTITUTE FOR JUSTICE**
Dan Alban (admitted *pro hac vice*)
dalban@ij.org
Kirby Thomas West (admitted *pro hac vice*)
kwest@ij.org
901 North Glebe Road, Suite 900
Arlington, VA 22203
(703) 682-9320
(703) 682-9321 (fax)

**KOELLER, NEBEKER, CARLSON & HALUCK LLP**
David C. Bass (Cal. Bar No. 296380)
david.bass@knchlaw.com
Jerome Satran (Cal Bar. No. 188286)
jerry.satran@knchlaw.com
1478 Stone Point Drive, Suite 435
Roseville, CA 95661
(916) 724-5700
(916) 788-2850 (fax)

*Counsel for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
## EASTERN DIVISION

| | |
|---|---|
| EMPYREAL ENTERPRISES, LLC, d/b/a EMPYREAL LOGISTICS<br><br>                         Plaintiff,<br><br>        v.<br><br>The United States of America; the U.S. Department of Justice; Attorney General MERRICK GARLAND, in his official capacity; the Federal Bureau of Investigation; CHRISTOPHER A. WRAY, Director of the Federal Bureau of Investigation, in his official capacity; KRISTI KOONS JOHNSON, Assistant Director of the Federal Bureau of | Case No.: 5:22-cv-00094-JWH-SHKx<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

| | |
|---|---|
| Investigation overseeing the FBI's Los Angeles Field Office, in her official capacity; the Drug Enforcement Administration; ANNE MILGRAM, Administrator of the Drug Enforcement Administration, in her official capacity; SHANNON D. DICUS, San Bernardino County Sheriff-Coroner, in his official capacity as the head of the San Bernardino County Sheriff's Office. | |
| | Defendants. |

## INTRODUCTION

This is a civil rights lawsuit challenging the repeated and continuing highway robberies of armored cars by government agents. Specifically, Plaintiff Empyreal Logistics ("Empyreal"), a cash-in-transit company operating in 28 states, challenges the ongoing stops and searches of its vehicles, and the seizure of cash and other property lawfully transported therein. These unlawful and unconstitutional stops, searches, and seizures are orchestrated by the Department of Justice ("DOJ") and its subordinate law-enforcement agencies, including the Federal Bureau of Investigation ("FBI") and the Drug Enforcement Administration ("DEA"), in conjunction with local law-enforcement officials, including the San Bernardino County Sheriff (the "Sheriff"). Together, these law-enforcement agencies are targeting armored vehicles owned by Empyreal because those vehicles are transporting cash proceeds from state-legal medical and adult-use cannabis dispensaries to legitimate financial institutions such as banks and credit unions. Notably, Empyreal never transports or handles cannabis. Empyreal also provides cash transport services for traditional, non-cannabis businesses, such as restaurants and convenience stores. Empyreal and its clients operate in full compliance with applicable state cannabis laws and all applicable federal and state money laundering

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

compliance requirements, including the anti-money laundering requirements of the Banking Secrecy Act and applicable regulatory guidance issued by the Financial Crimes Enforcement Network ("FinCEN").

Despite this, sheriff's deputies are conducting pretextual stops of Empyreal's armored vehicles, searching them, and seizing the cash contents—covering up their surveillance cameras and sometimes damaging Empyreal's vehicles to access the cash in their secured vaults—and are then turning the seized cash over to federal law-enforcement for forfeiture proceedings under the federal equitable sharing program. Since mid-May 2021, Empyreal's vehicles have been stopped and searched by sheriff's deputies five times, including **three times in an eight-week period** in San Bernardino County, California. Three of those stops resulted in seizures of the cash contents of Empyreal's vehicles: once in May 2021 in Dickinson County, Kansas, and again in November 2021 and December 2021 in San Bernardino County, California.

These ongoing stops, searches, and seizures are beyond the statutory authority of the law-enforcement agencies involved and violate Empyreal's constitutional rights under the Fourth, Fifth, and Fourteenth Amendments to the U.S. Constitution. There is no legitimate reason that San Bernardino County Sheriff's deputies should be targeting a state-sanctioned business that is operating lawfully under California law. And there is no legitimate reason for federal agencies to be targeting a business that provides financial infrastructure support for the state-legal medical cannabis industry, particularly when DOJ is forbidden from spending federal funds to do so under the appropriations rider known as the Rohrabacher-Farr Amendment. Even if these agencies were genuinely concerned about whether Empyreal's clients are acting in full compliance with the law, it makes no sense to confiscate lawfully collected currency from Empyreal's vehicles as it is delivered safely to the financial system for greater transparency instead of investigating or enforcing against any

businesses suspected to be non-compliant. The real reason Empyreal is being targeted is because it is very profitable for these law-enforcement agencies to seize the cash proceeds that Empyreal is transporting and keep that money using civil forfeiture.

These repeated, ongoing stops, searches, and seizures are costly to Empyreal and extremely disruptive to its business. Empyreal has been forced to suspend business operations in the largest county in the United States, San Bernardino County, and has stopped driving through Kansas. Empyreal has lost customers because of these incidents, has been unable to roll out new services in multiple states because of informed concerns about similar seizures occurring in those states, and is constrained from growing its services in Southern California, a key market. If these incidents continue to occur—and there is every indication they will—it will threaten Empyreal's business model and its ability to continue providing financial infrastructure for the state-legal medical cannabis industry by safely moving cash from business premises into the legal banking system for greater transparency. Accordingly, Empyreal seeks not only permanent injunctive and declaratory relief, but will also seek immediate injunctive and declaratory relief in the form of a preliminary injunction so that it can resume business operations in San Bernardino County and is not forced to suspend further business operations in California or elsewhere during the pendency of this lawsuit.

## JURISDICTION AND VENUE

1. Plaintiff seeks prospective declaratory and injunctive relief against the Defendants' coordination of, and participation in, the ongoing unlawful and unconstitutional stops, searches, and seizures of its property, detentions of its employees, and seizures of the property of Plaintiff's clients in Plaintiff's lawful possession at the time of the stops and searches.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

2.  Plaintiff brings a statutory *ultra vires* claim, a Fourth Amendment claim, and a Fifth Amendment claim against the United States of America; DOJ; Attorney General Merrick Garland, in his official capacity; FBI; FBI Director Christopher Wray, in his official capacity; Assistant FBI Director Kristi Koons Johnson, in her official capacity; DEA; and DEA Administrator Anne Milgram, in her official capacity (collectively, the "Federal Defendants") under the Administrative Procedure Act, 5 U.S.C. § 702, and the Declaratory Judgments Act, 28 U.S.C. §§ 2201, 2202, as well as directly under the United States Constitution.

3.  Plaintiff brings its Fourth and Fourteenth Amendment claims against San Bernardino County Sheriff-Coroner Shannon D. Dicus ("Sheriff Dicus" or the "Sheriff") in his official capacity as the head of the San Bernardino County Sheriff's Department (the "Sheriff's Department") under 42 U.S.C. § 1983.

4.  Plaintiff brings its *ultra vires* claim against Sheriff Dicus pursuant to taxpayer standing under California common law. *See Cal. DUI Lawyers Ass'n v. Cal. Dep't of Motor Vehicles*, 20 Cal. App. 5th 1247, 1264, 229 Cal. Rptr. 3d 787, 800 (2018) ("[A] governmental agency that acts outside of the scope of its statutory authority acts *ultra vires* and the act is void.").

5.  This Court has subject-matter jurisdiction under 28 U.S.C. § 1331, as five of Plaintiff's six claims arise under federal law.

6.  This Court has supplemental jurisdiction over Plaintiff's state law claim against Sheriff Dicus under 28 U.S.C. § 1367(a).

7.  Venue is proper in the United States District Court for the Central District of California under 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1) because the two most recent seizures of Plaintiff's property occurred in San Bernardino County, California. San Bernardino County is in the Eastern Division of the Central District of California.

## PARTIES

### Plaintiff

8.  Plaintiff Empyreal Enterprises, LLC, d/b/a Empyreal Logistics ("Empyreal") is a Pennsylvania limited liability company in good standing with the Pennsylvania Bureau of Corporations and Charitable Organizations.

9.  Empyreal is headquartered in Bethel Park, Pennsylvania.

10. Empyreal has over 200 employees in 13 offices.

11. Empyreal operates a cash-in-transit (armored car) business in approximately 28 states, including California.

12. Unlike traditional armored-car companies, Empyreal operates discreetly, using state-of-the art technology and surveillance systems in its vehicle fleet.

13. Empyreal serves financial institutions that work with state-legal medical cannabis businesses in numerous states, including California, offering secure cash collection and transport, deposit validation at secure vault locations, as well as standard cash services to businesses and financial institutions.

14. Empyreal offers these same cash management services to financial institutions that service state-licensed adult-use cannabis businesses.

15. Empyreal's clients include both financial institutions and the state-legal cannabis businesses with which they do business.

16. Empyreal also provides its cash logistics services to clients in other businesses outside the cannabis industry.

### Defendants

17. Defendant DOJ is the federal executive department responsible for the enforcement of federal law in the United States.

18. Defendant Merrick Garland ("AG Garland") is sued in his official capacity as Attorney General of the United States.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

19. As Attorney General, AG Garland supervises, directs, and coordinates the operations of DOJ, and the agencies operating under its aegis.

20. These agencies include, among others, FBI, DEA, and the U.S. Marshals Service.

21. DOJ agencies such as FBI and DEA also participate in joint task forces and joint investigations with state or local law-enforcement agencies. These federal task forces include federal Task Force Officers, local or state law-enforcement officers who are cross-sworn as federal officers.

22. Federal task forces connected to DOJ agencies such as FBI and DEA operate in San Bernardino County, California, in Dickinson County, Kansas, and across the nation.

23. DOJ coordinates the activities of federal task forces and joint investigations in conjunction with DOJ agencies and state and local law enforcement, particularly when their operations involve multiple states, jurisdictions, or DOJ agencies.

24. DOJ also operates the federal equitable sharing program, which partners with state and local law-enforcement agencies to process the property seized by those agencies through the federal forfeiture process and then distributes up to 80% of the forfeiture proceeds back to those agencies.

25. Defendant FBI is a federal intelligence and law enforcement agency, responsible for investigating and enforcing various federal crimes.

26. In addition to FBI agents who are exclusively federal employees, FBI includes FBI Task Force Officers, who are state and local law enforcement officers cross-sworn as FBI agents.

27. Defendant Christopher A. Wray ("Director Wray") is sued in his official capacity as the Director of the FBI.

28. Director Wray is responsible for supervising and directing the agency's operations.

29. Defendant Kristi Koons Johnson ("Assistant Director Johnson") is sued in her official capacity as Assistant Director of the FBI overseeing the FBI's Los Angeles Field Office.

30. The Los Angeles Field Office of the FBI conducts investigations related to the enforcement of federal law throughout the Central District of California, including in San Bernardino County.

31. Consequently, Assistant Director Johnson is responsible for the oversight and direction of FBI operations in San Bernardino County.

32. One or more FBI task forces operates in San Bernardino County.

33. Defendant DEA is a federal agency responsible for enforcing federal drug crimes in the United States.

34. In addition to DEA agents who are exclusively federal employees, DEA includes DEA Task Force Officers, who are state and local law enforcement officers cross-sworn as DEA agents.

35. One or more DEA task forces operates in San Bernardino County, California, in Dickinson County, Kansas, and in many other jurisdictions across the nation.

36. Defendant Anne Milgram ("Administrator Milgram") is sued in her official capacity as Administrator of the DEA.

37. As DEA Administrator, Administrator Milgram is responsible for supervising and directing the agency's operations.

38. Defendant Sheriff Dicus is the acting Sheriff-Coroner of San Bernardino County.

39. Sheriff Dicus is sued in his official capacity as Sheriff-Coroner of San Bernardino County.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

40. Under the California Constitution, Sheriff Dicus holds his office as an officer of the local county government.

41. In his capacity as Sheriff of San Bernardino County, Sheriff Dicus is the chief law enforcement officer of San Bernardino County and the head of the Sheriff's Department.

42. In his capacity as Sheriff of San Bernardino County, Sheriff Dicus has final authority over the Sheriff's Department policies, practices, administration, and enforcement.

43. The Sheriff's Department participates in multiple federal task forces, including both FBI and DEA task forces.

44. The Sheriff's Department participates in DOJ's federal equitable sharing program, which distributes up to 80% of forfeiture proceeds from property seized by local law-enforcement agencies directly back to those agencies.

FACTUAL ALLEGATIONS

*Empyreal's Business*

45. Empyreal operates a cash-in-transit (armored car) business in approximately 28 states, including California.

46. Empyreal offers a variety of cash management solutions including cash collection and transport, deposit validation at secure vault locations, and delivery of the cash into the national banking system for greater transparency and tracking.

47. Empyreal is run by CEO Deirdra O'Gorman, who has more than 26 years of experience as a financial services executive and also runs a compliance firm that works with financial institutions to build compliance programs, with adherence to the enhanced due diligence compliance standards required by FinCEN.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

48. Although its services mirror those offered by traditional armored-car companies, Empyreal's business model is unique as it relies on a multi-faceted approach that utilizes technology-based security solutions along with traditional approaches to armored transport.

49. Most of Empyreal's cannabis-industry clients hold medical cannabis licenses.

50. Because Empyreal does not ever handle or transport cannabis and does not engage in any other activities that require a cannabis license in any state, Empyreal does not hold a cannabis license in any state (and it is not required to hold such a license). A significant percentage of Empyreal's cash-in-transit business does not involve the cannabis industry. These clients include restaurants, convenience stores, and other cash-intensive businesses.

51. With respect to its cannabis-industry clients, Empyreal contracts only with state-legal cannabis businesses that first must have established a banking relationship with a financial institution with anti-money laundering law programs implemented pursuant to the 2014 FinCEN Guidance Regarding Marijuana-related Business ("2014 FinCEN Guidance") and applicable state-issued guidance.

52. Empyreal's financial institution clients must also conduct extensive initial and on-going due diligence of cannabis industry customers to ensure compliance with their Bank Secrecy Act obligations and other regulatory requirements, including filing marijuana-related Suspicious Activity Reports (SARs) to comply with the 2014 FinCEN Guidance.

53. Approximately 20% of Empyreal's business is in California, including business that originates in California but is served by Empyreal branches operating from nearby states.

54. Many of Empyreal's existing clients in California have requested that Empyreal expand services in California in the near future.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

55. Absent interference by Defendants, such as the events described in this lawsuit, Empyreal projects it will double its business in California next year.

*Defendants Are Targeting Empyreal's Vehicles*

56. Empyreal's vehicles have been repeatedly targeted by Defendants for stops, searches, and seizures based on the fact that Defendants know that Empyreal vehicles are transporting the cash proceeds of state-legal cannabis businesses and want to seize that money and forfeit it using civil forfeiture.

57. Upon information and belief, DOJ is coordinating a federal effort across multiple states, jurisdictions, and DOJ agencies—in cooperation with multiple state and/or local law-enforcement agencies via joint task forces or joint investigations—to target Empyreal vehicles for stops and searches in order to seize and forfeit the cash proceeds of state-legal cannabis businesses that Empyreal is transporting and forfeit those cash proceeds using civil forfeiture.

58. The traffic stops of Empyreal's vehicles leading to the searches of those vehicles and the seizures of their contents are pretextual.

59. Not a single traffic citation was issued to an Empyreal driver during any of the traffic stops discussed in this complaint.

60. No criminal charges have been brought against Empyreal or any of its employees relating to any of the traffic stops, searches, or seizures discussed in this complaint.

61. No criminal charges have been brought against any of Empyreal's clients relating to any of the traffic stops, searches, or seizures discussed in this complaint.

62. Empyreal's vehicles have been stopped and searched by sheriff's deputies at least five times: on May 17, 2021 in Dickinson County, Kansas (the "May 17 stop"); on May 18, 2021 in Dickinson County, Kansas (the "May 18 seizure");

on November 16, 2021 in San Bernardino County, California (the "November 16 seizure"); on December 9, 2021 in San Bernardino County, California (the "December 9 seizure"); and on January 6, 2022 (the "January 6 stop") in San Bernardino County, California.

63.  The Federal Defendants were involved in conducting the first two stops and/or seizures in Dickinson County, Kansas, while all of the Defendants were involved in conducting the latter three stops and/or seizures in San Bernardino County, California.

64.  On May 17, 2021, the Dickinson County Sheriff's Office in Dickinson County, Kansas stopped an Empyreal vehicle eastbound on I-70 based on an allegedly obscured license plate tag. Upon information and belief, this was a pretextual stop done in conjunction with a DEA task force.

65.  The Empyreal vehicle was not transporting any cannabis proceeds during the May 17 stop, so no seizure occurred, but the deputy questioned the Empyreal driver extensively about the purpose of the trip, asking many questions that were unrelated to the alleged license plate tag issue, and detained the Empyreal driver and the Empyreal vehicle beyond the amount of time necessary to address any traffic violation.

66.  On May 18, 2021, the Dickinson County Sheriff's Office in Dickinson County, Kansas stopped, searched, and seized approximately $165,620 from an Empyreal vehicle westbound on I-70, working in conjunction with a DEA task force.

67.  The cash proceeds being transported by Empyreal's vehicle during the May 18 seizure were entirely from state-licensed medical cannabis dispensaries in or near Kansas City, Missouri that are in good standing, operating lawfully and under strict compliance with Missouri medical cannabis laws.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

68.  On September 3, 2021, the United States of America filed a civil forfeiture complaint in the United States District Court for the District of Kansas seeking civil forfeiture of the cash seized in the May 18 seizure. DEA special agent Bryson Wheeler was the affiant for the affidavit accompanying that forfeiture complaint. According to that complaint, the DEA conducted surveillance of the Empyreal vehicle as it visited state-legal medical cannabis dispensaries in Kansas City, Missouri to pick up the currency prior to the May 18 seizure.

69.  Three times in an eight-week period from mid-November 2021 to early January 2022, the San Bernardino County Sheriff's Department in California stopped and searched Empyreal vehicles as their drivers lawfully conducted Empyreal business. Two of those stops resulted in seizures of the vehicles' contents.

70.  Upon information and belief, the Sheriff's Department is working in coordination with one or more of the Federal Defendants to orchestrate these ongoing seizures.

71.  On November 16, 2021, San Bernardino County Sheriff's Department deputies stopped and seized approximately $700,000 in legal currency from one of Empyreal's vehicles, seized the vehicle itself, and seized the driver's business and personal cellphones. In the process, the government caused significant, unnecessary damage to the vehicle and the technology therein.

72.  The cash proceeds being transported by Empyreal's vehicle during the November 16 seizure were entirely from state-licensed cannabis businesses in good standing, operating lawfully under California law.

73.  Three of the four cannabis businesses whose cash proceeds were seized during the November 16 seizure hold California medical cannabis licenses and operate in strict compliance with California's medical cannabis laws.

74.  The San Bernardino County Sheriff's Department was working in conjunction with the FBI and/or a joint investigation or task force involving the FBI or one

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    or more of the Federal Defendants during or shortly after the November 16

2    seizure.

3    75.  On December 9, 2021, San Bernardino County Sheriff's Department deputies

4    stopped and seized approximately $350,000 in legal currency from one of

5    Empyreal's vehicles.

6    76.  The cash proceeds being transported by Empyreal's vehicle during the

7    December 9 seizure were entirely from state-licensed cannabis businesses

8    operating lawfully under California law.

9    77.  All five of the cannabis businesses whose cash proceeds were seized during the

10   December 9 seizure hold California medical cannabis licenses and operate in

11   strict compliance with California's medical cannabis laws.

12   78.  The San Bernardino County Sheriff's Department was working in conjunction

13   with the FBI and/or a joint investigation or task force involving the FBI or one

14   or more of the Federal Defendants during or shortly after the December 9

15   seizure.

16   79.  On January 6, 2022, one or more San Bernardino County Sheriff's Department

17   deputies stopped and searched an Empyreal vehicle and interrogated the driver.

18   The vehicle was not transporting any cannabis proceeds but was transporting

19   coins from a non-cannabis business. Deputies declined to seize the coins once

20   they realized they were from a non-cannabis business.

21   80.  The approximately $1,050,000 in cash seized from Empyreal's vehicles in the

22   two seizures by San Bernardino County Sheriff's Department has been

23   transferred to the FBI or one or more of the Federal Defendants under the

24   federal equitable sharing program and remains in the possession of one or more

25   of the Federal Defendants.

26

27

28

81.  The FBI and DOJ are pursuing civil forfeiture of the currency seized in the November 16 seizure and the December 9 seizure pursuant to the federal equitable sharing program.

82.  No warrant was obtained for the search and seizure of Empyreal's vehicles or their contents for the May 18 seizure or the December 9 seizure.

83.  Upon information and belief, Defendants are actively engaged in an ongoing effort to intercept or interdict Empyreal vehicles, stop them pretextually, search them, seize their monetary contents, and permanently keep the proceeds using civil forfeiture.

84.  Upon information and belief, Defendants' ongoing effort targeting Empyreal vehicles does not take into account whether the cash proceeds being seized are from state-licensed medical cannabis dispensaries operating lawfully and in strict compliance with the medical cannabis laws of the state in which they are located.

85.  Upon information and belief, Defendants do not know whether the cash proceeds they are seizing from Empyreal vehicles are proceeds from medical cannabis, and Defendants take no measures to verify whether the proceeds are from medical cannabis or other state-legal, adult-use cannabis sales.

86.  Upon information and belief, Defendants do not even necessarily know whether the cash proceeds they are seizing from Empyreal vehicles are from cannabis businesses or other types of businesses.

*The May 17, 2021 Stop and Search*

87.  On May 17, 2021, Dickinson County Sheriff's Deputy Kalen Robinson pulled over an Empyreal vehicle driven by an Empyreal employee eastbound on I-70 in Dickinson County, Kansas toward Kansas City, Missouri, allegedly because the Colorado license plate tag was slightly covered by the license plate holder.

88. Upon information and belief, the Empyreal vehicle's license plate tag was not actually covered and the May 17 stop was entirely pretextual and at least partly based on the vehicle having a Colorado license plate.

89. Upon information and belief, the May 17 stop was done in conjunction with one or more of the other Federal Defendants, including DEA and the local DEA task force.

90. No warrant was obtained to stop or search the vehicle.

91. Upon being questioned by Deputy Robinson about the purpose of the trip, the Empyreal driver answered all questions truthfully. The driver explained that the vehicle was going to pick up cash proceeds from state-licensed medical cannabis dispensaries in Kansas City, Missouri the next day and then transport those cash proceeds back on I-70 westbound across Kansas.

92. The Empyreal driver provided the route manifest to Deputy Robinson.

93. Dashcam footage recorded by Deputy Robinson includes audio of phone calls between Deputy Robinson and DEA Special Agent Bryson Wheeler during the May 17 stop.

94. After Deputy Robinson explained his understanding of Empyreal's cash-in-transit business, DEA Special Agent Wheeler stated: "Yeah, that's – at the same time, I don't think that's necessarily illegal. It's just strange as hell."

95. In a subsequent phone call between Deputy Robinson and DEA Special Agent Wheeler during the same May 17 stop, Agent Wheeler offers an erroneous theory about how it is allegedly illegal to take the proceeds from state-legal cannabis sales out of the state where the sale occurred: "Because the way the boss and I look at it is where it's derived from, say Colorado, say Missouri, those places it's legal there. But our understanding is it has to stay within the confines of that state. Drug proceeds from Colorado can't leave Colorado."

96. DEA Special Agent Wheeler's theory that state-legal medical cannabis proceeds cannot leave the state in which a cannabis sale was made is incorrect and unsupported by the law.

97. DEA Special Agent Wheeler further elaborated on this erroneous theory: "Just like Missouri's can't go – so if you start a logistics company you would have to have one in every state that has this stuff. You would go around and collect in that state and centrally warehouse it. You can't drive it from across the state borders." This too is incorrect.

98. Later on during the same call, DEA Special Agent Wheeler baselessly accuses Empyreal of bulk cash smuggling: "I'll let you do your interdiction stop the way you want to, but, yeah, you definitely have some reason to check into this because this is basically bulk cash smuggling."

99. But "bulk cash smuggling," as defined by U.S. law, involves the *international* transportation and *knowing concealment* of $10,000 or more with the *intent to evade a currency reporting requirement*, and only occurs when someone "with the intent to evade a currency reporting requirement under section 5316, knowingly conceals more than $10,000 in currency or other monetary instruments on the person of such individual or in any conveyance, article of luggage, merchandise, or other container, and transports or transfers or attempts to transport or transfer such currency or monetary instruments from a place within the United States to a place outside of the United States, or from a place outside the United States to a place within the United States." 31 U.S.C. § 5332.

100. Empyreal was not transporting any currency internationally on May 18 (and does not transport currency internationally).

101. Empyreal was not knowingly concealing any currency but was instead transporting it in a vault specifically made to hold bank deposits, which the

Empyreal driver readily told the deputies during both the May 17 stop and the May 18 seizure.

102. Empyreal was transporting the currency for deposit in legitimate financial institutions that file currency transaction reports as required by the Banking Secrecy Act, and thus was not evading any currency reporting requirements.

103. Dashcam footage recorded by Deputy Robinson also includes audio of a phone call between Deputy Robinson and an unidentified caller during the May 17 stop, during which Deputy Robinson repeats DEA Special Agent Wheeler's erroneous theory: "They can't – that money cannot leave that state. It has to stay in that state. That's why they made those state laws that way." That statement is incorrect. There are no such state laws.

104. Dashcam footage recorded by Deputy Robinson also includes audio of a phone call between Deputy Robinson and Special Assistant United States Attorney ("AUSA") Colin Wood during the May 17 stop.

105. Deputy Robinson repeats DEA Special Agent Wheeler's erroneous theory to Special AUSA Colin Wood: "Well, the money from the sales under the state legislature in those states say the money has to stay within those states." This is not true; no such law exists.

106. Special AUSA Colin Wood tells Deputy Robinson: "I think – I think I'd take it. . . . And we'll – and we'll argue about it."

107. At one point, Special AUSA Colin Wood suggests Deputy Robinson should get a warrant if he cannot get the driver's consent to open the vault in the Empyreal vehicle: "She – she either needs to help you get in it or get a search warrant per drug proceeds – And – and cut into them, I guess."

108. On that same call, Deputy Robinson baselessly accuses Empyreal of "money laundering" by transporting currency to a financial institution in another state:

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

"This – is what they're doing is they're money laundering and they're putting it in a bank account out in Colorado."

109. Empyreal was not engaged in money laundering and there is no evidence that it was doing so. To the contrary, all of the evidence indicates that Empyreal was operating a legitimate cash-in-transit business transporting bank deposits to legitimate financial institutions.

110. It is not illegal to transport bank deposits interstate for deposit in financial institutions in other states.

111. Deputy Robinson's dashcam video records him repeatedly talking with other deputies, Special AUSA Colin Wood, and DEA Special Agent Bryson Wheeler about waiting until the next day to seize the Empyreal vehicle on its return trip because there is likely nothing in the vault now, since it is making its currency pickups the next day. For example, Deputy Robinson says:

    a. "See, her – her time wasn't until tomorrow to start picking up. Um, I wonder if we can wait until tomorrow."

    b. "I think I'm going to kick this and get it tomorrow."

    c. "I'm going to kick her in hopes to get her tomorrow with this money."

    d. "So I'll – we'll just put it in and we'll take them down on the westbound."

112. In yet another phone call with DEA Special Agent Bryson Wheeler during the May 17 stop, Deputy Robinson says: "I didn't know if you guys wanted to maybe set up on this and get her ass com[ing] back. Because I talked to Colin Wood. And Colin Wood's like absolutely, that's – that's cash – bulk cash smuggling right there at its finest."

113. DEA Special Agent Bryson Wheeler responds by suggesting that they add all Empyreal vehicles to a License Plate Reader ("LPR") system so that they can

"smash" and "crush" Empyreal's vehicles: "Yep. Yep. Yep. No, I would absolutely put all the vehicles that you can find that they have in the LPR and everything that we can get, set up on it and smash those all day long until – until they just go to submission or – they are going to fight us on it, but go ahead. Go ahead and fight us on it. We're – we've got – we got people that want to sit around and take this, too. So I just talked to John. He said absolutely crush every one of those cars that you can identify."

114. Deputy Robinson responds: "Okay. Um, I'm going to – this is going to take some work on, I think, my end, your end both."

115. Later during that same call, DEA Special Agent Bryson Wheeler asks Deputy Robinson: "What can I start working on to make this a little easier?" Deputy Robinson responds: "Well, and I'm going to send you this company's name here real quick. And we need to find as many – or many vehicles for this as possible that's, you know, doing this." Agent Wheeler responds: "Okay. Sure."

116. The Empyreal driver continued to be detained on the side of the road for over 40 minutes during the duration of the stop, including all of Deputy Robinson's phone calls.

117. Deputy Robinson released the Empyreal driver without issuing a traffic citation, but the driver was then surveilled by DEA the next morning, May 18, 2021, as the Empyreal vehicle visited state-legal medical cannabis dispensaries in or near Kansas City, Missouri to pick up the cash proceeds for transportation to financial institutions.

118. DEA took photos of the Empyreal driver visiting state-legal medical cannabis dispensaries in or near Kansas City, Missouri and then continued conducting surveillance on the Empyreal vehicle by following it on I-70 westbound in an unmarked vehicle until it entered Dickinson County, Kansas and could be "handed off" to Deputy Robinson, who was waiting in a marked police vehicle.

*The May 18, 2021 Stop, Search, and Seizure*

119. On May 18, 2021, the same Empyreal driver and Empyreal vehicle were again pulled over in a vehicle stop by Dickinson County Sheriff's Deputy Kalen Robinson while travelling westbound on I-70 in an Empyreal vehicle from Kansas City, Missouri to deliver approximately $165,620 in cash proceeds from state-legal medical cannabis dispensaries in Kansas City, Missouri to financial institutions in other states.

120. The cash proceeds being transported by Empyreal's vehicle during the May 18 seizure were entirely from state-licensed medical cannabis dispensaries in or near Kansas City, Missouri that are in good standing, operating lawfully and under strict compliance with Missouri medical cannabis laws.

121. Upon information and belief, there was no legitimate reason for the vehicle stop on May 18, which was entirely pretextual.

122. The vehicle stop on May 18 was planned in advance and coordinated by Dickinson County Sheriff's deputies and one or more of the Federal Defendants, including DEA and the local DEA task force.

123. However, despite knowing a day in advance that Empyreal's vehicle would be traveling westbound on I-70 with cash proceeds from Missouri-licensed medical cannabis dispensaries, and despite being advised by Special AUSA Colin Wood that they either needed to get a warrant or consent to search the vehicle, neither the Dickinson County Sheriff's deputies nor the DEA obtained a warrant to stop or search the vehicle or to seize anything in the vehicle.

124. Dashcam footage recorded by Deputy Robinson shows him almost immediately asking the Empyreal driver: "So you went and picked up some money from the dispensaries, correct?"

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

125. After the driver responds affirmatively, Deputy Robinson says: "So I'm searching that vehicle and I'm seizing any money that's inside that vehicle."

126. Dickinson County Sheriff's deputies, working in conjunction with a DEA task force, detained and interrogated the Empyreal driver for at least one hour, searched the vehicle, gained access to the secured vault, and seized the $165,620.

127. No warrant was ever obtained to search the vehicle or seize its contents.

128. To protect its business reputation, Empyreal reimbursed its clients the approximately $165,620 seized during the May 18 seizure, effectively indemnifying its clients, and thus has an interest in recovering the seized cash. If this cash is recovered, it will be used by Empyreal, since Empyreal has already reimbursed the other parties involved.

129. As a cash-in-transit business, Empyreal was acting as a bailee for its clients while transporting the $165,620 in cash seized during the May 18 seizure.

130. Empyreal has a possessory interest in the approximately $165,620 in cash seized during the May 18 seizure.

131. Empyreal leases the vehicle that was temporarily seized during the May 18 seizure.

132. Empyreal employs the driver, who was seized and detained during the May 18 seizure.

133. The Empyreal driver was not issued a traffic citation for either the May 17 traffic stop or the May 18 traffic stop.

134. The May 18 seizure was done without regard for whether the money was proceeds from state-legal medical cannabis dispensaries in Missouri.

135. The $165,620 was eventually transferred from the Dickinson County Sheriff's Department to DEA pursuant to DOJ's equitable sharing program.

136. Upon information and belief, the cash seized during the May 18 seizure remains in the possession of the DEA or one of the other Federal Defendants.

137. DEA sent a Notice of Seizure of Property and Initiation of Administrative Forfeiture Proceedings (a "CAFRA Notice") to Empyreal indicating that it was pursuing administrative forfeiture of the $165,620.

138. On September 3, 2021, the United States filed a civil forfeiture complaint seeking to forfeit the $165,620 in the United States District Court for the District of Kansas. The affiant for the affidavit supporting the complaint was DEA Special Agent Bryson Wheeler.

*The November 16, 2021 Stop, Search, and Seizure*

139. On November 16, 2021, San Bernardino County Sheriff's Deputy Jonathan Franco conducted a traffic stop of an Empyreal vehicle driven by an Empyreal employee in San Bernardino County, California, for allegedly driving too close to a semi-truck on the freeway.

140. Upon information and belief, there was no legitimate reason for the traffic stop on November 16, which was entirely pretextual.

141. At the time of the stop, the Empyreal vehicle was transporting approximately $700,000 in cash proceeds from state-licensed cannabis businesses operating lawfully under California law to legitimate financial institutions. Three of the four cannabis businesses hold California medical cannabis licenses and operate in strict compliance with California's medical cannabis laws.

142. Deputy Franco proceeded to ask the Empyreal driver to disclose information about what the Empyreal vehicle was transporting and after learning that the Empyreal vehicle was transporting cash, Deputy Franco asked many questions about the nature of Empyreal's business.

143. The Empyreal driver answered Deputy Franco's questions and offered to call his supervisors to provide any other requested information.

144. Deputy Franco then spoke with members of Empyreal's leadership team, including the current Senior Vice President of Operations at Empyreal, who is a former deputy sheriff.

145. Empyreal's leadership team explained to Deputy Franco the legitimacy of the business, where the cash was coming from and where it was going, the identity and licensure of the companies whose cash was being transported, and offered GPS data to confirm this information.

146. Despite these assurances and the offer of additional supporting information, Deputy Franco was joined by other law enforcement officers.

147. Upon arriving at the scene, law enforcement covered the vehicle's external cameras.

148. Law enforcement then seized the Empyreal driver's business and personal phones.

149. During the seizure, counsel for Empyreal was repeatedly denied any access to its driver.

150. The Sheriff's Department instead sought a search warrant to take the phones and seized cash on the grounds that they "were possessed by a person with the intent to use [them] as a means of committing a public offense or [are] possessed by another to whom he or she may have delivered [them] for the purpose of concealing [them] or preventing discovery" and that they "tend to show that a felony has been committed or that a particular person has committed a felony."

151. The Statement of Probable Cause in the November 16 search warrant application is based on critical factual errors, material omissions, and highly misleading statements about activities that are simply not criminal.

152. The Statement of Probable Cause in the November 16 search warrant application contains no evidence supporting probable cause to believe that any crime had been, was being, or was about to be committed.

153. The Statement of Probable Cause in the November 16 search warrant application states that: "Investigators contacted the Bureau of Cannabis Control and found that Empyreal LLC was not listed as a business authorized to conduct marijuana/cannabis business in the State of California." While it is true that Empyreal does not have a license or other authorization to operate as a cannabis business, this statement is misleading because Empyreal is not required to have any such authorization or license.

154. Empyreal does not handle or transport cannabis and thus needs no cannabis business license.

155. The Statement of Probable Cause in the November 16 search warrant application states that: "In addition, some of the companies having their currency transported were also not listed as authorized marijuana/cannabis businesses through the State of California." This statement is false. Upon information and belief, this statement was either the product of an error in running the search for these businesses or a deliberate attempt to mislead the judge reviewing the warrant.

156. All of the businesses whose currency was being transported had current cannabis licenses in good standing.

157. The Statement of Probable Cause in the November 16 search warrant application falsely attributes this claim to a former Empyreal supervisor: "Once the currency arrives to the [Empyreal] Branch, the currency is deposited into bank accounts belonging to each individual cannabis company and turned into coin-base."

158. Coinbase is a cryptocurrency exchange platform, not a cryptocurrency, so nothing can be "turned into" Coinbase.

159. The Empyreal supervisor denies stating that Empyreal converts any currency into cryptocurrency, and would not have said anything about cryptocurrency conversion because that simply is not a service Empyreal offers.

160. Empyreal does not, in any way, convert cash or coin deposits into cryptocurrency. All cash and coin collected by Empyreal is processed and reported to financial institutions as their original cash and coin amount.

161. However, even if Empyreal did convert currency into cryptocurrency, that is not an illegal activity, and provides no basis for probable cause.

162. The claim in the Statement of Probable Cause in the November 16 search warrant application that "this is a modern form of laundering proceeds made by marijuana/cannabis companies in order to avoid State taxes and/or Law Enforcement detection" is thus both irrelevant and fails to provide any reason to believe that any tax evasion or money laundering was taking place.

163. The Statement of Probable Cause in the November 16 search warrant application completely omits the fact that after speaking with the Empyreal supervisor, Deputy Franco then spoke on the phone with Empyreal's Senior Vice President of Operations.

164. Omitted from the Statement of Probable Cause in the November 16 search warrant application is that Empyreal's Senior Vice President explained to Deputy Franco on that phone call that Empyreal does not convert any currency into cryptocurrency.

165. Also omitted from the Statement of Probable Cause in the November 16 search warrant application was that Empyreal's Senior Vice President explained to Deputy Franco that Empyreal does sometimes provide actual rolled coins to retail clients through change orders or "change exchange" services so that

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    Empyreal's retail clients have coins on hand to provide as change to their
2    customers.

3    166. Further omitted from the Statement of Probable Cause in the November 16
4         search warrant application is that Empyreal's Senior Vice President explained
5         to Deputy Franco that Empyreal's business operates as a traditional cash-in-
6         transit company and that Empyreal works with licensed financial institutions
7         (banks and credit unions) to provide currency transportation services to their
8         customers. The Senior Vice President explained that Empyreal's vehicles pick
9         up sealed bags of currency and coin from retail locations in Southern California
10        and return the currency to Empyreal's branch location.

11   167. Further omitted from the Statement of Probable Cause in the November 16
12        search warrant application is that Empyreal's Senior Vice President addressed
13        Deputy Franco's concerns that Empyreal was avoiding state taxes by
14        transporting cannabis proceeds out of California. The Senior Vice President
15        explained that after retail client deposits are counted and validated by Empyreal
16        personnel, that currency is strapped, bundled, and delivered back into the
17        banking system in California. The Senior Vice President explained to Deputy
18        Franco that this process ensures that California tax revenue is still collected.

19   168. Further omitted from the Statement of Probable Cause in the November 16
20        search warrant application is that Empyreal's Senior Vice President explained
21        to Deputy Franco that Empyreal is transparent about its cash-in-transit services
22        with banks and credit unions and fully reports all currency
23        transported/processed to those financial institutions, in compliance with all
24        laws. State-legal cannabis businesses are thus subject to tax compliance and
25        auditing based on the currency Empyreal processes and reports to financial
26        institutions.

27
28

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

169. Therefore, Deputy Franco's conclusion in the Statement of Probable Cause in the November 16 search warrant application that "I believe the [vehicle] contains proceeds from illegal marijuana/cannabis companies for the purpose of money laundering" is completely unfounded.

170. The November 16 search warrant application contains no evidence supporting probable cause to believe that money laundering or any other illegal activity had been, was being, or was about to be committed.

171. On January 25, 2022, the Sheriff filed a declaration by Sergeant Alex Naoum of the San Bernardino County Sheriff's Department (ECF No. 46-1). Sergeant Naoum's declaration states that: "During the [November 16] stop, the deputy made further observations, including hearing inconsistent statements made by the driver and company representatives, that led the deputy to believe the contents of the [vehicle] were illicit proceeds of unlawful drug sales." *Id.* ¶ 4.

172. Sergeant Naoum does not elaborate any further in his declaration about what "inconsistent statements" were allegedly made by the driver and company representatives, nor does he explain why the supposed inconsistent statements "led the deputy to believe the contents of the vans were illicit proceeds of unlawful drug sales."

173. Sergeant Naoum's vague and conclusory explanations for the search of the vehicle and seizure of its contents fail to show that the deputies had probable cause to seek a warrant for the November 16 search and seizure.

174. While they sought a search warrant, the Sheriff's Department continued to subject Empyreal's driver to extensive questioning about Empyreal's business operations, details of its cash logistics process, and other information considered by Empyreal to be trade secrets.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

175. After securing the warrant, and without asking Empyreal for access to the money in the vehicle, law enforcement destroyed property in the armored vehicle in order to access the cash inside.

176. Law enforcement then seized approximately $700,000 from the vehicle and the vehicle itself.

177. At the time of the November 16 seizure, Empyreal had not yet had an opportunity to count and validate the amount of money in the deposit bags that were seized because that is typically done at an Empyreal currency processing facility upon completion of a trip and the Empyreal vehicle was stopped before it had completed its trip. However, the amount of currency declared by Empyreal's customers for the deposit bags seized on November 16 was $712,206.34.

178. While seizing the money, one of the deputies noted that each bag of cash had its own barcode from different companies and stated that they could not mix the money together because some companies might be able to "prove it's legit."

179. Upon information and belief, despite knowing the names of the companies whose proceeds they were seizing based on the labeling of the bags containing the cash, the deputies made no effort to inquire about whether any of those companies were state-licensed medical cannabis businesses, state-licensed adult use cannabis businesses, or otherwise "legit."

180. After they finished counting the money and announced the total amount seized, the deputies celebrated, exchanging the following statements with each other:

"Shut the front door!"

"No way, dude!"

"Nice."

"Way to go, buddy!"

"Wowee!"

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1  "Good job, Will."

2  181. The November 16 seizure took more than four hours.

3  182. The Empyreal driver was not issued a traffic citation for the November 16
4        traffic stop.

5  183. To protect its business reputation, Empyreal reimbursed its clients the
6        approximately $700,000 seized during the November 16 seizure, effectively
7        indemnifying its clients, and thus has an interest in recovering the seized cash.
8        If this cash is recovered, it will be used by Empyreal, since Empyreal has
9        already reimbursed the other parties involved.

10 184. As a cash-in-transit business, Empyreal was acting as a bailee for its clients
11        while transporting the $700,000 in cash seized during the November 16 seizure.

12 185. Empyreal has a possessory interest in the approximately $700,000 in cash
13        seized during the November 16 seizure.

14 186. Empyreal owns the business phone seized from the Empyreal driver during the
15        November 16 seizure.

16 187. Empyreal leases the vehicle that was temporarily seized and seriously damaged
17        during the November 16 seizure.

18 188. Empyreal employs the driver, who was detained for several hours during the
19        November 16 seizure.

20 189. The property seized during the November 16 seizure was transferred to the FBI
21        for civil forfeiture under DOJ's federal equitable sharing program and has been
22        issued an FBI tracking number.

23 190. Upon information and belief, the cash seized during the November 16 seizure
24        remains in the possession of the FBI or one of the other Federal Defendants.

25 191. The FBI and DOJ are pursuing civil forfeiture of the currency seized in the
26        November 16 seizure pursuant to the federal equitable sharing program.

27

28

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

192. On November 30, 2021, counsel for Empyreal sent a mitigation packet to the Sheriff's Department in response to the November 16 seizure.

193. The mitigation packet contained a detailed nine-page letter further explaining Empyreal's operations and regulatory compliance, as well as other supporting documents. In the letter, counsel for Empyreal also requested the prompt return of the seized cash.

194. The Sheriff's Department has not responded to Empyreal's mitigation packet or request for communication and a prompt return of its seized funds, other than to confirm receipt of the mitigation packet.

195. On January 18, 2022, Empyreal's counsel received a document titled "NOTICE OF SEIZURE OF PROPERTY AND INITIATION OF ADMINISTRATIVE FORFEITURE PROCEEDINGS" from DOJ and FBI stating their intention to permanently forfeit the property seized during the November 16 seizure. This CAFRA notice is dated January 11, 2022, and states that: "The asset(s) referenced in this notice letter were seized on November 16, 2021 by the FBI at Barstow, California."

196. Sergeant Naoum's declaration states that: "Currency bags labeled with contents in the amount of $688,206.36 were seized pursuant to the warrant. Upon further processing, the contents of those currency bags were found to be currency in the amount of $712,176.36. The significant difference between the labels and the contents of the bags seized has not been explained." ECF No. 46-1 at ¶ 6.

197. However, the amount of currency seized on November 16 identified in the January 11, 2022 notice from DOJ and FBI is $712,176.36, which is $29.98 less than the $712,206.34 amount declared by Empyreal's customers for the deposits.

198. The difference of $29.98 between the DOJ/FBI total and total declared by Empyreal's customers is likely due to a miscount and is not unusual for over $700,000 in deposits.

199. The difference between the $712,206.34 amount declared by Empyreal's customers and the Sheriff's total of $688,206.36 for the labels on the currency bags is $23,999.98, almost exactly $24,000.

200. Empyreal's records of the customer declarations for the November 16 deposits indicate that there were four $24,000 deposit bags deposited by the same business. ("Series A" deposit bags, a common size of tamper-evident sealable currency deposit bag, hold $24,000 in twenty-dollar bills—12 "straps" of 100 twenty-dollar bills.)

201. Two of these $24,000 deposit bags had nearly identical barcodes that were one-digit apart.

202. Upon information and belief, the Sheriff's office may have neglected to count one of the $24,000 deposit bags when totaling the money labels on the outside of the bags, but ultimately opened all of the bags and counted the money inside, thus explaining the apparent discrepancy between the two totals calculated by the Sheriff's office.

*The December 9, 2021 Stop, Search, and Seizure*

203. On December 9, 2021, in San Bernardino County, California, an Empyreal vehicle was again pulled over by San Bernardino County Sheriff's deputies while legally transporting cash from state-legal dispensaries to legitimate financial institutions.

204. The vehicle contained about $350,000 in cash proceeds from state-licensed cannabis businesses operating lawfully under California law to legitimate financial institutions. All five of the cannabis businesses hold California

medical cannabis licenses and operate in strict compliance with California's medical cannabis laws.

205. Empyreal's vehicle was driven by the same Empyreal employee who drove the vehicle in the November 16 seizure.

206. Upon information and belief, deputies recognized the Empyreal vehicle or suspected that it was the same or similar Empyreal vehicle as the November 16 stop.

207. Deputies conducted a pretextual stop of the Empyreal vehicle, alleging that the driver had slightly exceeded the speed limit and prematurely activated his turn signal.

208. Upon information and belief, the driver's operation of the Empyreal vehicle was completely lawful.

209. In reality, the deputies had planned the stop in advance and would have pulled over the driver and the Empyreal vehicle regardless of how carefully or lawfully it was driven.

210. Upon information and belief, the same deputies conducted the December 9 stop and seizure that had conducted the November 16 stop and seizure, including Deputy Jonathan Franco.

211. One of the deputies said to the Empyreal driver: "You don't remember me do you? I remember you."

212. This time, the deputies had a drug-sniffing dog at the scene.

213. The deputies alleged that the dog alerted on the vehicle.

214. But Empyreal does not dispute that the currency in the vehicle was proceeds from state-licensed cannabis businesses, so it is unsurprising that a drug-sniffing dog would alert to the vehicle. The mere presence of currency from state-legal cannabis businesses provides no basis for probable cause.

215. In fact, upon information and belief, the mere presence of a large amount of currency that has been in circulation, regardless of the source, is likely to trigger a drug-dog alert because a majority of currency in circulation is tainted by illegal drug residue.

216. Therefore, any drug dog alert on a large amount of currency that has been in circulation, such as the approximately $350,000 seized on December 9, cannot provide probable cause for a search or seizure.

217. In reality, the basis for the search itself was pretextual and there was no probable cause for the search.

218. Upon information and belief, the deputies had planned the search of the vehicle and seizure of its cash contents in advance.

219. Deputies covered up or attempted to cover up the cameras on the exterior and interior of the Empyreal vehicle but failed to disable audio recording equipment.

220. One of the deputies told another deputy that he believed it was the same vehicle as the November 16 seizure because they both had a crack in the windshield.

221. Deputies approached the driver and began asking questions.

222. Deputies asked the driver if there was anything illegal in the vehicle, and the driver correctly answered that there was not.

223. Deputies ordered the driver to exit the vehicle.

224. Upon being questioned, the driver confirmed that the vehicle belonged to Empyreal.

225. Deputies again questioned and interrogated the driver for several minutes about the purpose of the trip and the nature of Empyreal's business.

226. One deputy told the driver: "If I stop you, I have the right to open the safe."

227. One deputy told the driver that "I do have the right to take the money" because it was connected to "drugs," notwithstanding the fact that the money was

proceeds from medical and adult-use cannabis dispensaries operating legally under California law.

228. The driver offered to call the CEO of Empyreal, who could explain the legality of Empyreal's business to the deputies, but they declined.

229. No warrant was obtained to search the vehicle or seize its contents.

230. The only basis for the December 9 search and seizure of Empyreal's vehicle offered thus far by the Sheriff was in a declaration filed in this case by the Sheriff on January 25, 2022 (ECF No. 46-1). Sergeant Alex Naoum of the San Bernardino County Sheriff's Department states that: "During the [December 9] stop, the deputy made further observations, including hearing inconsistent statements made by the driver, that indicated the contents of the [vehicle] were illicit proceeds of unlawful drug sales." *Id.* ¶ 7.

231. Sergeant Naoum does not elaborate any further in his declaration about what "inconsistent statements" were allegedly made by the driver, nor does he explain how the supposed inconsistent statements "indicated the contents of the vans were illicit proceeds of unlawful drug sales."

232. Sergeant Naoum's vague and conclusory explanations for the search of the vehicle and seizure of its contents fail to show that the deputies had probable cause for the December 9 search and seizure.

233. On January 25, 2022, the Federal Defendants filed the declaration of FBI Special Agent David Ricker in this case (Declaration of David Ricker, ECF No. 45-1). Agent Ricker's declaration states that: "Probable cause was developed during the traffic stop on December 9, 2021 to believe that the U.S. currency was being laundered in violation of 18 U.S.C Section 1956 – laundering of monetary instruments. During the investigation, investigators learned that the driver for Plaintiff had a document in his possession instructing him what to do if he is stopped by law enforcement. Specifically, the document instructed the

driver to 'NEVER SAY the words CANNABIS, or MARIJUANA' and 'NEVER SAY the NAMES OF THE BANKS OR CLIENTS WE SERVICE.'" Ricker Decl. ¶ 8.

234. But nothing about this document provides probable cause for money laundering—there is nothing illegal or suspicious about Empyreal instructing drivers to maintain client privacy and to refrain from mentioning controlled substances that Empyreal does not handle or transport—and Special Agent Ricker fails to offer any other explanation of the supposed probable cause for the December 9 seizure.

235. Instead, Special Agent Ricker's declaration quotes very selectively from a four-page "Police Stop Procedures" card that Empyreal developed *after* the unlawful November 16 seizure and provided to its drivers as part of a "Police Stop" training program. *See* ECF No. 49-3 (Redacted version of Ex. C, Police Stop Procedures card); ECF No. 70-3 (Sealed, unredacted version of Ex C, Police Stop Procedures card).

236. The "Police Stop Procedures" card provides advice on how to behave and what to say (and not say) during a police stop, including general advice such as "Cooperate with any lawful request," "Do not make any sudden movements," "Do not argue or act hostile or defensive," and "Do not lie."

237. It is perfectly appropriate for Empyreal to train its drivers how to behave and what to say—and not say—during a police stop.Deputies searched the vehicle and found one or more manuals of Empyreal's procedures, which they began to read aloud and describe to each other. One deputy noted that one of the manuals specifically directs employees to not transport marijuana. Deputies seized the manual as evidence.

238. Deputies then gained access to the vehicle's secured vault using threat of force and seized the approximately $350,000 in cash in the vault.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

239. The deputies counted the cash aloud in the vehicle. Before beginning the count, one of them apparently observed the physical amount of cash in the vehicle and said, "This is, uh, more small." Upon information and belief, he was comparing the December 9 seizure total to the November 16 seizure total.

240. After they finished counting the cash, one of the deputies said, "That's it?" and chuckled. He then said: "You set the bar too high." When another deputy remarked that he thought they'd get "a million or two," the deputy responded, "At least we got over a million."

241. Upon information and belief, the deputies were referring to the combined amounts of the November 16 and December 9 seizures, which total approximately $1,050,000.

242. After the cash was counted, one of the deputies remarked that there were "pretty small amounts [of cash] this time, huh?" Upon information and belief, he was comparing the December 9 seizure total to the November 16 seizure total.

243. Upon information and belief, despite knowing the names of the companies whose proceeds they were seizing based on the labeling of the bags containing the cash, the deputies made no effort to inquire about whether any of those companies were state-licensed medical cannabis businesses or state-licensed adult use cannabis businesses.

244. After the stop, search, and seizure was completed, the deputies removed the covers that they had placed on the cameras in Empyreal's vehicle.

245. The December 9 seizure was much briefer than the November 16 seizure. Notably, the deputies appeared to already have a plan for the warrantless and pretextual stop, search, and seizure of the vehicle and its contents.

246. The Empyreal driver was not issued a traffic citation for the December 9 traffic stop.

247. To protect its business reputation, Empyreal reimbursed its clients the approximately $350,000 seized during the December 9 seizure, effectively indemnifying its clients, and thus has an interest in recovering the seized cash. If this cash is recovered, it will be used by Empyreal, since Empyreal has already reimbursed the other parties involved.

248. As a cash-in-transit business, Empyreal was acting as a bailee for its clients while transporting the $350,000 in cash seized during the December 9 seizure.

249. Empyreal has a possessory interest in the approximately $350,000 in cash seized during the December 9 seizure.

250. Empyreal leases the vehicle that was temporarily seized during the December 9 seizure.

251. Empyreal employs the driver who was again detained during the December 9 seizure.

252. The property seized during the December 9 seizure was also transferred to the FBI for civil forfeiture under DOJ's equitable sharing program.

253. Upon information and belief, the cash seized during the December 9 seizure remains in the possession of one of the Federal Defendants.

254. The FBI and DOJ are pursuing civil forfeiture of the currency seized in the December 9 seizure pursuant to DOJ's equitable sharing program.

255. On February 4, 2022, Empyreal's counsel received a document titled "NOTICE OF SEIZURE OF PROPERTY AND INITIATION OF ADMINISTRATIVE FORFEITURE PROCEEDINGS" from DOJ and FBI stating their intention to permanently forfeit the property seized during the November 16 seizure. This CAFRA notice is dated February 1, 2022, and states that: "The asset(s) referenced in this notice letter were seized on December 9, 2021 by the FBI at Rancho Cucamonga, California."

256. Despite the claim in FBI Special Agent Ricker's declaration that there was probable cause for money laundering under 18 U.S.C. § 1956, the February 1, 2022 CAFRA notice does not cite money laundering or 18 U.S.C. § 1956 as a basis for the intended forfeiture. Instead, it indicates that the sole basis for the intended forfeiture is the Controlled Substances Act, stating: "The forfeiture of this property has been initiated pursuant to 21 USC 881."

*January 6, 2022 Stop and Search*

257. On January 6, 2022, an Empyreal vehicle driven by an Empyreal driver was again stopped and searched by one or more San Bernardino County Sheriff's deputies in San Bernardino County, California.

258. Upon information and belief, the January 6 stop was a pretextual stop.

259. Upon information and belief, the January 6 stop was done in conjunction with one or more of the Federal Defendants.

260. No warrant was obtained to stop or search the vehicle.

261. Although Empyreal had suspended cash logistics operations in San Bernardino County after the December 9 seizure and instructed drivers on cash logistics trips not to enter San Bernardino County, this Empyreal driver was simply picking up an order of rolled coin boxes from Empyreal's vendor, which happens to be located in San Bernardino County, in order to replenish its rolled coin supply.

262. One or more deputies interrogated the Empyreal driver and searched the Empyreal vehicle.

263. The Empyreal vehicle was not transporting cannabis proceeds. It was transporting coins from a non-cannabis business (a rolled coin vendor).

264. Upon confirming that the coins were not related to cannabis, deputies did not seize the coins.

265. Upon information and belief, had the coins been from a cannabis-related business, deputies would have seized the coins.

266. Deputies released the Empyreal driver and did not issue a traffic citation for the January 6 stop.

*California's Legal Cannabis Industry and Empyreal's Business Model*

267. Cannabis has been legal in California for medical use since 1996, when Californians voted to pass the Compassionate Use Act of 1996. Cal. Health & Safety Code § 11362.5.

268. Later, in November 2016, California voters also approved the Adult Use of Marijuana Act, which legalized the recreational use of cannabis.

269. In addition to protecting the use of cannabis, California law makes it legal for state-licensed dispensaries to sell cannabis for medical and recreational ("adult use") sales. Cal. Bus. & Prof. Code § 26000(b).

270. Under California law, local law enforcement is restricted from seizing and forfeiting the assets of state-legal cannabis operations. *See, e.g.*, *Granny Purps, Inc. v. County of Santa Cruz*, 53 Cal. App. 5th 1, 9, 266 Cal. Rptr. 3d 752, 758 (2020).

271. As state-licensed dispensaries proliferated across the state, industry actors recognized a need for protection for financial transactions associated with cannabis businesses. *See* Assem. Com. on Banking and Finance, Analysis of Assem. Bill No. 1525 (2019–2020 Reg. Sess.).

272. Specifically, entities were reluctant to provide financial services to cannabis businesses because of the absence of a clear legal framework for providing those services. *See id*.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

273. As a result, dispensaries and other state-legal cannabis businesses were often forced to keep large amounts of cash on hand, unable to deposit it with financial institutions. *See id.*

274. To address this problem, the California Legislature passed, and Governor Newsom signed, Assembly Bill 1525, which protects entities providing financial services to the legal cannabis industry. Cal. Bus. & Prof. Code § 26260(a).

275. Among other things, the new law made clear that "[a]n entity that . . . transports cash or financial instruments, or provides other financial services does not commit a crime under any California law . . . solely by virtue of the fact that the person receiving the benefit of any of those services engages in commercial cannabis activity as a licensee pursuant to this division." Cal. Bus. & Prof. Code § 26260(a).

276. Empyreal's business operations—transporting cash for financial institutions and state-legal dispensaries with which they contract—fall squarely within this statutory protection.

277. Financial service businesses like Empyreal are essential to the safety and efficient administration of California's state-legal cannabis industry.

278. The federal government still classifies cannabis as a Schedule 1 drug, but its enforcement powers are limited in states in which it is legal.

279. One such restriction is an appropriations rider known as the Rohrabacher-Farr Amendment. This Amendment prohibits the Department of Justice from spending funds "to prevent [states that have legalized marijuana] from implementing their own laws that authorize the use, distribution, possession, or cultivation of medical marijuana." Consolidated Appropriations Act 2021, Pub. L. No. 116-260, § 531, 134 Stat. 1283 (2020) (amended Dec. 3, 2021).

280. The Rohrabacher-Farr Amendment protects private entities operating cannabis dispensaries under state law and empowers them to enjoin prosecutions on this basis if they can show they were legally operating under state law. *United States v. McIntosh*, 833 F.3d 1163 (9th Cir. 2016); *Sierra Club v. Trump*, 929 F.3d 670, 695–96 (9th Cir. 2019).

*The "Equitable Sharing" Partnership Between*
*the Sheriff and the Federal Defendants*

281. The Sheriff is working with one or more of the Federal Defendants to seize and forfeit the proceeds of state-legal cannabis businesses.

282. Upon information and belief, the Sheriff is participating in DOJ's equitable sharing program with one or more of the Federal Defendants.

283. The Sheriff's decision to repeatedly seize money lawfully earned by Empyreal's clients and lawfully transported by Empyreal for its financial institution clients is motivated solely or primarily by the prospect of participating in DOJ's equitable sharing program and the subsequent receipt of direct payments to the Sheriff's Department of up to 80% of the forfeiture proceeds.

284. Under California law, the Sheriff would normally only be able to directly receive 65% of forfeiture proceeds from civil forfeitures done under state law.

285. Under California law, the Sheriff cannot seize or otherwise participate in the civil forfeiture of the cash proceeds of cannabis businesses operating legally under California law.

286. Without participating in DOJ's equitable sharing program, the Sheriff would be unable to seize or keep any of the proceeds from forfeitures of cash proceeds seized from Empyreal vehicles under California law because they are cash proceeds from businesses operating legally under California law.

287. Unlike federal law, for a civil forfeiture of $40,000 or more in currency, California law requires proof by "clear and convincing evidence" that the property is subject to forfeiture. This is a more stringent standard than federal law.

288. Without participating in DOJ's equitable sharing program, any seizure by the Sheriff of $40,000 or more in U.S. currency—including all of the seizures of cash from Empyreal vehicles—would be subject to this higher burden of proof.

289. The DOJ's equitable sharing program permits local or state law-enforcement agencies to transfer seized property to a federal agency, which then processes the forfeiture under federal law and distributes the proceeds of forfeitures to cooperating state and local law enforcement agencies. Participating agencies are eligible for payments of up to 80% of the forfeiture proceeds.

290. There are two primary ways for local law enforcement to qualify for equitable sharing: by participating in a joint task force or investigation with federal law-enforcement, or through adoption, a process by which a federal agency takes control of property seized by state authorities, based on state law, and then investigates and prosecutes the case under federal law.

291. Upon information and belief, the Sheriff is participating in a joint task force or investigation with one or more of the Federal Defendants related to Empyreal, which is how it qualifies for equitable sharing. This enables the Sheriff's Department to receive up to 80% of forfeiture proceeds related to the Empyreal seizures.

292. Upon information and belief, the joint task force involved in the November 16 seizure, the December 9 seizure, and the January 6 stop was the Inland Regional Narcotics Enforcement Team ("IRNET"), which is a joint task force lead by the San Bernardino County Sheriff's Department and composed of state and federal agencies, including DEA and FBI.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

293. However, Deputy Franco states in the November 16 search warrant application that he was a member of IRNET from October 2017 to January 2019, and has been assigned to the Narcotics Division since January 2019 and works on the Highway Interdiction Team.

294. Upon information and belief, Deputy Franco was not assigned to IRNET and thus was not a federal Task Force Officer at the time of the November 16 seizure.

295. In the alternative, the Sheriff has referred or transferred the Empyreal seizures for adoption by one or more of the Federal Defendants. Although this would qualify the Sheriff's Department for equitable sharing under federal law, this would violate California law, which prohibits California law-enforcement agencies from participating in adoptive forfeitures. *See* Cal. Health & Safety Code § 11471.2(a) ("State or local law enforcement authorities shall not refer or otherwise transfer property seized under state law authorizing the seizure of property to a federal agency seeking the adoption of the seized property by the federal agency for proceeding with federal forfeiture under the federal Controlled Substances Act.").

296. In the alternative, by referring or transferring the Empyreal seizures for adoption by one or more of the Federal Defendants, the Sheriff is violating Cal. Health & Safety Code § 11471.2(a).

297. Every year, state and local law enforcement agencies collect hundreds of millions through equitable sharing. In 2019 alone, the federal government made $333.8 million in payments to state and local law enforcement through the program. From 2000 to 2019, that figure was $8.8 billion nationwide.

298. According to data made available online by DOJ, in the last five years, the San Bernardino County Sheriff's Department has directly received more than $4.2

million in equitable sharing proceeds, earned primarily through joint task forces.

299. According to data made available online by DOJ, in the last five years, the IRNET joint task force has received more than $15.8 million in equitable sharing proceeds.

300. Upon information and belief, San Bernardino County Sheriff's deputies contacted FBI and/or one or more of the other Federal Defendants during or after seizing Empyreal's vehicle on November 16, 2021.

301. Upon information and belief, the Sheriff's Department again alerted one or more of the Federal Defendants during or after stopping another Empyreal vehicle on December 9, 2021.

302. Upon information and belief, the Sheriff's Department stopped the Empyreal vehicle on December 9 because—after the November 16 seizure—they were aware that the vehicle might contain a large amount of cash.

303. Upon information and belief, the Sheriff's Department stopped the Empyreal vehicle on January 6, 2022 because—after the November 16 seizure and December 9 seizure—they were aware that the vehicle might contain a large amount of cash.

304. Upon information and belief, one or more of the Federal Defendants and the Sheriff are actively engaged in an ongoing effort to intercept or interdict Empyreal vehicles, stop them pretextually, search them, seize their monetary contents, and permanently keep the proceeds using civil forfeiture.

305. Upon information and belief, the IRNET joint task force facilitates coordination between the Sheriff and the Federal Defendants to intercept or interdict Empyreal vehicles, stop them, search them, seize their monetary contents, and permanently keep the proceeds using civil forfeiture.

306. Upon information and belief, the Sheriff has an ongoing policy, pattern, or practice of stopping Empyreal vehicles, searching them, seizing their cash contents, and turning the seized property over to one or more of the Federal Defendants for civil forfeiture, as described in the foregoing paragraphs of this complaint.

307. Upon information and belief, the IRNET joint task force, led by the San Bernardino Sheriff's Department, has an ongoing policy, pattern, or practice of stopping Empyreal vehicles, searching them, seizing their cash contents, and turning the seized property over to one or more of the Federal Defendants for civil forfeiture

308. Upon information and belief, the Federal Defendants, coordinated by DOJ, have an ongoing nationwide policy, pattern, or practice of coordinating with state and local law enforcement, including the San Bernardino County Sheriff's Department and the Dickinson County Sheriff's Department, through joint task forces such as IRNET, in an ongoing campaign to stop, search, and seize of Empyreal vehicles and their contents, and then pursue the civil forfeiture of their cash contents, as described in the foregoing paragraphs of this complaint.

## INJURY TO PLAINTIFF

309. Defendants' ongoing stops, searches, and seizures of Empyreal's vehicles and their contents—including the stop and search on May 17, 2021, the stops, searches, and seizures on May 18, 2021, November 16, 2021, and December 9, 2021, and the stop and search on January 6, 2022—have injured and continue to injure Empyreal, as described below.

310. Defendants' continued retention of the seized cash since the seizures constitute an ongoing injury to Empyreal, as described below.

311. Defendants' ongoing efforts to forfeit the seized cash constitutes an ongoing injury to Empyreal, as described below.

312. Defendants' ongoing policy, pattern, or practice of stopping and searching Empyreal vehicles, and then seizing their contents, constitutes an ongoing injury to Empyreal, as described below.

313. Defendants' ongoing campaign targeting Empyreal vehicles for interception or interdiction, followed by the seizure and attempted forfeiture of their contents, constitutes an ongoing injury to Empyreal, as described below.

314. Empyreal is being injured by being regularly subjected to pretextual stops, which unnecessarily delay and inconvenience its drivers and their vehicles, subject its drivers to additional legal hazards and dangers from unnecessary interaction with law enforcement, and violate the constitutional rights of both Empyreal and its drivers.

315. Empyreal is being injured by having the license plate numbers of its vehicles entered into LPRs by the DEA for the purpose of "smash[ing]" Empyreal "all day long . . . until they just go to submission" by using LPRs to identify Empyreal vehicles and target them for pretextual traffic stops and warrantless searches and seizures.

316. Empyreal is being injured by being regularly subjected to warrantless searches without reasonable suspicion or probable cause, which unnecessarily delay and inconvenience its drivers and their vehicles, subject its drivers to additional legal hazards and dangers from unnecessary interaction with law enforcement, and violate the constitutional rights of both Empyreal and its drivers.

317. Empyreal was injured by the seizure of approximately $165,620 in cash on May 18, 2021, which rendered it unable to perform a service—transportation of cash—for which it had been contracted by its clients.

318. Empyreal was injured by the necessity of reimbursing its clients for the approximately $165,620 in cash seized on May 18, 2021.

319. Empyreal is injured by the continued inability to complete this contracted-for service as one or more of the Federal Defendants continue to retain the cash seized on May 18, 2021.

320. Empyreal is and will continue to be injured by the cost of contesting the forfeiture of the approximately $165,620 in cash seized on May 18, 2021, in order to secure its return.

321. Due to the May 18 seizure, Empyreal has re-routed its services for medical cannabis dispensaries in Kansas City, Missouri in order to avoid traveling through the State of Kansas, including Dickinson County, at substantial expense. This is particularly inconvenient because Kansas City, Missouri sits on the Kansas border, and is primarily served by I-70, which runs through Kansas, for westbound travel.

322. Empyreal was injured by the seizure of approximately $700,000 in cash on November 16, 2021, which rendered it unable to perform a service—transportation of cash—for which it had been contracted by its clients.

323. Empyreal was injured by the necessity of reimbursing its clients for the approximately $700,000 in cash seized on November 16, 2021.

324. Empyreal is injured by the continued inability to complete this contracted-for service as one or more of the Federal Defendants continue to retain the cash seized on November 16, 2021.

325. Empyreal was injured by the seizure and destruction of its property on November 16, 2021, requiring Empyreal to repair the vehicle's severely damaged security features.

326. Empyreal is and will continue to be injured by the cost of contesting the forfeiture of the approximately $700,000 in cash seized on November 16, 2021, in order to secure its return.

327. Empyreal was injured by the seizure of approximately $350,000 in cash on December 9, 2021, which rendered it unable to perform a service—transportation of cash—for which it had been contracted by its clients.

328. Empyreal was injured by the necessity of reimbursing its clients for the approximately $350,000 in cash seized on December 9, 2021.

329. Empyreal is injured by the continued inability to complete this contracted for service as one or more of the Defendants continues to retain the cash seized on December 9, 2021.

330. Empyreal is and will continue to be injured by the cost of contesting the forfeiture of the approximately $350,000 in cash seized on December 9, 2021, in order to secure its return.

331. Empyreal is injured by the Sheriff and one or more Federal Defendants seizing and covering the interior and exterior security cameras on its vehicles during the November 16 and December 9 seizures, which improperly interferes with Empyreal's property, impairs Empyreal's ability to protect and safeguard its property, and inhibits Empyreal's ability to gather facts about the incident to both defend against the forfeiture of the seized property and to pursue vindication of its statutory and constitutional rights, including through this lawsuit.

332. Because of these five stops of Empyreal vehicles, three of which occurred in an eight-week period, Empyreal reasonably believes it is being targeted by the Federal Defendants.

333. Because of the two recent seizures in San Bernardino County, and three stops of Empyreal vehicles by Sheriff's deputies in an eight-week period, Empyreal reasonably believes it is being targeted by Sheriff Dicus and the San Bernardino County Sheriff's Department.

334. Being subject to repeated, ongoing stops, searches, and seizures by Defendants unjustifiably infringes on Empyreal's constitutionally protected rights and liberty interests, including its right to be free from unreasonable searches and seizures and its right to due process of law.

335. Being subject to repeated, ongoing stops, searches, and seizures by Defendants is extremely disruptive and costly to Empyreal and seriously jeopardizes Empyreal's ability to serve its clients, including medical cannabis businesses and non-cannabis clients.

336. For example, prior to the May 18 seizure, Empyreal had planned to start offering services for non-cannabis clients in three Midwestern states. But, upon information and belief, based on the May 18 seizure, law-enforcement agencies in those states have begun to keep a lookout for Empyreal vehicles to stop, search, and seize their contents. Because of this real risk of harassment and property loss, Empyreal has been unable to start offering services for non-cannabis customers in those three Midwestern states.

337. Being subject to repeated, ongoing stops, searches, and seizures by Defendants causes reputational harm and makes Empyreal's clients less likely to engage in business with Empyreal in the future.

338. Empyreal has lost business opportunities and potential clients because of the Kansas and California seizures.

339. For example, Empyreal lost a potential client—the Colorado franchisee of a major fast-food chain—because of concerns the potential client had arising from the May 18 seizure.

340. Empyreal's competitors have used the Kansas and California seizures as a selling point for why Empyreal's clients and potential clients should do business with them instead, including in posts on social media websites such as LinkedIn.

341. As a result of the reputational harm Empyreal has suffered from the Kansas and California seizures, Empyreal is reasonably concerned that potential financial investors or business partners will be reluctant to invest in or enter into business relationships with Empyreal.

342. Being targeted for repeated, ongoing stops, searches, and seizures by Defendants threatens the viability of Empyreal's entire cash-in-transit business model.

343. Because of Defendants' actions against Empyreal vehicles in San Bernardino County, Empyreal has been forced to suspend its business operations in San Bernardino County and reroute other Southern California routes to avoid San Bernardino County, at serious and unquantifiable financial loss.

344. Suspending business operations in San Bernardino County has been particularly costly to Empyreal because Empyreal was building a vault and currency processing facility in San Bernardino County and has had to suspend further construction and planned operations from that facility. Empyreal had already spent approximately $100,000 on renovations to its planned location in San Bernardino County and is incurring expenses of approximately $21,000 per month in rent and utilities.

345. Losing the ability to open and operate the San Bernardino County currency processing facility has impacted Empyreal's operations outside San Bernardino County, because that location was to be Empyreal's currency processing facility serving all of Southern California, and Empyreal has had to reroute Southern California routes that would have delivered to that facility at considerable expense.

346. Empyreal's ability to meet the demands of its existing clients to expand its services in California is dependent on both being able to continue operations in

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

San Bernardino County and on being able to serve Southern California from its San Bernardino County currency processing facility.

347. Empyreal's projected future revenue growth in California is dependent on both being able to continue operations in San Bernardino County and on being able to serve Southern California from its San Bernardino County currency processing facility.

348. If Empyreal continues to have its vehicles stopped, searched, and seized by Defendants in California, Empyreal will have to suspend its business operations in California, at serious financial loss.

349. Suspending business operations in California will be particularly costly to Empyreal, because approximately 20% of Empyreal's business—over $3.5 million in 2021—originates in California, and Empyreal projects that revenue to more than double in 2022.

350. If Empyreal continues to have its vehicles stopped, searched, and seized nationwide by the Federal Defendants, and their task forces and partners in local or state law enforcement agencies, Empyreal will have to cease lawful business operations for financial institutions, and their customers, involved in state-legal medical cannabis and adult-use cannabis operations. Ending these services would severely impact Empyreal's business.

## CLAIMS

### Count I – *Ultra Vires* Actions by Sheriff Dicus

**Sheriff Dicus Has No Statutory Authority to Seize, Retain, or Forfeit Plaintiff's Property or the Property Plaintiff is Transporting**

351. Plaintiff hereby incorporates paragraphs 1-350 by reference.

352. Sheriff Dicus's repeated searches and seizures of lawfully obtained property are *ultra vires* because they not authorized by state law.

353. The authority vested in a sheriff in California is set out in Cal. Gov't Code §§ 26600–16.

354. Specifically, a sheriff is authorized to "preserve peace" and "to accomplish this object may sponsor, supervise, or participate in any project of crime prevention, rehabilitation of persons previously convicted of crime, or the suppression of delinquency." Cal. Gov't Code § 26600.

355. In pursuit of this goal, a sheriff is authorized to "arrest and take before the nearest magistrate for examination all persons who attempt to commit or who have committed a public offense." Cal. Gov. Code § 26601.

356. No provision of California law authorizes a sheriff to search and seize property where there is no evidence of criminal activity.

357. "A governmental agency that acts outside of the scope of its statutory authority acts *ultra vires* and the act is void." *Cal. DUI Laws. Ass'n v. Cal. Dep't of Motor Vehicles*, 20 Cal. App. 5th 1247, 1264, 229 Cal. Rptr. 3d 787, 800 (2018).

358. Empyreal's business operations—transporting cash for state-legal dispensaries and financial institutions—are expressly protected by California law. *See* Cal. Bus. & Prof. Code § 26260(a) ("An entity that . . . **transports cash** or financial instruments, or provides other financial services **does not commit a crime** under any California law . . . solely by virtue of the fact that the person receiving the benefit of any of those services engages in commercial cannabis activity as a licensee pursuant to this division.") (emphasis added).

359. For both the November 16 seizure and the December 9 seizure, and the January 6 stop, Sheriff Dicus and his office had no reason to believe that Empyreal was engaged in activity that is criminal under California law.

360. In fact, Sheriff Dicus and his office were presented with ample information showing that Empyreal was engaged in lawful activity protected by California law.

361. Sheriff Dicus and his office, working in conjunction with one or more of the Federal Defendants, nevertheless seized and retained approximately $1,050,000 in cash over the course of the two seizures.

362. Whenever Sheriff Dicus and his department act as they did during the November 16 and December 9 seizures—seizing and retaining the proceeds of state-licensed cannabis industry businesses that are operating lawfully under California law—their conduct is *ultra vires* and unlawful.

363. Whenever Sheriff Dicus and his department act as they did during the November 16 and December 9 seizures—seizing and retaining property while it is being legally transported pursuant to Cal. Bus. & Prof. Code § 26260(a)— their conduct is *ultra vires* and unlawful.

364. Whenever Sheriff Dicus and his department act as they did during the November 16 and December 9 seizures and the January 6 stop—stopping, searching, and/or seizing vehicles that they believe are legally transporting cannabis proceeds pursuant to Cal. Bus. & Prof. Code § 26260(a)—their conduct is *ultra vires* and unlawful.

365. Any future stops, searches, or seizures of Empyreal vehicles or their contents by Sheriff Dicus and his department done on the same basis as the November 16 and December 9 seizures or the January 6 stop will also be *ultra vires* and unlawful.

366. As a direct and proximate result of Sheriff Dicus' and his department's ongoing *ultra vires* acts, Empyreal's property and the property of its clients was unlawfully seized, causing Empyreal substantial injury.

367. As a direct and proximate result of Sheriff Dicus' and his department's ongoing *ultra vires* acts, Empyreal has had to suspend its operations in San Bernardino County.

368. Until Sheriff Dicus and his department cease acting in this *ultra vires* manner toward Empyreal, and Empyreal can be assured that these stops, searches, and seizures will no longer occur in San Bernardino County, Empyreal will be unable to resume operations in San Bernardino County.

369. But for the ongoing *ultra vires* acts of Sheriff Dicus and his department, Empyreal would resume its operations in San Bernardino County.

370. Plaintiff is entitled to protection from the ongoing *ultra vires* actions by the Sheriff directed at its vehicles and their contents.

## Count II – *Ultra Vires* Actions by the Federal Defendants

**The Federal Defendants Have No Statutory Authority to Seize, Retain. or Forfeit Plaintiff's Property or the Property Plaintiff is Transporting**

371. Plaintiff hereby incorporates paragraphs 1-350 by reference.

372. The Federal Defendants' participation in any law enforcement activity that results in the seizure of cash in transit in Empyreal's possession that was collected from state authorized medical marijuana businesses is *ultra vires* and unlawful.

373. The Federal Defendants may not "draw[] [Money] from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7.

374. Congress has explicitly limited the Federal Defendants' authority to enforce the Controlled Substances Act as it applies to state authorized medical marijuana use by exercising its appropriations power in the Consolidated Appropriations Act of 2021, via a rider known as the Rohrabacher-Farr Amendment.

375. Through its constitutional power, Congress has withheld all funding for any activities that interfere with a state's implementation of their medical marijuana laws. Consolidated Appropriations Act 2021, Pub. L. No. 116-260, § 531, 134

Stat. 1283 (2020) (amended Dec. 3, 2021) ("None of the funds made available under this Act to the Department of Justice may be used, with respect to any of the [listed states] to prevent any of them from implementing their own laws that authorize the use, distribution, possession, or cultivation of medical marijuana."); *United States v. McIntosh*, 833 F.3d 1163, 1172 (9th Cir. 2016) ("Congress has enacted an appropriations rider that specifically restricts DOJ from spending money to pursue certain activities.").

376. The Federal Defendants are prohibited from spending funds for law enforcement activities against those engaged in conduct permitted by state medical marijuana laws and who fully complied with such laws. *McIntosh*, 833 F.3d at 1177.

377. Moreover, prospective relief is available against DOJ and DOJ agencies for actions that violate the spending prohibition of the Rohrabacher-Farr Amendment. *See Sierra Club v. Trump*, 929 F.3d 670, 695–96 (9th Cir. 2019) ("'Appellants . . . can seek—and have sought—to enjoin [an agency] from spending funds' contrary to Congress's restrictions." (emphasis omitted) (quoting *McIntosh*, 833 F.3d at 1172)).

378. California and Missouri have both authorized the use of medical marijuana and the establishment of businesses to distribute and sell medical marijuana to customers.

379. Empyreal's cash-in-transit business provides a financial infrastructure for the depositing of cash proceeds that is essential to implementing the medical marijuana laws in California and Missouri and has been expressly authorized by California law.

380. Missouri only licenses medical cannabis businesses, so all of the cash proceeds in the May 18 seizure were from state-legal medical cannabis businesses.

381. The state-licensed medical cannabis businesses whose proceeds were seized in the May 18 seizure operate in strict compliance with Missouri's medical cannabis laws.

382. By participating in the May 18 seizure, and the subsequent forfeiture of the seized cash, the Federal Defendants have violated the spending prohibition of the Rohrabacher-Farr Amendment.

383. Seven of the eight cannabis businesses whose proceeds were seized in the November 16 and December 9 seizures in San Bernardino County hold medical cannabis licenses.

384. The state-licensed medical cannabis businesses whose proceeds were seized in the November 16 and December 9 seizures operate in strict compliance with California's medical cannabis laws.

385. By participating in the November 16 and December 9 seizures, and any subsequent forfeiture of the seized cash, the Federal Defendants have violated the spending prohibition of the Rohrabacher-Farr Amendment.

386. Most of Empyreal's clients who operate in the cannabis industry hold medical cannabis licenses, so there is a high likelihood that any future seizure of cash proceeds being transported by Empyreal vehicles will involve funds from state-legal medical cannabis businesses.

387. All of Empyreal's clients who hold medical cannabis licenses operate in strict compliance with their respective state's medical cannabis laws, as demonstrated by their continued possession of medical cannabis licenses in good standing in their respective states.

388. None of the Defendants have offered any allegations, let alone evidence, of any specific noncompliance by any of Empyreal's medical cannabis clients with their respective state medical cannabis laws.

389. None of the Defendants have offered any allegations, let alone evidence, of any specific noncompliance by Empyreal with any state's medical cannabis laws.

390. In fact, Empyreal's business is not regulated by the cannabis laws of any state.

391. Empyreal does not violate the cannabis laws of any state.

392. Empyreal therefore operates in strict compliance with the medical cannabis laws of every state in which it operates.

393. No state medical cannabis law requires licensed medical cannabis businesses to use separate cash-in-transit providers from other businesses, including licensed adult-use cannabis businesses.

394. Empyreal therefore does not violate any state medical cannabis laws by providing cash-in-transit services for both state-licensed medical cannabis dispensaries and state-licensed adult use cannabis dispensaries (or non-cannabis businesses).

395. Empyreal is thus in strict compliance with the medical cannabis laws of California and Missouri, as well as every other state in which it operates, even when it transports proceeds from state-licensed medical cannabis dispensaries and state-licensed adult use cannabis dispensaries on the same trip.

396. The Federal Defendants' participation in the seizure and/or forfeiture of proceeds from state-legal medical marijuana businesses being transported by Empyreal causes federal funds to be spent without congressional appropriation.

397. Any time spent on any activity by the Federal Defendants incurs a cost to the United States, no matter how de minimis, and there is no good faith and mistake exception to the Appropriations Clause. *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012) ("The Appropriations Clause prevents Executive Branch officers from even inadvertently obligating the Government to pay money without statutory authority.").

398. For instance, any time spent conducting interdiction or traffic stops on vehicles suspected of containing cash proceeds from state-legal medical marijuana businesses by federal agents or task force officers, or any time spent processing the seizures or forfeitures of such funds, is an expenditure of federal funds.

399. Any direct costs spent by federal agencies or task forces—including the fuel cost of traveling to seizure locations, or the costs of transporting, counting, and storing any seized cash proceeds from state-legal medical marijuana businesses—is also the expenditure of federal funds.

400. Neither the Attorney General nor any other federal official can take an action that exceeds the scope of their constitutional and/or statutory authority.

401. Each time the Federal Defendants—including federal task force officers and any joint task forces or investigations—participate in activities that result in the seizure or forfeiture of proceeds that originated from state-legal medical marijuana transactions, this violates Congress' command in the Consolidated Appropriations Act 2021 and is thus *ultra vires* and unlawful.

402. Any future participation by the Federal Defendants—including federal task force officers and any joint task forces or investigations—in the seizure or forfeiture of proceeds that originated from state-legal medical marijuana transactions, this violates Congress' command in the Consolidated Appropriations Act 2021 and is thus *ultra vires* and unlawful.

403. Any future seizures of Empyreal vehicles or their contents involving the Federal Defendants on the same basis as the May 18, November 16, or December 9 seizures will also be *ultra vires* and unlawful.

404. As a direct and proximate result of the Federal Defendants' ongoing *ultra vires* acts, Empyreal's property and the property of its clients was unlawfully seized, causing Empyreal substantial injury.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

405. As a direct and proximate result of the Federal Defendants' ongoing *ultra vires* acts, Empyreal has stopped operating in Kansas and has had to find other routes to transport proceeds from state-legal medical cannabis businesses in Missouri.

406. As a direct and proximate result of the Federal Defendants' ongoing *ultra vires* acts, Empyreal's ability to resume operating in San Bernardino County, and to continue operating in California, in Missouri, and nationwide, is seriously jeopardized.

407. If the Federal Defendants continue their ongoing *ultra vires* actions toward Empyreal, Empyreal will be forced to suspend operations not just in San Bernardino County, but in California, Missouri, and possibly nationwide.

408. Plaintiff is entitled to protection from the ongoing *ultra vires* actions by the Federal Defendants directed at its vehicles and their contents.

## **Count III – Fourth Amendment Violations by Sheriff Dicus**

### **42 U.S.C. § 1983; U.S. Const., Amends. IV, XIV**
### **Sheriff Dicus and the Sheriff's Department Are Violating the Fourth Amendment**

409. Plaintiff hereby incorporates paragraphs 1-350 by reference.

410. The Fourth Amendment generally requires a warrant to stop, search, or seize an individual or their property.

411. Even when a warrant is not required, the Fourth Amendment prohibits officers from conducting stops, searches, or seizures without articulable, individualized reasonable suspicion or probable cause of criminality.

412. Pretextual vehicle stops without articulable, individualized reasonable suspicion or probable cause of criminality violate the Fourth Amendment.

413. The stops of Empyreal vehicles were pretextual and were really for the purpose of searching the vehicles and seizing their cash contents for forfeiture.

414. The pretextual nature of the stops is demonstrated by, for example, the fact that not a single traffic citation was issued to an Empyreal driver for any of the traffic stops.

415. Even when an officer lawfully stops a vehicle for a valid traffic violation, the stop may not be prolonged beyond the time needed for that traffic-violation stop without at least reasonable suspicion.

416. No reasonable suspicion existed to extend any of the November 16, December 9, or January 6 traffic-violation stops.

417. Even when an officer lawfully stops a vehicle for a valid traffic violation, the officer may not search or seize any property in the vehicle without probable cause.

418. The warrant obtained for the November 16 search and seizure of the Empyreal vehicle and its contents was not supported by probable cause.

419. No warrant was obtained for the December 9 search and seizure of the Empyreal vehicle or its contents.

420. No warrant was obtained for the January 6 stop and search of the Empyreal vehicle.

421. The Sheriff has twice searched Empyreal's vehicles and seized the currency they were transporting because deputies believed the currency was the "illicit proceeds of unlawful drug sales."

422. But the state-licensed sale of cannabis is lawful under California law.

423. The transport of cannabis proceeds (including in localities where dispensaries are prohibited) is lawful under California law.

424. Empyreal lawfully transports the state-lawful proceeds of state-lawful product sales, and its business is expressly legal under California statute. *See* Cal. Bus. & Prof. Code § 26260(a).

425. The Fourth Amendment prohibits the Sheriff from stopping, searching, or seizing Empyreal's personnel or property without reasonable suspicion or probable cause of criminality.

426. To search property related to cannabis or cannabis proceeds, the Sheriff must have probable cause to believe that the property is associated with or is the proceeds of cannabis sales that violate state law.

427. To seize property related to cannabis or cannabis proceeds, the Sheriff must have probable cause to believe that the property is associated with or is the proceeds of cannabis sales that violate state law.

428. The Sheriff is engaged in ongoing stops, searches, and seizures of Empyreal's personnel and property, and currency being transported by Empyreal, based on allegations that the currency is the proceeds of cannabis sales that violate state law, or is related to money laundering or tax evasion.

429. But the Sheriff has no probable cause to believe that Empyreal's property, or any currency being transported by Empyreal, is associated with or is the proceeds of cannabis sales that violate state law.

430. The Sheriff also has no probable cause to believe that Empyreal's property, or any currency being transported by Empyreal, is related to money laundering or tax evasion.

431. The Sheriff is thus engaged in ongoing violations of the Fourth Amendment by stopping, searching, and seizing Empyreal's personnel and property, and currency being transported by Empyreal, without reasonable suspicion or probable cause of criminal activity.

432. Plaintiff is entitled to protection from any future stops, searches, and seizures by the Sheriff without reasonable suspicion or probable cause to believe that Empyreal's property, or any currency being transported by Empyreal, is associated with criminal activity.

## Count IV – Fourth Amendment Violations by the Federal Defendants

### U.S. Const., Amend. IV
### The Federal Defendants are Violating the Fourth Amendment

433. Plaintiff hereby incorporates paragraphs 1-350 by reference.

434. The Fourth Amendment generally requires a warrant to stop, search, or seize an individual or their property.

435. Even when a warrant is not required, the Fourth Amendment prohibits officers from conducting stops, searches, or seizures without articulable, individualized reasonable suspicion or probable cause of criminality.

436. The Fourth Amendment does not permit law enforcement officers to ignore the probable cause requirement for searches and seizures and attempt to develop *post hoc* justifications for those searches and seizures—that is, to do as Special AUSA Colin Wood recommended to Deputy Robinson: "take it . . . and we'll argue about it."

437. The Fourth Amendment's reasonableness requirement constrains officers' discretion, and their conduct is judged by balancing intrusions on individuals' security in their persons, property, and privacy against legitimate government interests.

438. The Fourth Amendment's reasonableness requirement imposes a minimum of reasonable suspicion or probable cause for officers' stops, searches, or seizures, and in some instances additional or other safeguards are also necessary to ensure that individuals' Fourth Amendment rights are not subject to officers' discretion.

439. The reasonableness of warrantless searches depends on the specific enforcement needs and privacy interests at issue.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

440. No warrant was obtained for the search and seizure of Empyreal's vehicles or their contents for the May 18 seizure or the December 9 seizure.

441. No warrant was obtained for the May 17 stop and search or the January 6 stop and search of Empyreal's vehicles.

442. Federal law prohibits Federal Defendants from spending funds "to prevent [all states that have legalized medical marijuana use] from implementing their own laws that authorize the use, distribution, possession, or cultivation of medical marijuana." Consolidated Appropriations Act 2021, Pub. L. No. 116-260, § 531, 134 Stat. 1283 (2020) (amended Dec. 3, 2021).

443. Federal law protects private entities operating medical cannabis businesses under state law and empowers them to enjoin prosecutions on this basis if they can show they were legally operating under state law.

444. The Federal Defendants' conduct invades Empyreal's security in its persons, property, and privacy and does not serve any legitimate government interest.

445. The Federal Defendants' conduct is unreasonable, and thus violates the Fourth Amendment, because even if the Federal Defendants did have probable cause to seize the cash contents of Empyreal's vehicles for violation of federal controlled substances laws, actually seizing or forfeiting that property would exceed Federal Defendants' authority because that conduct would improperly "prevent [states] from implementing their own laws that authorize the use, distribution, or cultivation of medical marijuana."

446. It is not reasonable for Federal Defendants to coordinate and/or participate in the stop, search, and seizure of vehicles transporting state-legal medical cannabis proceeds that Federal Defendants are forbidden from spending any federal funds to interfere with. Therefore, those stops, searches, and seizures violate the Fourth Amendment.

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

447. It is not reasonable for the Federal Defendants to coordinate and/or participate in the stop, search, and seizure of vehicles based on transparently bogus legal theories such as the notion that the interstate transportation of bank deposits to legitimate financial institutions constitutes money laundering, bulk cash smuggling, or somehow violates state cannabis laws.

448. It is not reasonable for the Federal Defendants to coordinate and/or participate in the stop, search, and seizure of vehicles because those vehicles are transporting proceeds of activities that are legal in the state where they took place because those activities are not legal in states where the proceeds are being transported. This violates the Full Faith and Credit Clause of the U.S. Constitution.

449.  It is not reasonable for the Federal Defendants to coordinate and/or participate in the stop, search, and seizure of vehicles when the motivation for that conduct is to "smash" Empyreal into "submission" and "crush" Empyreal because they can "take [the money] . . . and we'll argue about it" after the seizure. Such *post hoc* justifications and mere speculation of criminal activity are abhorrent to the Fourth Amendment.

450. The Federal Defendants are engaged in ongoing violations of the Fourth Amendment by coordinating and/or participating in the unreasonable stops, searches, and seizures of Empyreal's personnel and property, and the seizure and forfeiture of property entrusted to Empyreal for transport to financial institutions.

451. Plaintiff is entitled to protection from any future Fourth Amendment violations by the Federal Defendants arising from their coordination of, or participation in, unreasonable stops, searches, and seizures of Empyreal vehicles, and the seizure and forfeiture of their contents, as described above.

## Count V – Due Process Violations by Sheriff Dicus

**42 U.S.C. § 1983, U.S. Const., Amend. XIV**
**The Sheriff's Seizure of Plaintiff's Property was Motivated by an**
**Unconstitutional Profit Incentive in Violation of the Fourteenth Amendment**

452. Plaintiff hereby incorporates paragraphs 1-350 by reference.

453. The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution requires that government deprivations of property occur only through neutral and objective actors.

454. It is a violation of due process for enforcement processes to be infected with personal or institutional financial interests.

455. The Sheriff has a significant financial incentive in stopping, searching, and seizing Empyreal's vehicles and the money transported within them, creating actual bias, the potential for bias, and/or the appearance of bias.

456. The Sheriff receives up to 80% of the money forfeited through civil forfeiture following seizures processed through DOJ's equitable sharing program.

457. On information and belief, these profits are used to pay for Sheriff's Department salaries, equipment, facilities, and/or other benefits.

458. These financial interests distort the Sheriff's decision-making in investigating potential wrongdoing and enforcing the laws of the State of California.

459. The financial interests incentivize the Sheriff to stop, search, and seize Empyreal's vehicles and the money transported within them for reasons other than enforcing the laws of the State of California and regardless of equities or justice.

460. For instance, the financial interests incentivize the Sheriff to stop, search, and seize Empyreal vehicles and the money transported within them even though Empyreal's business is in full compliance with California's cannabis laws.

461. Because Empyreal's business is in full compliance with California laws, the Sheriff does not have any law-enforcement purpose for stopping, searching, and seizing Empyreal's vehicles or the money transported within them.

462. In fact, the Sheriff would be unable to seize and pursue civil forfeiture of the cash proceeds transported by Empyreal's vehicles absent DOJ's equitable sharing program because the cash proceeds come from businesses operating lawfully under California law.

463. If the Sheriff's intent is to investigate and pursue cannabis-related operations out of compliance with state law, then he would investigate accordingly, but instead, the Sheriff's interest in these stops, searches, and seizures is the profits his department receives after the funds are forfeited through civil forfeiture.

464. If the Sheriff were motivated by proper law-enforcement objections, instead of profits, he would simply investigate the dispensaries themselves to ensure their compliance with California's cannabis laws, instead of stopping, searching, and seizing Empyreal's vehicles and the money transported within them.

465. Because of these financial incentives, the only "enforcement" effort the Sheriff is taking against the state-legal cannabis businesses whose cash proceeds Empyreal is transporting is seizing and forfeiting those proceeds.

466. Absent these financial incentives, the Sheriff would have no reason to behave in this manner.

467. Absent DOJ's equitable sharing program, the Sheriff would be unable to behave in this manner.

468. Absent these financial incentives, the Sheriff would not stop, search, and seize Empyreal's vehicles and the money transported within them.

469. In other words, these financial incentives are the sole motivation for the Sheriff's Department to conduct actual highway robberies—where Empyreal's armored vehicles are pulled over on threat of force, their vaults are forcibly

opened, and the cash contents are forcibly taken—in cooperation with federal agencies and task forces.

470. Plaintiff is entitled to protection from highway robberies, regardless of whether they are conducted by criminals or by the Sheriff and federal law-enforcement agencies acting under color of law.

471. Plaintiff is entitled to protection from these profit-incentivized stops, searches, and seizures and to relief for the harms Plaintiff has already endured as a result of the profit-incentivized stops, searches, and seizures it has been subjected to until now.

## Count VI – Due Process Violations by the Federal Defendants

**U.S. Const., Amend. V**
**Federal Defendants' Seizure of Plaintiff's Property was Motivated by an Unconstitutional Profit Incentive in Violation of the Fifth Amendment**

472. Plaintiff hereby incorporates paragraphs 1-350 by reference.

473. The Due Process Clause of the Fifth Amendment to the U.S. Constitution requires that government deprivations of property occur only through neutral and objective actors.

474. It is a violation of due process for enforcement processes to be infected with personal or institutional financial interests.

475. The Federal Defendants have a significant financial incentive in stopping, searching, and seizing Empyreal's vehicles and the money transported within them, creating actual bias, the potential for bias, and/or the appearance of bias.

476. The Federal Defendants retain at least 20% of the money forfeited through civil forfeiture following seizures made under DOJ's equitable sharing program.

477. On information and belief, these profits are used to pay for Federal Defendants' salaries, equipment, facilities, and/or other benefits.

478. These financial interests distort the Federal Defendants' decision-making in investigating potential wrongdoing and enforcing the laws of the United States.

479. The financial interests incentivize the Federal Defendants to coordinate the stop, search, and seizure of Empyreal's vehicles and the money transported within them for reasons other than enforcing the laws of the United States and regardless of equities or justice.

480. For instance, the financial interests incentivize the Federal Defendants to coordinate the stop, search, and seizure of Empyreal vehicles and the money transported within them instead of simply investigating or taking enforcement action against businesses that might be operating unlawfully, if they genuinely believe them to be operating in violation of federal law. Instead, the Federal Defendants have concocted counterfactual narratives based on nothing more than speculation in order to justify the seizure and forfeiture of funds from the bailee of these businesses despite the absence of any concrete justification for doing so. As Special AUSA Colin Wood stated: "I think – I think I'd take it . . . And we'll – and we'll argue about it."

481. Because of these financial incentives, the only "enforcement" effort the Federal Defendants are taking against the state-legal cannabis businesses whose cash proceeds Empyreal is transporting is seizing and forfeiting those proceeds.

482. Absent these financial incentives, the Federal Defendants would have no reason to behave in this manner.

483. Absent these financial incentives, the Federal Defendants would not coordinate the stop, search, and seizure of Empyreal's vehicles and the money transported within them.

484. These financial interests incentivize the Federal Defendants to interfere with state-legal medical cannabis industries, even though they have been forbidden by Congress from spending any federal funds on such activities.

485. These financial interests incentivize the Federal Defendants to focus only on seizing and forfeiting the legitimate cash proceeds of state-legal cannabis proceeds generated by sales at legitimate, state-licensed dispensaries and transported by a legitimate cash-in-transit service in a means expressly legalized by state statute rather than pursuing genuine criminal activity that actually poses a danger to public safety.

486. In other words, these financial incentives are the sole motivation for Federal Defendants to coordinate actual highway robberies—where Empyreal's armored vehicles are pulled over on threat of force, their vaults are forcibly opened, and the cash contents are forcibly taken—in conjunction with state and local law-enforcement agencies and task forces.

487. Plaintiff is entitled to protection from highway robberies, regardless of whether they are conducted by criminals or by Federal Defendants and other law-enforcement agencies acting under color of law.

488. Plaintiff is entitled to protection from any future profit-incentivized stops, searches, and seizures coordinated by the Federal Defendants.

### REQUEST FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that this Court:

A. Issue declaratory relief against Defendant Sheriff Dicus in his official capacity declaring void as *ultra vires* his detention, search, and seizure of vehicles believed to be involved in the lawful transportation of proceeds from state-legal cannabis businesses, and his seizure of those proceeds, in contravention of California statutes permitting the licensed medical and adult-use sale of cannabis, and California's express statutory protection of Plaintiff's business operations.

B. Issue injunctive relief against Defendant Sheriff Dicus in his official capacity enjoining him from stopping, searching, and seizing vehicles believed to be involved in the lawful transportation of proceeds from state-legal cannabis businesses, and his seizure of those proceeds, in contravention of California statutes permitting the licensed medical and adult-use sale of cannabis and California's express statutory protection of Plaintiff's business operations.

C. Issue declaratory relief against Federal Defendants declaring void as *ultra vires* their participation in the detention, search, and seizure of vehicles believed to be involved in the transportation of proceeds from state-legal medical cannabis businesses, and the seizure and attempted forfeiture of those proceeds, for violating Congress' command against spending funds on such activities contained in the appropriations rider known as the Rohrabacher-Farr Amendment.

D. Issue injunctive relief against Federal Defendants enjoining them from participating in the detention, search, and seizure of vehicles believed to be involved in the transportation of proceeds from state-legal medical cannabis businesses, and the future seizure and attempted forfeiture of those proceeds, for violating Congress' command against spending funds on such activities contained in the appropriations rider known as the Rohrabacher-Farr Amendment.

E. Issue declaratory relief against Defendant Sheriff Dicus in his official capacity, declaring unconstitutional under the Fourth Amendment, as incorporated by the Fourteenth Amendment, his policy, pattern, or practice of unreasonably stopping and searching Plaintiff's vehicles and seizing or retaining the contents of those vehicles, based solely on the actual or suspected presence of cash earned by state-legal cannabis dispensaries.

F. Issue injunctive relief against Defendant Sheriff Dicus in his official capacity enjoining him from unreasonably stopping, searching, seizing, retaining, or forfeiting Plaintiff's vehicles or their contents based solely on the actual or suspected presence of cash earned by state-legal cannabis dispensaries without reasonable suspicion or probable cause.

G. Issue declaratory relief against the Federal Defendants declaring unconstitutional under the Fourth Amendment their policies, patterns, or practices of unreasonably stopping and searching Plaintiff's vehicles, and seizing, retaining, or forfeiting the contents of those vehicles, based on the actual or suspected presence of cash earned by state-legal cannabis dispensaries.

H. Issue injunctive relief against Federal Defendants enjoining them from any future stops, searches, seizures, detentions, or attempted forfeitures of Plaintiff's vehicles or their contents based on the actual or suspected presence of cash earned by state-legal cannabis dispensaries without reasonable suspicion or probable cause.

I. Issue declaratory relief against Defendant Sheriff Dicus in his official capacity declaring unconstitutional under the Fourteenth Amendment of the United States Constitution his seizure of Plaintiff's property—including property being transported by Plaintiff in which it has a possessory interest as a bailee or in which it has a property interest through indemnification of its clients—for the purpose of participation in the DOJ's equitable sharing program because the Sheriff is motivated by an improper financial incentive, and thus deprives Plaintiff of due process of law.

J. Issue injunctive relief against Defendant Sheriff Dicus in his official capacity enjoining him from seizing Plaintiff's property—including property being transported by Plaintiff in which it has a possessory interest as a bailee or in which it has a property interest through indemnification of its clients—for the purpose

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

of participation in the DOJ's equitable sharing program because the Sheriff is motivated by an improper financial incentive, and thus deprives Plaintiff of due process of law.

K. Issue declaratory relief against the Federal Defendants declaring unconstitutional under the Fifth Amendment of the United States Constitution their seizure and forfeiture of Plaintiff's property—including property being transported by Plaintiff in which it has a possessory interest as a bailee or in which it has a property interest through indemnification of its clients—because their actions are motivated by an improper financial incentive, and thus deprive Plaintiff of due process of law.

L. Issue injunctive relief against Federal Defendants enjoining their future seizure or attempted forfeiture of Plaintiff's property—including property being transported by Plaintiff in which it has a possessory interest as a bailee or in which it has a property interest through indemnification of its clients—because their actions are motivated by an improper financial incentive, and thus deprive Plaintiff of due process of law.

M. Enter an award against all Defendants allowing Plaintiff to recover its attorney fees, costs, and expenses in this action under 28 U.S.C. § 2412 and any other applicable provisions of law or equity.

N. Award any further equitable or legal relief the Court may deem just and proper.

Dated: March 16, 2022                    Respectfully submitted,

/s/ Dan Alban
**INSTITUTE FOR JUSTICE**              **KOELLER, NEBEKER, CARLSON &**
Dan Alban (admitted *pro hac vice*)     **HALUCK LLP**
dalban@ij.org                           David C. Bass (Cal. Bar No. 296380)
Kirby Thomas West (admitted *pro hac*   david.bass@knchlaw.com
 *vice*)                                Jerome Satran (Cal Bar. No. 188286)
kwest@ij.org                            jerry.satran@knchlaw.com
901 North Glebe Road, Suite 900         1478 Stone Point Drive, Suite 435
Arlington, VA 22203                     Roseville, CA 95661
(703) 682-9320                          (916) 724-5700
(703) 682-9321 (fax)                    (916) 788-2850 (fax)

*Counsel for Plaintiff*

FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF